**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

THE CATHOLIC BENEFITS ASSOCIA-
TION, on behalf of its members; and BIS-
MARCK DIOCESE,

*Plaintiffs,*

v.

CHARLOTTE BURROWS, Chair of the
United States Equal Employment Oppor-
tunity Commission; and UNITED STATES
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

*Defendants.*

No.

**CBA PLAINTIFFS' VERIFIED COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

1

Table of Contents

I.  NATURE OF THE ACTION ................................................................4

II. JURISDICTION AND VENUE...........................................................9

III. PARTIES ......................................................................................9

    A.  Plaintiffs .................................................................................9

        1. The Bismarck Diocese ..........................................................9

        2. The Catholic Benefits Association .......................................11

        3. The CBA's Associational Standing .......................................14

        B. Defendants .........................................................................18

IV. PLAINTIFFS' CATHOLIC BELIEFS AND PRACTICES RELATED TO ABORTION,
    FERTILITY TREATMENT, AND SEXUALITY .................................18

    A.  Catholic Teaching on Abortion ..................................................19

    B. Catholic Teaching on Artificial Reproductive Technology............................20

    C. Catholic Teaching on Gender Ideology .....................................21

V.  THE PREGNANT WORKERS FAIRNESS ACT, TITLE VII, AND EEOC'S RULES
    FOR EACH ..........................................................................24

    A. The Pregnant Workers Fairness Act ...........................................24

        1. The PWFA Protects Pregnant Women and Their Babies ......................25

        2. EEOC's NPRM Interprets PWFA to Require Accommodation of Abortion
           and Immoral Fertility Treatment.......................................... 28

        3. The EEOC's PWFA Rule Requires Employers to Accommodate Abortion
           and Immoral Fertility Treatment ..........................................30

    B. Title VII and EEOC's Harassment Guidance ................................34

C. The EEOC's PWFA Rule and Harassment Guidance Impose Speech Codes
   Regarding Abortion, Immoral Fertility Treatment, and Transgender Issues ...............36

D. The EEOC's Rejection of Categorial Religious Exemption and Minimization
   of Protections Provided by the Religious Freedom Restoration Act and the First
   Amendment ...............................................................................................................38

E. Enforcement Mechanisms .............................................................................................40

VI. NEED FOR RELIEF.............................................................................................................41

VII. CAUSES OF ACTION ........................................................................................................43

Count I: Administrative Procedure Act - Agency Action Not in Accordance with Law ........... 43

Count II: Administrative Procedure Act - Agency Action In Excess of Statutory Authority
          and Limitations ........................................................................................................44

Count III: Administrative Procedure Act - Agency Action that is Arbitrary, Capricious and an
           Abuse of Discretion ...............................................................................................45

Count IV: First Amendment of Freedom of Speech ..................................................................46

Count V: Religious Freedom Restoration Act ...........................................................................47

Count VI: First Amendment Free Exercise ...............................................................................48

Count VII: First Amendment Church Autonomy ......................................................................50

Count IX: Title VII, 42 U.S.C. §§ 2000e-1(a) and 2000e(j) ....................................................51

VIII.  PRAYER FOR RELIEF ....................................................................................................51

Plaintiffs, the Catholic Benefits Association, on behalf of its members, and the Bismarck Diocese, (collectively, either "Plaintiffs" or "CBA Plaintiffs"), through their attorneys, First & Fourteenth PLLC, allege:

## I.    NATURE OF THE ACTION

1.    Over a ten-day span in April, EEOC issued a series of regulations and enforcement guidelines that ran roughshod over the religious rights of the Catholic employers bringing this lawsuit. First, the EEOC issued a final rule requiring employers to accommodate and not retaliate against women employees seeking abortion or immoral infertility treatments. *See* Implementation of the Pregnant Workers Fairness Act, 89 Fed. Reg. 29,096 (April 19, 2024) ("PWFA Rule").[1] The PWFA Rule requires employers to provide employees with paid leave and other accommodations for seeking an abortion or pursuing immoral infertility treatments. The District Court for the Western District of Louisiana has already preliminarily enjoined this rule to protect the United States Conference of Catholic Bishops and other plaintiffs on June 17, 2024.[2]

2.    Second, the PWFA Rule restricts the speech of Catholic employers by deeming criticism of or even the absence of affirmation for these choices to constitute retaliation.

3.    Third, the EEOC gratuitously provided its preemptive constrictive interpretation of the Religious Freedom Restoration Act ("RFRA")[3] and constitutional defenses those

---

[1] Because the EEOC now interprets the PWFA to impose similar requirements on employers as its April 2024 regulation, this complaint uses the term "PWFA Rule" to include both the regulation and the EEOC's similar interpretation of Title VII.

[2] Mem. Order, *U.S. Conf. of Cath. Bishops v. EEOC*, No. 2:24-cv-00691 (W.D. La.) (June 17, 2024), ECF No. 53.

[3] 42 U.S.C. § 2000bb.

conscientiously opposed to accommodating an employee's abortion or in vitro fertilization ("IVF") might raise. PWFA Rule, 89 Fed. Reg. at 29,148-53.

4.    Finally, the EEOC issued enforcement guidance regarding sexual harassment under Title VII that likewise burdens the free exercise and speech rights of Catholic employers. *See* EEOC Enforcement Guidance on Harassment in the Workplace (April 29, 2024), https://www.eeoc.gov/laws/guidance/enforcement-guidance-harassment-workplace ("Harassment Guidance").[4] EEOC's Harassment Guidance effectively requires Catholic employers to use false pronouns, to avoid speaking the truth regarding human sexuality around certain employees, and to permit opposite-sex employees to intrude into private spaces reserved to those of the other sex.

5.    These were not the only federal government attacks on religious employers. During this same period, the United States Department of Health and Human Services issued regulations forcing Catholic employers to cover abortion and gender transition services in their employee health plans by foreclosing all other options. Nondiscrimination in Health Programs and Activities, 89 Fed. Reg. 37,522 (May 6, 2024). The District Court for the Southern District of Mississippi has already preliminarily enjoined this Rule.[5] The EEOC reinforced this rule by reading Title VII to

---

[4] Because the EEOC now interprets Title VII to impose similar requirements on employers as its April 2024 enforcement guidance regarding sexual harassment, this complaint uses the term "Harassment Guidance" to include both the regulation and the EEOC's similar interpretation of Title VII.

[5] Mem. Op. and Order Granting Plaintiffs Mtn. for Expedited Relief, § 705 Relief, and a Prel. Inj., Tennessee v. Becerra, No. 1:24-cv161-LG-BWR (S.D. Miss.) (July 3, 2024), ECF No. 29.

require coverage of gender transition services. (The CBA has challenged the rules described in this paragraph in a separate lawsuit).[6]

6.    It did not have to be this way. Before this administrative hijacking, Congress passed a law protecting pregnant women in the workplace by requiring employers to provide reasonable accommodations to "known limitations related to pregnancy, childbirth, and related medical conditions" so long as the accommodations do not constitute an undue hardship on the employer. The Pregnant Workers Fairness Act, 42 U.S.C. § 2000gg, *et seq* ("PWFA") filled a gap in federal law, where pregnant women have had limited protections from discrimination, but employers were not generally required to provide common sense accommodations to pregnant workers. These accommodations include workplace accessibility, the ability to take additional bathroom, food, or hydration breaks, temporary lifting accommodations, and leave for medical appointments or childbirth. These low-cost accommodations align with Catholic values that support pregnant women and postpartum mothers.

7.    This laudable addition to federal law was supported by broad bipartisan coalition, including the United States Conference of Catholic Bishops, Democrats for Life of America, and the National Association of Evangelicals.

8.    The PWFA nowhere mentions "abortion," and it nowhere requires employers to accommodate employees seeking an abortion. The text and legislative context make clear that the laudable PWFA has nothing to do with the immoral choice to terminate a pregnancy through direct abortion or to engage in immoral fertility treatments like IFV. The EEOC, undaunted by text or

---

[6] CBA Plaintiffs' Complt, *Cath. Benefits Ass'n v. Becerra*, No. 3:23-cv-203-PDW-ARS (D.N.D., E. Div.) (May 30, 2024), ECF No. 46.

context, hijacked this statute and demanded that Catholic and other employers affirmatively accommodate abortion and immoral fertility treatments.

9.      Those who drafted and passed PWFA repeatedly affirmed it did *not* apply to abortion. Senator Bill Cassidy directly said the proposed law would not "do anything to promote abortion." 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022).

10.     None of the pro-life organizations that supported the PWFA would have done so had it applied to abortion or other immoral infertility treatments that destroy fertilized ova.

11.     The EEOC's rulemaking has betrayed the firm understanding that the PWFA exists to protect pregnant women, postpartum mothers, and their babies–not force religious employers to provide material support for and engage in speech supportive of abortions or immoral fertility treatments. When the EEOC first proposed transforming the PWFA into an abortion accommodation mandate on August 11, 2023, 88 Fed. Reg. 54,714, Regulations to Implement the Pregnant Workers Fairness Act (August 11, 2023) ("PWFA NPRM"), its proposal generated 53,000 critical comments, including from the PWFA's co-sponsors and from organizations that had endorsed the bill.

12.     EEOC ignored these comments, breezed past numerous legal flaws with its proposed interpretation of the PWFA, and published the PWFA Rule that mentions abortion 384 times and went into effect on June 18, 2024.

13.     The PWFA Rule passed on a 3-2 vote, with Commissioner Andre Lucas filing a vigorous statement rejecting EEOC's action. If not corrected, the PWFA Rule will force the CBA Plaintiffs either to violate their Catholic values by providing abortion and IVF accommodation benefits, modifying religious speech and policies, and otherwise acting in ways directly contrary to

their Catholic values, or to suffer enforcement and other adverse actions. The Administrative Procedure Act, the Constitution, and RFRA support immediate injunctive and declaratory relief to prevent this from happening.

14.     As explained in the declarations of Archbishop Bernard Hebda of St. Paul and Minneapolis and Bishop Liam Cary of Baker and the verification of portions of this complaint by Bishop David Dennis Kagan of Bismarck, *see* Exs. E, F, and further detailed in Section IV below, the CBA Plaintiffs cannot, consistent with their faith, support by word or deed or accommodate abortion or immoral fertility treatments, and they cannot, by word or deed affirm or accommodate a gender ideology that would give men access spaces like bathrooms, dressing rooms, or other spaces reserved for women or vice versa. Thus, the EEOC's PWFA Rule and its Harassment Guidance burden their religious exercise.

15.     Failure to comply with the PWFA Rule exposes the CBA Plaintiffs to severe penalties. The EEOC similarly may initiate civil lawsuits and agency enforcement actions that expose them to compensatory damages, punitive damages, and attorneys' fees. 42 U.S.C. § 2000gg-2.

16.     At the same time that the EEOC was rewriting the PWFA, it issued new "enforcement guidance" for sexual harassment under Title VII that purport to apply its seventy year old prohibition of "sex" discrimination to include speech and conduct related to "abortion," "contraception," "gender identity" and to mandate use of false pronouns and improper access to single sex spaces when requested by transgender employees. *See* Harassment Guidance, ¶ II(A)(5). The EEOC's Harassment Guidance is in utter disregard of sincere Catholic beliefs for employers like the CBA Plaintiffs and contrary to RFRA and various constitutional protections.

## II.    JURISDICTION AND VENUE

17.    The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1361 because this action arises under the Constitution and U.S. laws. The Court has jurisdiction to render declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 2000bb-1.

18.    Venue lies in this district under 28 U.S.C. § 1391(e)(1). With its principal office in Bismarck, Plaintiff, the Bismarck Diocese, resides in this district and this division.

## III.   PARTIES

### A. Plaintiffs

### 1. The Bismarck Diocese

19.    The Bismarck Diocese (also known as the Roman Catholic Diocese of Bismarck) is that "portion of the people of God," located in twenty-four counties in western North Dakota, "which is entrusted to [the Bishop of Bismarck] for him to shepherd" in cooperation with his priests. *See* Code of Canon Law, c. 369 (1983). The Diocese carries out the spiritual, educational, and social service mission of the Catholic Church in western North Dakota. Its Bishop is the Most Reverend David Dennis Kagan. He exercises pastoral care and canonical support for more than 93 parishes, missions, and other Catholic ministries within the Diocese.

20.    The Bismarck Diocese is a member of the Catholic Benefits Association.

21.    The Bismarck Diocese has approximately sixty employees and, therefore, is an "employer" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b), and the PWFA, 42 U.S.C. § 2000gg(2).

22.    The Bismarck Diocese has an Office of Family Life whose mission is to foster a culture of life and to proclaim and defend the God-given, inviolable dignity of every person. Because "[h]uman life must be respected and protected absolutely from the moment of conception,"

direct abortion is never permitted. *Catechism of the Catholic Church* ("CCC"), ¶¶ 2270-75 (2d ed. 2016). The Diocese endeavors to support women in reconciliation and spiritual healing after having an abortion. For example, the Office of Family Life runs Project Rachel, a post-abortion ministry that offers hope and healing for those who suffer from the spiritual and emotional pain of abortion and its aftermath.

23.    The Bismarck Diocese teaches that reproductive technologies and procedures like gamete donation that dissociates husband and wife, like artificial insemination that dissociates the sexual act from the procreative act, and like IVF that necessarily destroys fertilized ova are morally unacceptable. CCC, ¶¶ 2275, 2273-79.

24.    The Diocese regularly speaks and teaches regarding Catholic beliefs, including abortion, sex and sexuality, marriage, and the family. This includes the Diocese's monthly newsletter, *Dakota Catholic Action*. The June 2024 issue, for example, includes an article, "A Theological Response to Gender Ideology" that discusses how Catholics should respond to gender ideology. The article makes clear that while "Pope Francis has insisted that the Church accompany those who identify as transgender, provide them with loving pastoral care and respect their dignity, he also has consistently condemned gender ideology, recently calling it 'the ugliest ideology of our time.'" 83 Dakota Catholic Action 6, p. 26 (June 2024), https://files.ecatholic.com/2950/documents/2024/5/June24DCA.pdf?t=1717094882000. "Just as a human person is necessarily composed of both body and soul, so too the person is sexually differentiated as either male or female. Being male or female is not like a garment that one can take on or off, but rather is constitutive of the person. Contrary to the tenets of gender ideology, God did not create non-binary, third sex or gender-fluid beings, but rather a binary complement of male and female." *Id.*

25.    The Diocese does not make accommodation for employees to engage in the violation of the moral teachings of the Church, including respect for human life.

26.    The Diocese does not and will not provide any workplace accommodation for an employee to obtain a direct abortion, an immoral fertility treatment, or transgender affirmation through use of false pronouns or improper access to single sex spaces.

27.    The Diocese will take appropriate adverse employment action against any applicant or employee who encourages another person to obtain a direct abortion, immoral fertility treatment, or transgender affirmation through use of false pronouns or improper access to single sex spaces or to request an accommodation for a direct abortion.

28.    The Diocese will take appropriate adverse employment action against any applicant, employee, or former employee whose speech, advocacy, or conduct undermines Catholic teachings about direct abortion, immoral fertility treatment, or transgender affirmation through use of false pronouns or improper access to single sex spaces.

29.    The Diocese adheres to the teachings of the Catholic Church regarding gender transition and the use of false pronouns stated by Archbishop Hebda in paragraphs 8 through 21 of his declaration attached as Exhibit F.

**2.  The Catholic Benefits Association**

30.    The CBA is a § 501(c)(3) nonprofit, non-stock corporation and Catholic ministry. Its certificate of incorporation states that it is "organized for charitable purposes" that are "consistent with Catholic values, doctrine, and canon law." Specifically, it states that the CBA is organized "[t]o support Catholic employers … that, as part of their religious witness and exercise, provide health or other benefits to their respective employees in a manner that is consistent with Catholic values"; and "[t]o work and advocate for religious freedom of Catholic and other employers

seeking to conduct their ministries and businesses according to their religious values." *See* Ex. A, Amended and Restated Certificate of Incorporation of the Catholic Benefits Association ("CBA Articles"), art. IV.

31.     Archbishop William E. Lori of Baltimore is chairman of the CBA's board of directors.

32.     Nine of the CBA's directors are Catholic archbishops or bishops. They are Archbishop Gregory M. Aymond of New Orleans, Archbishop Paul S. Coakley of Oklahoma City, Archbishop Salvatore Cordileone of San Francisco, Bishop John T. Folda of Fargo, Archbishop Bernard A. Hebda of Saint Paul and Minneapolis, Archbishop Jerome E. Listecki of Milwaukee, Archbishop William E. Lori of Baltimore, Archbishop Joseph F. Naumann of Kansas City in Kansas, and Archbishop Thomas G. Wenski of Miami. Two of its directors are religious women, Mother Agnes Mary Donovan, S.V., Superior General of the Sisters of Life; and Sister Mary Peter Muehlenkamp, O.P., J.D., In House Counsel for the St. Cecilia Congregation of the Dominican Sisters of Nashville. Other directors are Catholic lay leaders.

33.     The Catholic Benefits Association is itself a Catholic ministry. Its *raison d'être* is to protect the freedom of its members so they might conduct their ministries and their work consistently with Catholic values. This includes the CBA members' freedom to design and implement employment policies and practices, to provide medical services to patients, and to speak, write, preach, and teach with regard to subjects like sex, marriage, abortion, infertility treatment, and gender transition.

34.     All of the CBA's directors, officers, employees, and members are Catholic.

35.     The CBA has a standing Ethics Committee, comprised exclusively of the archbish-ops and bishops on its board. The CBA's Bylaws state:

> The Ethics Committee shall have exclusive authority to review all benefits, prod-ucts, and services provided by the Ministry, its affiliates or subsidiaries, or their respective contractors to ensure such conform with Catholic values and doctrine. If they do not, the committee shall determine the necessary corrections to bring such benefits, products, and services into conformity with Catholic values and doctrine. The decision of the committee shall be final and binding on the Ministry, its board, and its officers . . . .

Ex. B, CBA Third Amended and Restated Bylaws ("CBA Bylaws"), art. 5.14.2.

36.     To be a member of the CBA, an organization must be a Catholic employer as de-scribed in paragraphs 37 and 38, *infra. See* Ex. B, CBA Bylaws, arts. 3.1.1, 3.1.2; *see also* Ex. C, CBA Church or Church Affiliate Employer Membership Application; Ex. D, CBA Private Employer Membership Application.

37.     The CBA Bylaws provide that its nonprofit employer members must be listed in the current edition of *The Official Catholic Directory* or certified by the CBA's secretary as being Cath-olic. Ex. B, art. § 3.1.1.1.

38.     The Bylaws further provide that for-profit employers seeking membership in the CBA can satisfy the membership requirement of being Catholic "only if (i) Catholics (or trusts or other entities wholly controlled by such Catholic individuals) own 51% or more of employer, [and] (ii) 51% or more of the members of the employer's governing body, if any, is comprised of Catholics, and (iii) either the employer's owners or [its] governing body has adopted a written policy stating that the employer commitment" that with "regard to the benefits it provides to its employees, independent contractors, or students, or with regard to the health care services it provides to its patients, the employer shall, as part of its religious witness and exercise, be committed to providing no such benefits or services inconsistent with Catholic values." Ex. B, arts. §§ 3.1.1.2, 3.1.2.

39.     All members of the CBA meet its criteria for being Catholic.

40.     CBA members include 85 Catholic dioceses and archdioceses. Its members total over 1,380 Catholic employers plus 7,100 Catholic parishes.

41.     CBA members include dioceses, parishes, religious orders, schools, charities, colleges, hospitals, and other Catholic ministries along with Catholic-owned businesses.

42.     A substantial portion of its members have fifteen or more employees and, thus, are "employers" within the meaning of PWFA, 42 U.S.C. § 2000gg(2), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).

43.     The PWFA Rule and the Harassment Guidance thus constrain CBA members' ability to form their employees in Catholic values, to direct them consistently with those values, and to speak and act consistently with their sincere Catholic beliefs about abortion, fertility, and human sexuality. They thereby burden the religious exercise of CBA members.

### 3.  The CBA's Associational Standing

44.     The CBA has associational standing to represent its present and future members.

45.     To have associational standing, the Eighth Circuit has held in litigation challenging the EEOC's and HHS's position that Title VII and Section 1557 of the Affordable Care Act require healthcare coverage for gender transitions, that the CBA must, through testimony other than "the organizations' self-description of their membership," identify at least one member who would have standing to sue in its own right. *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 602 (8th Cir. 2022).

46.     This complaint is verified by the CBA's Chief Executive Officer, the Chairman of its Board, and the Bishop of Bismarck. The Bismarck Diocese is a specifically named plaintiff that has suffered the requisite harm from the PWFA Rule and the Harassment Guidance.

47.     In addition, CBA Plaintiffs attaches to this complaint, two declarations from non-plaintiff members of the CBA that specifically identify the following CBA members and that would have standing in their own right and have suffered the requisite harm. These include:

a.     Exhibit E: Declaration of Bishop Liam Cary on behalf of the Diocese of Baker; and

b.      Exhibit F: Archbishop Bernard Hebda on behalf the Diocese of Saint Paul and Minneapolis.

48.     Bishop Cary's declaration explains, among other things, that the PWFA Rule would force Catholic employers to accommodate, facilitate, and accept employee conduct in violation of Catholic teaching on abortion, sex, sexuality, marriage, and family. Because *all* people are imbued by God with dignity, Ex. E, Cary Decl. at ¶ 8, the Church cannot accommodate direct abortion, *id.* ¶¶ 10-13, and will take appropriate adverse employment action for employees who procure or encourage direct abortion, *id.* ¶¶ 13-16. For similar reasons, the Church cannot accommodate or facilitate immoral infertility "treatments" that deprive children of being conceived through the loving act of their parents, as opposed to technicians in a lab, or destroy "excess" embryos created in the process of artificial reproduction. *Id.* ¶¶ 18-21.

49.     Archbishop Hebda explains, in his declaration, that the Harassment Guidance would force Catholic employers to "act against central, unchangeable and architectural teachings of the Catholic faith" by identifying others "by a sex other than their God-gifted sex." Ex. F, Hebda Decl. at ¶ 8. He says, "[t]o call a male a female or vice-versa asserts contrary to that passage from the Book of Genesis that we human beings make ourselves, and that our biological sex and sexual complementarity are 'not good.' It implies also that we are not 'in God's image'– male and female made for mutual gift-giving, permanent love and procreation." *Id.* ¶ 10.

50.     Archbishop Hebda also explains why use of false pronouns as may be requested by a gender-transitioning employee violate Catholic values. He explains that that such a practice is contrary to Catholic values because it:***

      a.       "Contradicts the teachings of the Bible," *id.* ¶¶ 8-9,

      b.       Denies that humans are made in God's image, *Id.* ¶¶ 9-10,

      c.       Denies the "complementary and reciprocal relations between a man and a woman in marriage," *id.* ¶ 9,

      d.       Suggests that "human beings make ourselves," *id.* ¶¶ 10, 17,

      e.       "Contradicts reason and truth," *id.* ¶ 8,

      f.       Denies biological fact, *id.* ¶ 12,

      g.       "Betray[s] our sacred obligation not to knowingly harm other persons," *id.* ¶¶ 8, 15-16,

      h.       Requires Catholic employers to lie, *id.* ¶¶ 13-14,

      i.       Lessens our understanding of the nature of God, *id.* ¶ 11, and

      j.       Requires a Catholic employer "to avow another religious world view. *id.* ¶¶ 8, 17.

51.     Archbishop Hebda comments further that it would be inconsistent with the faith of Catholic employers to accommodate employee requests that are contrary to Catholic teaching. *Id.* ¶¶ 8-22.

52.     The dioceses of Bismarck, St. Paul and Minneapolis, and Baker each employ more than fifteen individuals. Because of their Catholic values, they oppose providing abortion accommodation; oppose immoral infertility procedure accommodation; and oppose being required to

speak or adopt policies in support of direct abortion, gender transition, immoral infertility procedures, or gender transition. They also oppose any requirement to identify someone, through the use of false pronouns, by a sex other than their God-gifted sex; and they oppose requirements to allow persons of the opposite sex to have access to spaces reserved for the other sex.

53.     Through Bishop Kagan's verification of this complaint and the declarations from two non-plaintiff CBA members, the CBA Plaintiffs have, through sworn testimony, identified to this Court three CBA members by name each of whom has over fifteen employees, each of whom are, because of their Catholic values morally opposed to accommodating access to direct abortion, accommodating immoral fertility treatment such as IVF, referring to someone as a sex other than their biological sex, or allowing persons of the opposite sex to access space reserved for one sex. Accordingly, they have suffered the requisite harm and satisfied other requirements for standing.

54.     The CBA can adequately represent its members' interests. CBA members are similarly situated in that the Defendants' PWFA Rule coerces CBA members to accommodate employees seeking direct abortions and immoral infertility treatment, all in violation of members' sincerely held Catholic beliefs.

55.     The Harassment Guidance harms CBA's members by threatening enforcement for use of pronouns consistent with an employee's God-gifted sex, reserving private spaces to one-sex, and speaking in opposition to the immoral practice of abortion.

56.     The CBA can adequately represent its members' interests. CBA members are similarly situated in that the Harassment Guidance coerces them: to use pronouns contrary to an employee's God-gifted sex, to allow employees of one sex to access private spaces reserved to those

of the opposite sex, and to abstain from speaking, adopting policies, and acting in opposition to the immoral practice of direct abortion or IVF.

57.     The CBA brings this action on behalf of itself and its members who have suffered and will suffer concrete harm as a result of Defendants' actions.

**B. Defendants**

58.     Defendant, Charlotte Burrows, is the Chair of the EEOC, and the EEOC is the federal agency that is responsible for promulgating, administering, and enforcing the PWFA Rule and the Harassment Guidance. She is sued only in her official capacity. The EEOC is responsible for, among other things, investigating complaints and bringing enforcement actions against employers for discrimination "because of … sex" in violation of Title VII. The EEOC is also directed to "provide examples of reasonable accommodations addressing known limitations related to pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg-3.

## IV.   PLAINTIFFS' CATHOLIC BELIEFS AND PRACTICES RELATED TO ABORTION, FERTILITY TREATMENT, AND SEXUALITY

59.     All Plaintiffs and all CBA members are Catholic ministries or Catholic-owned businesses that believe and practice the teachings of the Catholic Church on the nature of the human person, the dignity of humankind, the right to life, the right of conscience and religious freedom, and related ethical issues.

60.     The Catholic Church teaches that all people are created in the image and likeness of God and are thus imbued with human dignity. CCC, ¶ 1701.

61.      It proclaims "the equal dignity of all people, regardless of their living conditions or qualities," Declaration of the Dicastery for the Doctrine of the Faith "Dignitas Infinita" on Human       Dignity       ¶ 17       (Apr.       4,       2024),

18

https://press.vatican.va/content/salastampa/en/bollettino/publico/2024/04/08/240408c.html ("*Dignitatis Infinita*"), because: (1) revelation "holds that the dignity of the human person comes from the love of the Creator, who has imprinted the indelible features of his image on every person (cf. Gen. 1:26)," *id.* ¶ 18; (2) "the dignity of the human person was revealed in its fullness when the Father sent his Son, who assumed human existence to the full: 'In the mystery of the Incarnation, the Son of God confirmed the dignity of the body and soul which constitute the human being,'" *id.* ¶ 19 (citation omitted); and (3) all human beings' "ultimate destiny" is "communion with God, destined to last forever." *Id.* ¶ 20 (cleaned up).

62.     The Church teaches that this belief affects all social, political, and economic relationships. *Id.* ¶ 1.

63.     For example, the Church's teachings against abortion and euthanasia are inextricably paired to its teachings in favor of: a preferential option for the poor, care for migrants, and charity for people with disabilities. *See id.* ¶ 36-40, 47, 51-54.

64.     "[T]he Church . . . ardently urges that *respect for the dignity of the human person beyond all circumstances* be placed at the center of the commitment to the common good and at the center of every legal system." *Id.* ¶ 64 (emphasis original).

A.     **Catholic Teaching on Abortion**

65.     The Catechism of the Catholic Church teaches that life begins at conception and that "[h]uman life must be respected and protected absolutely from the moment of conception." CCC ¶ 2270. Thus, elective or "[d]irect abortion, that is to say, abortion willed either as an end or a means, is gravely contrary to the moral law." CCC ¶ 2271, *see also Dignitas Infinita*, ¶ 47 (quoting John Paul II, Encyclical Letter *Evangelium Vitae* ¶ 58 (March 25, 1995)).

66.     While direct abortion is never permitted for Catholics, medications and medical procedures "that have as their direct purpose the cure of a proportionately serious pathological condition of a pregnant woman are permitted when they cannot be safely postponed until the unborn child is viable," — "even if they will result in the death of the unborn child." United States Conference of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services*, ¶¶ 45, 47 (6th ed. 2018) ("ERD").

67.     Catholics' public witness is especially important regarding abortion.

68.     Accordingly, "[Catholics] need now more than ever to have the courage to look the truth in the eye and to call things by their proper name, without yielding to convenient compromises or to the temptation of self-deception." *Dignitatis Infinita*, ¶ 47, (citing Is. 5:20).

69.     "Especially in the case of abortion, there is a widespread use of ambiguous terminology, such as 'interruption of pregnancy,' which tends to hide abortion's true nature and to attenuate its seriousness in public opinion." *Id.*

70.     Catholic believe they must speak accurately about the nature of abortion. *Id.*

**B.  Catholic Teaching on Artificial Reproductive Technology**

71.     The Catechism of the Catholic Church, expresses that the sexual relationship between spouses is more than mere biology, John Paul II, Apostolic Exhortation, *Familiaris Consortio* ¶ 11 (1981), and the conception of a child is the most serious role of spouses, involving co-creation with God and holding that each child is to be received as a gift from the Creator. CCC ¶¶ 2367, 2378.

72.     The Catechism acknowledges the sorrow caused by infertility and supports the use of some reproductive technologies that restore normal fertility to marital intercourse, CCC ¶ 2375), preserving its unitive and procreative purposes, ERD ¶ 38.

73.     However, methods that involve third parties (medical technicians, donor gametes, or surrogate wombs); separate fertilization from the conjugal act; or methods that entail conception outside of a marriage recognized as valid by the Church are a violation of the dignity of the persons involved and are gravely immoral. ERD at ¶ 38.

74.     Catholics also cannot participate in fertility treatments like IVF that result in the destruction of fertilized ova.

75.     Accordingly, infertility treatments that support the procreative and unitive nature of marriage, for example hormonal support, are permissible. *Id.* at p. 17, ¶ 38.

76.     This teaching, too, flows from the Church's belief in the human dignity of all people. For example, "the practice of surrogacy violates the dignity of the child," because "the child has the right to have a fully human (and not artificially induced) origin and to receive the gift of a life that manifests both the dignity of the giver and that of the receiver." *Dignitas Infinita* ¶ 49. It also violates the dignity of the couple who hire the surrogate: "the legitimate desire to have a child cannot be transformed into a 'right to a child' that fails to respect the dignity of that child as the recipient of the gift of life." *Id.*

## C.   Catholic Teaching on Gender Ideology

77.     The book of Genesis establishes that God made human beings "in his image, male and female," and declared this to be "good." Genesis 1:27-31. Jesus repeats this scripture in the course of his teachings about the unbreakable complementary and reciprocal relations between a

man and a woman in marriage. Matthew 19:4-6. Furthermore, the Bible uses the image of a man and a woman in marriage to help humans understand God and God's love. In the Old Testament, God refers to himself as the faithful bridegroom. In the New Testament, Jesus also refers to himself as the bridegroom and instructs that men and women are to love him as a bride loves her husband, and to love one another as He loved them. John 13:34. Denying the givenness of male and female, and the family based upon this reciprocal relationship of opposite sexes, thus obscures a central image of God and the love command at the heart of Christianity. It also destroys the anthropological basis for the family, society's source of life, health, stability and progress.

78.    Reason naturally affirms faith on this matter, because God is the author of all reason and creation. Sex is inscribed into every cell in the human body. "Transgender medicine" can change surface appearance but never sex.

79.    Requiring a person to identify another by a sex other than his or her God-gifted sex would be to require such a person to act against central, unchangeable and architectural teachings of the Catholic faith. It would also contradict the teachings of the Bible concerning God's creative sovereignty, contradict reason and truth, and betray our sacred obligation not to knowingly harm other persons, particularly the most vulnerable. The implications are so much greater than whether to utter the words "he" or "she." Instead, to demand that a Catholic deny another's sex is asking him or her to avow another religious worldview.

80.    The sex of men and women is inscribed into every cell in their bodies. Medical intervention can only alter appearances but never sex itself. Scripture forbids lying to another about reality. CCC ¶ 2483.

81.     Catholic teaching affirms that each person's soul is made for the body it inhabits and thus it is never in the "wrong body." In addition, the body is not a mere "thing" to be manipulated by mind or will, like other things in the world. It is, rather, sacred. CCC ¶ 364; U.S. Conference of Catholic Bishops, Committee on Doctrine, *Doctrinal Note on the Moral Limits to Technological Manipulation of the Human Body* 4.

82.     Lying about a person's sex, including through use of false pronouns, also harms vulnerable human beings in many other ways. Lying about sex often serves to confirm a vulnerable person's psychological dysphoria and may interfere with that person's healthy growth and identity formation. Using false pronouns also confounds the psychological process by which people grow to understand themselves, including the distinctions inherent between persons of the opposite sex. Requiring someone to mis-identify another, including by a false pronoun, will knowingly obstruct the other person's development. *See* Congregation for Catholic Education, *"Male and Female He Created Them": Towards a Path of Dialogue on the Question of Gender Theory in Education*, 26, 33, 35.

83.     The Church has recently reemphasized its rejection of "gender theory." *See Dignitas Infinita* ¶ 56 ("Pope Francis has reminded us that 'the path to peace calls for respect for human rights . . . Regrettably, in recent decades, attempts have been made to introduce new rights that are neither fully consistent with those originally defined nor always acceptable. They have led to instances of ideological colonization, in which gender theory plays a central role; the latter is extremely dangerous since it cancels differences in its claim to make everyone equal.'") (quoting Pope Francis, *Address to Members of the Diplomatic Corps Accredited to the Holy See for the Presentation of New Year's Greetings* (8 January 2024)). "Desiring a personal self-determination, as gender theory prescribes, apart from this fundamental truth that human life is a gift, amounts to a

concession to the age-old temptation to make oneself God, entering into competition with the true God of love revealed to us in the Gospel." *Id.* ¶ 57. "This ideology 'envisages a society without sexual differences, thereby eliminating the anthropological basis of the family.' [But] '[w]e cannot separate the masculine and the feminine from God's work of creation, which is prior to all our decisions and experiences, and where biological elements exist which are impossible to ignore.' Only by acknowledging and accepting this difference in reciprocity can each person fully discover themselves, their dignity, and their identity." *Id.* ¶ 59 (quoting Pope Francis, Apostolic Exhortation *Amoris Laetitia*, ¶ 56, 286 (19 March 2016)).

84.     Requiring a Catholic institution to admit persons of one sex into a space reserved for the opposite sex violates the Catholic theological commitment to modesty—the preservation of respect for the dignity of the person. In many circumstances, such a requirement would also undercut CBA members' concern for an environment safe from embarrassment or misconduct.

## V.     THE PREGNANT WORKERS FAIRNESS ACT, TITLE VII, AND EEOC'S RULES FOR EACH

### A.  The Pregnant Workers Fairness Act

85.     The PWFA was passed by a bipartisan coalition to provide protection for pregnant women seeking workplace accommodations. Prior to this law, federal protections for pregnant workers were limited and patchwork.

86.     There is limited coverage for pregnancy discrimination in Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978 (PDA). Title VII's prohibition on discrimination "because of … sex" includes actions taken "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). And women "affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all

employment-related purposes … as other persons not so affected but similar in their ability or inability to work." *Id.*

87.     Title VII does not require employers to affirmatively accommodate women's pregnancies, childbirth, or pregnancy-related medical conditions unless the employer provides the accommodation to comparator workers who are limited in their ability to work for reasons unrelated to pregnancy. *See Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 229-30 (2015).

88.     The Americans with Disability Act (ADA) requires accommodations for employees experiencing a qualifying disability, 42 U.S.C. S 12112(a), the ADA in general does not treat pregnancy itself as a qualifying disability. *See Gudenkauf v. Stauffer Commc'ns, Inc.*, 922 F. Supp. 465, 473 (D. Kan. 1996) (collecting cases).

89.     The Family Medical Leave Act (FMLA) provides for women to take up to 12 weeks of unpaid leave for a serious health event, including pregnancy or childbirth. *See* 29 U.S.C. § 2612(a)(l)(D). FMLA only applies, however, when the woman has previously worked for the employer for 12 months and employers may terminate the employee taking leave if they do not return at the end of the 12 weeks. 29 USC S 2611 § (2)(A).

####   1.     **The PWFA Protects Pregnant Women and Their Babies**

90.     To address these gaps in coverage for pregnant women in the workplace Congress passed the PWFA in December 2022. *See* Consolidated Appropriations Act, 2023, div. II, Pub. L. No. 117-328, 136 Stat. 4486, 6084 (2022). The PWFA aimed to protect pregnant women in the workforce by requiring employers to provide workplace accommodations for "pregnancy, childbirth, or related medical conditions." *Id.* § 2000gg(4).

91.     Under the PWFA employers are required to accommodate any "known limitation related to the pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg-1(1). A

known limitation is defined as a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." *Id.* § 2000gg(4).

92.     The PWFA also prohibits employers from taking adverse employment actions or denying employment opportunities because an employee requested a reasonable accommodation. Employers may not discriminate against pregnant women who seek an accommodation. Prohibited practices include: (1) refusing to provide reasonable accommodations; (2) forcing an employee to accept an accommodation that is not reasonable; (3) denying employment opportunities because of the employee's need for a reasonable accommodation; (4) forcing an employee to take paid or unpaid leave rather than providing a reasonable accommodation; or (5) taking an adverse employment action against an employee because they requested a reasonable accommodation. *Id.* § 2000gg-1.

93.     A reasonable accommodation might include: enhanced accessibility to the workplace; job restructuring (for example, part-time status, reassignment to vacant position); remote work and telework; the option to change worksites, to take bathroom, food, or hydration breaks; lifting devices, accessing paid leave; preferred parking; unpaid time off for medical appointments or childbirth; and more. *See generally* 88 Fed. Reg. at 54,768 (listing accommodations).

94.     A "qualified employee" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C.A. § 2000gg(6). She remains "qualified" notwithstanding her "inability to perform an essential function … for a temporary period;" "The essential function [cannot] be performed [until] the near future;" or "The employee cannot perform the essential functions unless she is "reasonably accommodated." *Id.*

95.     The PWFA requires employers to engage in an "interactive process" with employees to "determine the appropriate reasonable accommodation." 42 U.S.C. § 2000gg(7).

96.     A consequence of this required "interactive process" is that a Catholic employer is more likely to become aware of an employee's immoral acts that, before the PWFA, might have remain hidden or left undiscussed. Taking an adverse action against the employee in this situation would likely run afoul of the anti-retaliation provision in the PWFA.

97.     The PWFA also bars retaliation and interference against pregnant women: (i) "[n]o person shall discriminate against any employee because such employee has opposed any act or practice made unlawful by this chapter," *id.* § 2000gg-2(f)(1), and (ii) "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of such individual having exercised or enjoyed, or on account of such individual having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." *Id.* § 2000gg-2(f)(2).

98.     Employers with fifteen or more employees are covered by the PWFA. 42 U.S.C.A. § 2000gg(2)(B).

99.     The PWFA provides an exclusion regarding insurance coverage: "Nothing in [the PWFA] shall be construed … by regulation or otherwise, to require an employer-sponsored health plan to pay for or cover any particular item, procedure, or treatment …" 42 U.S.C. § 2000gg-5(a)(2).

100.    The PWFA provides for private enforcement actions from private parties once administrative procedures have been exhausted. In addition, the EEOC has investigative and enforcement powers akin to those in Title VII. 42 U.S.C. § 2000gg-2(a)(1).

101.    The PWFA required the EEOC to adopt regulations by December 29, 2022 and provide examples of reasonable accommodations. 42 U.S.C. § 2000gg-3.

### 2.    The EEOC Proposed Rule Interprets PWFA to Require Employers to Accommodate Abortion and Immoral Infertility Treatment.

102.    The PWFA directed the EEOC to adopt a rule to implement the PWFA by December 29, 2022. 42 U.S.C.A. § 2000gg-3(a). The EEOC promulgated a proposed rule, Regulations to Implement the Pregnant Workers Fairness Act, on August. 11, 2022. 88 Fed. Reg. 54,714 (Aug. 11, 2023).

103.    The NPRM stated that "having … an abortion" is included in the "examples of pregnancy, childbirth, or related medical conditions." *Id.* at 54,774. The implications of mandating direct abortion accommodations are immense: covered employers would be required to support and devote resources, including by providing extra leave time, to assist employees' decision to terminate fetal life. *Id.* at 54,730.

104.    The EEOC proposed to define "pregnancy, childbirth, and related medical conditions" as including "current pregnancy; past pregnancy; potential or intended pregnancy [which can include infertility, fertility treatment, and the use of contraception]; labor; and childbirth …" *Id.* at 54,767. The following non-exhaustive list provides examples of conditions that are, or may be, ''related medical conditions'': termination of pregnancy, including via miscarriage, stillbirth, or abortion." *Id.*

105.    The proposed rule would require an employer to accommodate an employee's medical needs even when she seeks direct abortion or IVF, or other services contrary to Catholic values by engaging in an interactive process to become aware of the employee's condition and desires and how to reasonably accommodate them. *Id.*

28

106.     As to IVF, the NPRM asserts that an employee seeking time off or requesting leave "for IVF treatment" would be protected as a related medical condition. 88 Fed. Reg. at 54,720. Likewise, the NPRM considered how a "schedule change" may be required for an employee to "attend a round of IVF appointments" *Id.* at 54,782, *see also* 54,733, 54,774. The NPRM leaves no doubt: employers will be required to provide accommodation, including leave and schedule changes, to facilitate IVF treatment.

107.     The NPRM generated substantial comments opposing the radical expansion of the PWFA statute to include conduct, from direct abortion to IVF, that were not included in the statute passed by Congress. As the EEOC recognized, approximately 54,000 comments urged "the Commission to exclude abortion from the definition of 'pregnancy, childbirth, or related medical conditions.'" 89 Fed. Reg. 29,096, 29,104.

108.     Comments critical of the EEOC's proposed abortion accommodation revision included many key supports of the PWFA legislation, such as lead sponsor Senator Bill Cassidy; other leading legislative proponents, like Representative Virginia Foxx; as well as the United States Conference for Catholic Bishops, The Christian Employers Alliance, Comment Letter on PWFA Proposed Rule, 2 (Oct. 10, 2023), https://downloads.regulations.gov/EEOC-2023-0004-97876/attachment_1.pdf; and The Alliance Defending Freedom, Comment Letter on PWFA Proposed Rule, 4-9 (Oct. 2, 2023), https://downloads.regulations.gov/EEOC-2023-0004-49357/attachment_1.pdf.

109.     As co-sponsor, Senator Cassidy's comment highlighted that the sponsors of the legislation understood that the PWFA did not apply to abortion, as clearly expressed by Democrat co-sponsor Bob Casey's statement that "under the act … the EEOC, could not—could not—issue

any regulation that requires abortion leave." 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022) (Sen. Casey statement). In the face of unmistakable decision by Congress *not* to mandate leave for abortion as part of the PWFA, the EEOC did just that.

110.    In fact, no Member of Congress who supported the PWFA ever claimed the law would cover abortion. And given the well-known political realities, if the proposed law would have included abortion, it would have drastically changed the bi-partisan coalition of support for the PWFA.

### 3.    The EEOC's PWFA Rule Requires Employers to Accommodate Abortion and Immoral Infertility Treatment

111.    The EEOC was unphased by the overwhelmingly broad opposition to the NPRM adding abortion to the PWFA. The PWFA Rule published April 19, 2024 mentions "abortion" 348 times, and in substance, implements the abortion accommodation and fertility treatment accommodations for IVF that were covered in the PWFA Rule.

112.    As in the NPRM, the EEOC expands the definition of "pregnancy, childbirth, or related medical conditions" to include "termination of pregnancy, including ... abortion" and "fertility treatment" *See* 89 Fed. Reg. at 29,183, 29 CFR § 1636.3(b). Fertility treatment, according to the EEOC, includes treatments for immoral infertility treatments like IVF. *Id.* at 29,102, 29,190 ("An employee who requests leave for in vitro fertilization treatment for the employee to get pregnant has a limitation, either related to potential or intended pregnancy or a medical condition related to pregnancy [difficulty in becoming pregnant or infertility], and is seeking health care related to, affected by, or arising out of it.").

113.    This unnatural interpretation of the PWFA lacks any basis in the text of the recently passed statute which says nothing about abortion or IVF treatment. Likewise, the expansion of the

PWFA to cover activities widely recognized as inconsistent with the Catholic faith contradicts the robust legislative history that evinces a broad coalition of bipartisan supporters who understood that the pro-woman and pro-baby legislation had nothing to do with abortion or immoral infertility treatments.

114.    Contrary to the plain meaning of the PWFA text and confirming legislative history, the EEOC contends the "plain meaning" of the statute, including "pregnancy, childbirth, or related medical conditions', 89 Fed. Reg. at 29,106, requires abortion to be covered since the Commission has interpreted 'pregnancy, childbirth, or related medical conditions' in Title VII to include the decision to have—or not to have—an abortion and to prohibit discrimination in employment practices because an employee had or did not have an abortion." *Id.* This reflects the "plain meaning" of the phrase since "[b]y definition, individuals who are choosing whether or not to have an abortion are pregnant." *Id.*

115.    This meaning, interpreting a "known limitation" that "relates to pregnancy, childbirth, or related medication conditions" to include direct abortion, was not plain to any supporter of the PWFA in Congress. The intentional termination of pregnancy is not a *limitation* or *condition* relating to pregnancy.

116.    The EEOC supported its pro-abortion interpretation of the PWFA by pointing to its nonbinding enforcement guidance issued in 2015 regarding pregnancy discrimination under Title VII that claimed pregnancy discrimination "includes abortions." *Id.* at 29,106 n.65 (citing EEOC, *Enforcement Guidance on Pregnancy Discrimination and Related Issues,* at ¶ (I)(A)(4)(c) (2015), https://www.eeoc.gov/laws/guidance/enforcement-guidance-pregnancydiscrimination-and-related-issues). Unlike the PWFA itself, the EEOC promulgated rule lacks any substantive

rulemaking authority under Title VII. Because EEOC expanded the PWFA to require accommodation for abortion, the prohibition against retaliation, under the EEOC's interpretation of the PWFA, restricts speech activity related to abortion. Because "a request for a reasonable accommodation," would cover direct abortion, the request would "constitute activity" under the retaliation prohibition of 42 U.S.C § 2000gg-2. *See* 89 Fed. Reg. at 29,188. The PWFA, according to the EEOC, would prohibit CBA's members from disciplining an employee or taking any adverse action on account of the employee seeking and obtaining a direct abortion, requesting resources in the form of an accommodation to get a direct abortion, encouraging other employees to seek a direct abortion, or speaking out against the CBA member's religious policies with regard to abortion.

117.   The EEOC interprets the PWFA prohibition on harassment as applying to employee handbooks or policies that reject any effort to seek a direct abortion. It also may require employees to limit speech that would oppose any employee seeking an accommodation for getting a direct abortion or seeking immoral infertility treatment as a form of prohibited "harassment."

118.   Two EEOC commissioners did not vote for the PWFA Rule, and one published a rare statement expressing dissent from the 3-2 final vote. Commissioner Andrea Lucas concluded the PWFA Rule "cannot reasonably be reconciled with the text" of the PWFA. Statement p.1, https://www.linkedin.com/posts/andrea-lucas-a5b27513_a-lucas-statement-re-vote-re-pwfa-final-activity-7185711161609232387-GtB1/. And the "Commission paradoxically interprets a statute requiring employers to accommodate a worker's pregnancy and childbirth into a provision that also requires accommodation of a worker's inability to become pregnant." *Id.* p.7.

119.    Since the PWFA Rule was published, several states and religious groups have filed legal challenges to the rule. *See Texas v. Garland*, 2024 WL 967838 (N.D. Tex. Feb. 17, 2014) (enjoining administrative or other adjudication of PWFA claims against State of Texas because Congress, having passed the bill through proxy voting, violated the quorum rule in U.S. Const., art. I, sec. 5); *Tennessee et al v. EEOC*, No. 24-cv-84 (E.D. Ark. April 25, 2024); *Louisiana et al. v. EEOC*, No. 24-cv-00629 (W.D. La. May 13, 2024); *United States Conference of Catholic Bishops et al. v. EEOC*, No. 24-cv-691 (W.D. La. May 22, 2024).

120.    The U.S. District Court for the Western District of Louisiana recently issued a preliminary injunction finding that "the EEOC has exceeded its statutory authority to implement the PWFA and, in doing so, both unlawfully expropriated the authority of Congress." *Id.*, ECF #53 at 2. That court noted: "The Court's inquiry starts with the fact that the PWFA makes no reference to abortion: it does not contain the word 'abortion' even once…. The decision to obtain purely elective abortion is not undertaken to treat a 'medical condition' related to pregnancy or childbirth … the EEOC's arguments to the contrary amount to little more than semantic gymnastics." *Id.*, ECF #53 at 18, 20.

121.    That court likewise addressed the legislative history as contravening the EEOC's novel interpretation of the PWFA:

> [T]he Court sees this issue as even more straightforward. "Abortion" is a term that is readily understood by everyone. If Congress had intended to mandate that employers accommodate elective abortions under the PWFA, it would have spoken clearly when enacting the statute, particularly given the enormous social, religious, and political importance of the abortion issue in our nation at this time (and, indeed, over the past 50 years). The Court is therefore not persuaded, on the record before it, that Congress could reasonably be understood to have granted the EEOC the authority to interpret the scope of the PWFA in a way that imposes a nationwide mandate on both public and private employers – irrespective of applicable abortion-related state laws enacted in the wake of *Dobbs* – to provide workplace accommodation for the elective abortions of

33

employees.

*Id.*, ECF #53 at 20.

**B.  Title VII and EEOC's Harassment Guidance**

122.    Title VII makes it unlawful for an employer to discriminate against an employee or prospective employee "because of such individual's … sex." 42 U.S.C. § 2000e-2(a)(1).

123.    Title VII applies to employers with fifteen or more employees." 42 U.S.C. § 2000e(b).

124.    The U.S. Census Bureau estimates that there are over 875,000 employers in the United States with fifteen or more employees.[7]

125.    Title VII contains an exemption for religious employers. It states that Title VII "shall not apply" to a religious organization's "employment of individuals of a particular religion." *See* 42 U.S.C. § 2000e-1(a). The statute defines "religion" broadly to include "all aspects of *religious observance and practice*, as well as belief." 42 U.S.C. § 2000e(j) (emphasis added).

126.    Congress enacted the Pregnancy Discrimination Act in 1978 to further define what constitutes "sex" discrimination under Title VII. It specified that the terms "because of sex" or "on the basis of sex" include "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

---

[7] *See 2017 SUSB Annual Data Tables by Establishment Industry*, U.S. Census Bureau (Mar. 2020), https://web.archive.org/web/20200307131234/https://www.census.gov/data/tables/2017/econ/susb/2017-susb-annual.html (select "U.S. and states, NAICS sectors, small employment sizes less than 500" for statistics on firm size measured by number of employees).

127.    Concurrent with EEOC promulgating the PWFA Rule on April 19, 2024, it adopted its Harassment Guidance under Title VII that *inter alia* purports to make certain transgender conflicts subject to Title VII employment discrimination protections. *See* Harassment Guidance.

128.    Title VII makes it unlawful for an employer to "discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Discrimination "because of … sex" has long covered sexual harassment. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986).

129.    The Harassment Guidance addresses many scenarios that may properly be understood as violating Title VII's prohibition on employment discrimination. However, EEOC also sought to expand Title VII to cover potential employment conflicts for areas unrelated to "sex" discrimination that would burden sincere religious beliefs of many employers, including CBA's members.

130.    In particular, the Harassment Guidance seeks to apply Title VII to cover three scenarios that contravene sincere Catholic beliefs of CBA members about human sexuality, namely, (1) the use of private spaces traditionally reserved to single sex, (2) the use of pronouns contrary to biological sex, and (3) the ability to speak about human sexuality. *See* Harassment Guidance at ¶ II(A)(5)(c), (b).

131.    As to the use of private spaces traditionally reserved for a single sex, the EEOC interprets Title VII as prohibiting "harassing conduct" on the basis of "gender identity" to include "the denial of access to a bathroom or other sex-segregated facility consistent with the individual's gender identity." *Id.* and n.43. Access to a bathroom traditionally reserved to one sex by a

member of the opposite sex is given emphasis: "In addition to being part of a harassment claim, denial of access to a bathroom consistent with one's gender identity may be a discriminatory action in its own right and should be evaluated accordingly." *Id.*

132.    A Catholic diocese, school, or employer may not insist on reserving private spaces for use by a single-sex, such as a bathroom or locker room, without fear of engaging in unlawful conduct as recently interpreted by the EEOC Harassment Guidance.

### C. The EEOC's PWFA Rule and Harassment Guidance Impose Speech Codes Regarding Abortion, Immoral Fertility Treatment, and Transgender Issues

133.    Public witness to Catholic values on these issues is integral to the work and ministries of CBA members with such witness is through episcopal statements, preaching, teaching, employee handbooks, employer policies, and direct communications with parishioners, employees, and others-.

134.    Under the PWFA Rule and the Harassment Guidance, the EEOC mandates employer communications contrary to Catholic values and prohibits such communications consistent with Catholic values.[8]

135.    The EEOC mandates speech contrary to Catholic values through its false pronoun requirement. The EEOC interprets Title VII to prohibit the "intentional use of a name or pronoun inconsistent with the individual's known gender identity (misgendering)" *Id.* and n.42. The EEOC guidance continues with an "Example 15: Harassment Based on Gender Identity" including "misgendering" as a basis for harassment liability.

---

[8] The communication mandates contrary to Catholic values that are imposed by the PWFA Rule and the Harassment Guidance are collectively be referred to as the "Speech Codes."

136.    Thus, EEOC requires employers to use false pronouns upon an employee's request. Compliance with this requirement by a Catholic employer would violate Catholic values in numerous profound ways as articulated by Archbishop Hebda. *See* Ex. F, Hebda Decl. ¶¶ 8-17.

137.    The EEOC also prohibits employer speech consistent with Catholic values through its Harassment Guidance and its PWFA Rule anti-retaliation provision.

138.    Under the PWFA Rule, the EEOC requires employers to engage in conversation (called the "interactive" process) with their employees who desire an accommodation for the protected procedures. PWFA Rule at 29,128, 29,1896, 29 C.F.R. § 1636.3(h)(2).

139.    The PWFA Rule then bars an employer from taking an adverse action or retaliating against the employee even though she may have disclosed her speech or conduct at odds with the Employer's Catholic values. 42 U.S.C. § 2000gg-1(5); Rule 19,187, (§ 1636.4(e)(1); 42 U.S.C. § 2000gg-2(f)(1); PWFA Rule at 29,188, 29 C.F.R. §§ 1636.1(6) and 1636.5(f).

140.    The EEOC's Harassment Guidance functions similarly. The EEOC interprets Title VII to prohibit, "harassment based on a woman's decision about contraception or abortion." Harassment Guidance at II.A.5.b. Because the EEOC also protects employees' decisions related to immoral fertility treatment and gender transition, the EEOC will treat communications aligned with Catholic values and critical of certain employees' choices about these subjects as constituting harassment.

141.    Accordingly, through its PWFA Rule, its Harassment Guidance, and its interpretations of the PWFA and Title VII, it is the EEOC's policy and official position that Catholic employers' communications, policies, and practices declining to use false pronouns or describing,

teaching, or preaching Catholic values and their preservation of private spaces to one sex may constitute a violation of the PWFA or Title VII.

142.     While the EEOC Harassment Guidance claims it is "not meant to bind the public in any way," it also serves as a substantive resource and guidance when the EEOC and members of the public are assessing the merits of a claim based on harassment and whether to bring enforcement action. The Guidance is a "resource" for EEOC and other federal agencies when "adjudicat[ing]" and "litigat[ing] harassment claims." *Id.* at ¶ I(A). In practice, the Guidance reflects the official position of the EEOC in future enforcement actions. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, (1986) ("while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance") (citation omitted); and *Kroll v. White Lake Ambulance Auth.*, 691 F.3d 809, 815 (6th Cir. 2012) (describing EEOC guidance under ADA "very persuasive authority").

### D.   The EEOC's Rejection of Categorial Religious Exemption and Minimization of Protections Provided by RFRA and the First Amendment

143.     Title VII does "not apply … to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular *religion* to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." (Emphasis added). *Id.* § 2000e-1(a). Title VII then defines "religion" as "includ[ing] *all aspects of religious observance and practice*." 42 U.S.C. § 2000e(j) (emphasis added).

144.     The PWFA incorporates the Title VII religious exemption by reference. See *id.* § 2000gg-5(b).

145.     Thus, the EEOC repeatedly minimizes the scope of this broad religious exemption and limits it to protecting an employer's belief or values but not its religious observance or practice.

*See, e.g.,* 88 Fed. Reg. at 57,747 nn. 193-99 and related text; 89 Fed. Reg. at 29,144-46. In fact, neither the PWFA Rule nor the Harassment Guidance reference Title VII's broad definition of "religion" in 42 U.S.C. § 2000e(j).

146.    In its PWFA Rule, the EEOC instead adopted a cramped interpretation of the religious employer exemption carried over from Title VII into the PWFA, requiring that any religious defense be adjudicated only on a "case-by-case" basis, and further limiting the exemption to cover only religious discrimination. Religious discrimination is not even a form of discrimination covered by the PWFA. *See* 89 Fed. Reg. at 29,146-47. So understood, the statutory exemption Congress placed in the PWFA for religious employers does not apply to *any claim* under the PWFA, since the PWFA does not apply to religious class discrimination (it applies to discrimination related to pregnancy,). According to the EEOC, even if it did apply (which appears impossible), it would only be provide protection on a case-by-case. *Id.* at 29,144-50.

147.    While noting that religious employers have other rights, the EEOC repeatedly provided an extended discussions of the limitations of religious liberty protections under RFRA and the First Amendment. 988 Fed Reg. at 54,747, 89 Fed. Reg. at 29,096, n.8; 29,148-53.

148.    Finally, EEOC emphasizes that nondiscrimination serves a compelling government interest, in its view, which would all but eliminate any protection for religious employers under any of these legal protections. 89 Fed. Reg. at 29,148.

### E.  Enforcement Mechanisms

149.    Whether by EEOC or PWFA enforcement action, class action lawsuit, or employee lawsuit, a successful claim could result in:

      a.  Compensatory damages (including emotional damages and lost wages),

b.  Punitive damages (subject to a damages cap),

c.  Attorneys' fees,

d.  Costs; and

e.  Adverse publicity.

150.   The EEOC has authority to investigate alleged Title VII violations and will ask violators to voluntarily take corrective action for discriminatory behavior. 42 U.S.C. § 2000e-5(a).

151.   The Department of Justice may bring a federal lawsuit to enforce Title VII and the PWFA. *See, e.g.*, 81 Fed. Reg. 31,376, 31,439, 31,441.

152.   The PWFA and Title VII create private rights of action. Accordingly, individuals who believe they have been discriminated against under the PWFA or Title VII, as informed by EEOC's interpretation of both statutes, may bring their own federal lawsuits. These laws can also be enforced by class action suits.

153.   *Punitive damages*: Punitive damages are available under Title VII if the employer acted "with malice or with reckless indifference to the federally protected rights" of an employee. 42 U.S.C. § 1981a(b)(1). Punitive damages are subject to the same statutory caps that are imposed for nonpecuniary losses. *See id.* § 1981a(b)(3).

154.   *Injunctive relief*: Courts may order broad forms of injunctive relief under Title VII, *see* 42 U.S.C. §2000e-5(g)(1); *United States v. Criminal Sheriff, Parish of Orleans*, 19 F.3d 238, 239 (5th Cir. 1994), and may even mandate that employers adopt certain policies, *see, e.g.*, *Morris v. Am. Nat'l Can Corp.*, 730 F. Supp. 1489, 1498 (E.D. Mo. 1989), *aff'd in part, rev'd in part on other grounds*, 952 F.2d 710 (8th Cir. 1991); *Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1541 (M.D. Fla. 1991).

155.    *Attorneys' fees*: Under Title VII, a prevailing party is entitled to costs and attorney's fees. *See* 42 U.S.C. § 2000e-5(k); *id.* § 1988(b); § 2000gg-2.

## VI.    NEED FOR RELIEF

156.    Absent relief from this Court, CBA members and future members with fifteen or more employees are threatened by the EEOC's interpretation of the PWFA and Title VII resulting in the PWFA Rule and the Harassment Guidance to support by word and deed and to become complicit with their respective employees' choices to seek or engage in abortion, immoral fertility treatment, and gender transition in violation of their Catholic convictions.

157.    The PWFA Rule burdens CBA members' Catholic values and religious exercise by requiring them to accommodate employee efforts to engage in abortion and immoral fertility treatments.

158.    The Harassment Guideline burdens CBA members' Catholic values and religious exercise by requiring them to use false pronouns when requested by their employees.

159.    The PWFA Rule's anti-retaliation provision and the Harassment Guideline burdens CBA members' Catholic values and religious exercise by imposing Speech Codes that effectively bar them from teaching, preaching, and speaking, and from adopting and applying policies consistent with Catholic values related to marriage, human life, abortion, fertility, sexuality, and privacy.

160.    The PWFA Rule requires CBA members to change their speech, and/or be silent, to support abortion and immoral infertility treatment. It does so, for example, by requiring CBA members to withdraw their policies and practices against (i) abortion accommodations or advocacy and (ii) immoral infertility treatment, and replace them with policies and procedures that affirm a willingness to accommodate abortion and infertility treatments, prohibit any potentially

"harassing" discussion of abortion or infertility treatments in the workplace, including many potential discussions regarding the moral and religious implications of abortion, and to not "interfere with" "any individual" in the exercise of abortion- or fertility-related rights created by the PWFA Rule.

161.    Similarly, the Harassment Guidance forces CBA's members to change their speech as to sex and gender. For example, they must adopt policies that allow employees to identify themselves as a sex different than their biology and force the employer to use language congruent with the employee's "chosen" sex. Under the Harassment Guidance, CBA members must affirmatively sanction falsehoods related to sex and gender that are directly contrary to Catholic teaching.

162.    The Harassment Guidance burdens CBA members' Catholic values and religious exercise by requiring them to grant access to employee's of one sex to bathrooms, locker rooms, and other spaces reserved to those of the opposite sex.

163.    If CBA's members do not take immediate steps to comply with the PWFA Rule and the Harassment Guidance, they will be under threat of administrative investigations, civil lawsuits, and various penalties if they continue to act a manner that reflect their Catholic convictions.

164.    Absent relief from this Court, CBA members are currently threatened by the PWFA Rule and Harassment Guidance with administrative investigations, civil lawsuits, and various penalties if they continue to act in manner that reflects their Catholic convictions.

## VII.    CAUSES OF ACTION

### COUNT I

### Administrative Procedure Act
### Agency Action Not in Accordance with Law

165.    Plaintiffs incorporate by reference all preceding paragraphs.

166.    Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the PWFA Rule, complained of herein, constitutes "rules" under the APA, *id.* § 551(4), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court," *id.* § 704.

167.    The PWFA Rule is a "rule" under the APA. 5 U.S.C. § 551.

168.    The PWFA Rule is a "final agency action" subject to judicial review. 5 U.S.C. § 704.

169.    The APA prohibits agency actions that are "not in accordance with law, in excess of statutory authority, or limitation, or short of statutory right." *Id.* § 706(2)(A), (C). The PWFA Rule is not in accordance with law for a number of independent reasons.

170.    The PWFA Rule requires employers to accommodate direct abortion and immoral infertility treatments. It is not in accordance with the PWFA, which does apply to abortion or immoral infertility treatments.

171.    EEOC's failure to include in the PWFA Rule a religious exemption protecting Catholic employers for acting consistent with religious beliefs that parallels the religious exemption in Title IX is also not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A).

172.    The PWFA Rule is not in accordance with Catholic values, which requires CBA members to oppose direct abortion and immoral infertility treatment.

173.    The PWFA Rule is not in accordance with law because it violates the First Amendment, Fifth Amendment, and the Religious Freedom Restoration Act.

174.    Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

175.    Plaintiffs have no adequate remedy at law.

176.    Absent injunctive and declaratory relief against the PWFA Rule, the CBA Plaintiffs have been and will continue to be harmed.

## COUNT II

### Administrative Procedure Act
### Agency Action In Excess of Statutory Authority and Limitations

177.    Plaintiffs incorporate by reference all preceding paragraphs.

178.    The APA prohibits agency actions that are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). The PWFA Rule is in excess of statutory jurisdiction, authority, and limitations for a number of reasons.

179.    There is no statutory authority or jurisdiction for EEOC to require religious employers to provide accommodation for direct abortion or immoral infertility treatment.

180.    The PWFA Rule is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

181.    EEOC's decision to interpret the PWFA to require accommodation for direct abortion and immoral infertility treatment is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

182.    EEOC's failure to include a religious exemption in the PWFA Rule that parallels the religious exemption in Title IX is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

183.    The PWFA Rule is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) as violate the First Amendment, Fifth Amendment, and the Religious Freedom Restoration Act, as hereafter described.

184.     Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

185.     Plaintiffs have no adequate remedy at law.

186.     Absent injunctive and declaratory relief against the PWFA Rule and the Harassment Guidance, the CBA Plaintiffs have been and will continue to be harmed.

## COUNT III

### Administrative Procedure Act
### Agency Action Is Arbitrary, Capricious and an Abuse of Discretion

187.     Plaintiffs incorporate by reference all preceding paragraphs.

188.     The APA prohibits agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). The 2016 PWFA Rule is arbitrary and capricious agency action for a number of reasons.

189.     It is arbitrary and capricious for the EEOC to interpret the PWFA to apply to direct abortion or immoral infertility treatment.

190.     It is arbitrary and capricious for the EEOC to interpret the PWFA to restrict religious employers from speaking and acting consistent with religious convictions.

191.     EEOC's failure to include a religious exemption in the Rule that parallels the religious exemption in Title IX is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A).

192.     The PWFA Rule is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) as it violates the First Amendment, Fifth Amendment, and Religious Freedom Restoration Act as hereafter described.

193.     Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

194.    Plaintiffs have no adequate remedy at law.

195.    Absent injunctive and declaratory relief against the PWFA Rule, the CBA Plaintiffs have been and will continue to be harmed.

## COUNT IV

## First Amendment Freedom of Speech

196.    Plaintiffs incorporate by reference all preceding paragraphs.

197.    The Speech Codes bar CBA members from expressing their religious beliefs in opposition to direct abortion, immoral fertility treatments, use of false pronouns, and gender transition.

198.    The Speech Codes require CBA members to use false pronouns contrary to their Catholic values.

199.    The Speech Codes require CBA members to amend their written policies to avoid statements that may be interpreted by EEOC as discouraging employees from seeking a direct abortion, or seeking to use immoral fertility treatment, or gender transition, even if such revisions would be contrary to the longstanding Catholic beliefs and values of CBA members.

200.    The Speech Codes thus violate CBA members' right to be free from compelled speech and mandated speech as secured to them by the First Amendment.

201.    The PWFA Rule's viewpoint discrimination is not justified by a compelling governmental interest.

202.    The EEOC's actions thus also violate CBA members' rights of expressive association as secured to them by the First Amendment of the United States Constitution.

203.    The PWFA Rule's speech requirement is not justified by a compelling governmental interest.

204.    Even if it has a compelling government interest, the PWFA Rule is not narrowly tailored to achieve that interest.

205.    Absent injunctive and declaratory relief against the PWFA Rule, the CBA Plaintiffs have been and will continue to be harmed.

## COUNT V
## Religious Freedom Restoration Act

206.    Plaintiffs incorporate by reference all preceding paragraphs.

207.    CBA members' sincerely held Catholic beliefs oppose providing abortion accommodation, oppose immoral fertility treatment accommodation, oppose any requirement to identify someone by a sex other than their God-gifted sex, and oppose requirements to allow persons of the opposite sex to have access to space reserved for one sex.

208.    CBA members' compliance with these beliefs is a religious exercise.

209.    The PWFA Rule and the EEOC's Harassment Guidance create government-imposed coercive pressure on CBA members to change or violate their Catholic beliefs.

210.    The PWFA Rule and the Harassment Guidance chill CBA members' religious exercise.

211.    The PWFA Rule and the Harassment Guidance expose CBA members to civil suits that would hold them liable for practicing their sincerely held Catholic beliefs.

212.    The PWFA Rule and the Harassment Guidance thus impose a substantial burden on the CBA's and its members' religious exercise.

213.    The PWFA Rule and the Harassment Guidance furthers no compelling governmental interest.

214.    The PWFA Rule and the Harassment Guidance are not the least restrictive means of furthering Defendants' stated interests.

215.    The PWFA Rule and the Harassment Guidance violates the CBA's and its members' rights secured to them by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq.

216.    Absent injunctive and declaratory relief against the PWFA Rule and the Harassment Guidance, the CBA Plaintiffs have been and will continue to be harmed.

## COUNT VI

### First Amendment Free Exercise

217.    Plaintiffs incorporate by reference all preceding paragraphs.

218.    Plaintiffs and CBA members object to being prohibited from opposing providing direct abortion accommodation, opposing immoral fertility treatment accommodation, opposing any requirement to identify someone by a sex other than their God-gifted sex, and opposing requirements to allow persons of the opposite sex to have access to space reserved for one sex, and speaking out in favor of the same.

219.    The PWFA Rule and the Harassment Guidance impose substantial burdens on CBA members by forcing them to choose between their exercise of religion and the avoidance of fines, penalties, liability, and other adverse consequences.

220.    The PWFA Rule and the Harassment Guidance seek to suppress the religious practice of individuals and organizations such as CBA members, while allowing exemptions for similar conduct based on secular and non-religious reasons. Thus, the PWFA Rule and the Harassment Guidance are neither neutral nor generally applicable.

221.    None of the statutes pursuant to which the PWFA Rule and the Harassment Guidance are promulgated is generally applicable. Title VII and the PWFA are not generally applicable because it exempts or does not cover employers that employ fewer than fifteen employees and, as a result, does not apply to millions of employers that together employ hundreds of millions of people. The PWFA is not generally applicable because it categorically exempts employers from being compelled to provide an accommodation if there is an "undue hardship."

222.    The PWFA Rule and the Harassment Guidance are not justified by a compelling governmental interest.

223.    Even if the PWFA Rule and the Harassment Guidance are justified by a compelling government interest, it is not the least restrictive means of achieving that interest.

224.    Defendants' actions thus violate the CBA's and its members' rights secured to them by the Free Exercise Clause of the First Amendment.

225.    Absent injunctive and declaratory relief against the PWFA Rule and the Harassment Guidance, the CBA Plaintiffs have been and will continue to be harmed.

### COUNT VII

### First Amendment Church Autonomy

226.    Plaintiffs incorporate by reference all preceding paragraphs.

227.    Plaintiffs and CBA members object to being prohibited from opposing providing direct abortion accommodation, opposing immoral fertility treatment accommodation, opposing any requirement to identify someone by a sex other than their God-gifted sex, and opposing requirements to allow persons of the opposite sex to have access to space reserved for one sex, and speaking out in favor of the same.

228.    As part of their institutional freedom protected by the First Amendment Doctrine of Church Autonomy, CBA Members may structure their internal governance, policies, relationships, and communications with employees consistently with their Catholic faith, including beliefs about the moral evils of abortion, certain infertility treatment, and matters of sexual identity. The First Amendment protects religious institutions right to make personnel decisions based on religious doctrine.

229.    The PWFA Rule and the Harassment Guidance wrongly interfere with CBA members internal governance, structure, and communications by forcing them to choose between their exercise of religion and the avoidance of fines, penalties, liability, and other adverse consequences.

230.    Defendants' actions thus violate the CBA's and its members' rights secured to them by the Church Autonomy Doctrine of the First Amendment.

231.    Absent injunctive and declaratory relief against the PWFA Rule and the Harassment Guidance, the CBA Plaintiffs have been and will continue to be harmed.

## COUNT IX

### Title VII, 42 U.S.C. §§ 2000e-1(a) and 2000e(j)

232.    Plaintiffs incorporate by reference all preceding paragraphs.

233.    The PWFA Rule and the Enforcement Guidance do not apply to religious entities or societies "with respect to the employment of individuals of a particular religion" or with respect to the employer's religious observance and practice. 42 U.S.C. § 2000e-1(a); 42 U.S.C. § 2000e(j).

234.    As described above, the PWFA Rule and the Harassment Guidance are contrary to the Catholic values, observance, and practice of the CBA Plaintiffs.

235.    Applying those rules to the CBA Plaintiffs violates the religious exemption within Title VII.

236.    Absent injunctive and declaratory relief against the EEOC Statement, the CBA Plaintiffs have been and will continue to be harmed.

## VIII.   PRAYER FOR RELIEF

Wherefore Plaintiffs[9] request that the Court provide declaratory and injunctive relief as follows:

A. Declare that the Pregnant Workers Fairness Act, 42 U.S.C. § 2000gg-1, et seq., and the rule implementing it, Implementation of the Pregnant Workers Fairness Act, 89 Fed. Reg. 29,096 (April 19, 2024) do not require CBA Plaintiffs and members to accommodate an employee's direct abortion, advocacy for abortion, facilitation of an abortion; or an employee's immoral infertility treatments, advocacy for immoral infertility treatments, facilitation of immoral infertility treatments.

B. Declare that the PWFA, the PWFA Rule, Title VII of the Civil Rights Act of 1964 (as amended, 42 U.S.C. § 2000e et seq., and Enforcement Guidance on Harassment in the Workplace (April 29, 2024), https://www.eeoc.gov/laws/guidance/enforcement-guidance-harassment-workplace ("Harassment Guidance") do not require CBA Plaintiffs and members to accommodate their employees' direct abortion or immoral fertility treatments; speak or communicate in favor of the direct abortion, immoral fertility treatments, or gender transition when such is contrary to the Catholic faith; refrain from speaking or

---

[9] Unless indicated otherwise, "Plaintiffs" or "CBA Plaintiffs" as used throughout this lawsuit, does not include one CBA member to the extent that it filed a separate lawsuit seeking relief that overlaps with the relief requested here.

communicating against the same when such is contrary to the Catholic faith; use pronouns inconsistent with a person's biological sex; or allow persons to use private spaces reserved for the opposite sex because this Court finds that such an application of these laws violate CBA members' sincerely held Catholic beliefs without satisfying strict scrutiny under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq. and without complying with Title VII's religious exemption that protects employers' religious practices, 42 U.S.C. § 2000e-1(a) and 42 U.S.C. § 2000e(j);

C.  Declare that the PWFA Rule and Defendants' enforcement of the PWFA Rule or interpreting or applying the PWFA against CBA members violate the Administrative Procedure Act, and that no legal burdens can be assessed against these members for failure to accommodate abortion or immoral infertility treatments, or directly or indirectly facilitate access to abortion or immoral fertility treatment;

D.  Declare that the PWFA Rule and Defendants' enforcement of it against CBA members violate the laws and constitutional provisions described in their causes of action;

E.  Issue a preliminary injunction, and permanent injunction prohibiting:

    a.  The Equal Employment Opportunity Commission, Chair Burrows, their divisions, bureaus, agents, officers, commissioners, employees, and anyone acting in concert or participation with them, including their successors in office, from interpreting or enforcing the PWFA, 42 U.S.C. § 2000gg-1, et. seq., or any implementing regulations thereto against the CBA Plaintiffs and members in a manner that would require them to accommodate direct abortion or immoral infertility treatments, speak in favor of the same or refrain from speaking against the same, including by

otherwise pursuing, charging, or assessing any penalties, fines, assessments, investigations, or other enforcement actions;

b. The Equal Employment Opportunity Commission, Chair Burrows, their divisions, bureaus, agents, officers, commissioners, employees, and anyone acting in concert or participation with them, including their successors in office, from interpreting or enforcing Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., or any implementing regulations thereto against the CBA Plaintiffs and the CBA members in a manner that would require them to speak or communicate in favor of the direct abortion, immoral fertility treatments, or gender transition when such is contrary to the Catholic faith; refrain from speaking or communicating against the same when such is contrary to the Catholic faith; use pronouns inconsistent with a person's biological sex; or allow persons to use private spaces reserved for the opposite sex, including by pursuing, charging, or assessing any penalties, fines, assessments, investigations, or other enforcement actions;

F.  Vacate the PWFA Rule as it includes abortion, immortal infertility treatment, or speech about the same.

G.  Extend the relief above to: CBA Plaintiffs and the CBA present and future members, anyone acting in concert or participation with them;

H.  Declare that to come within the scope of this order, a CBA member must meet the following criteria: (a) the employer is not yet protected from the PWFA, the PWFA Rule, Title VII, and the Harassment Guidelines with regard to the issues described in paragraphs B and E(2) above; (b) the CBA has determined that the employer meets the CBA's strict

membership criteria; (c) the CBA's membership criteria have not substantively changed since the CBA filed this complaint; and (d) the CBA member is not subject to an adverse ruling on the merits in another case involving the PWFA, the PWFA Rule, Title VII, or the Harassment Guidelines with regard to the issues described in paragraphs B and E(2) above;

I.  Declare that the PWFA Rule and Defendants' enforcement of the PWFA Rule or interpreting or applying the PWFA against the CBA and its members violate the Administrative Procedure Act, and that no legal burdens can be assessed against these members for failure to accommodate abortion or immoral infertility treatments, or directly or indirectly facilitate access to abortion or immoral fertility treatments;

J.  Declare that the PWFA Rule and Defendants' enforcement of the Final Rule against CBA members violate the laws and constitutional provisions described in their causes of action;

K.  Award nominal damages.

L.  Award Plaintiffs the costs of this action and reasonable attorney's fees as provided by law, including 28 U.S.C. § 2412(d) and 42 U.S.C. § 1988(b); 42 U.S.C. § 2000gg-2; and

M.  Award such other and further relief as the Court deems equitable and just.


DATED: July 24, 2024.

Respectfully submitted,

L. Martin Nussbaum
Andrew Nussbaum
First & Fourteenth PLLC
2 N. Cascade Ave., Suite 1430
Colorado Springs, CO 80903
(719) 428-2386
martin@first-fourteenth.com
andrew@first-fourteenth.com

and

Michael Francisco
First & Fourteenth PLLC
800 Connecticut Ave NW, Suite 300
Washington, DC 20006
(202) 754-0522
michael@first-fourteenth.com


*Attorneys for Plaintiffs*

**VERIFICATION PURSUANT TO 28 U.S.C. § 1746**

I declare under penalty of perjury that the foregoing allegations, especially those in para-graphs 14, 31, 33, 48-50, and 59-84 pertaining to the teachings of the Catholic Church, Catholic values, and the beliefs, values, and governance of The Catholic Benefits Association are true and correct to the best of my knowledge.

Executed on July **23**, 2024

Most Rev. William E. Lori
Archbishop of Baltimore
Chairman of the Board of The Catholic Benefits Association

**VERIFICATION PURSUANT TO 28 U.S.C. § 1746**

I declare under penalty of perjury that, to the best of my knowledge, that: (1) the foregoing allegations, especially those in paragraphs 14, 30-43, 46-47, 52-57, 156-164, pertaining to The Catholic Benefits Association ("CBA"), it purpose, values, governance, and its members are true and correct; (2)  Exhibits A, B, C, and D are respectively true and accurate copies of the CBA's Amended and Restated Certificate of Incorporation, its Third Amended and Restated Bylaws, its Nonprofit Employer Application for Membership, and its For Profit Employer Application for Membership.

Executed on July 23, 2024

Douglas Wilson, Jr.
Executive Director of the Catholic Benefits Association

**VERIFICATION PURSUANT TO 28 U.S.C. § 1746**

I declare under penalty of perjury that the foregoing allegations, especially those in paragraphs 19-29 pertaining to Bismarck Diocese are true and correct to the best of my knowledge.  I also affirm that, as applied to the Bismarck Diocese, paragraphs 14, 156-164 are true and correct to the best of my knowledge.

Executed on July 23, 2024

Most Rev. David Dennis Kagan
Bishop of Bismarck Diocese