**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

| | |
|---|---|
| THE CATHOLIC BENEFITS ASSOCI-ION, on behalf of its members; BIS-MARCK DIOCESE,<br><br>      *Plaintiffs,*<br>v.<br><br>CHARLOTTE BURROWS, Chair of the United States Equal Employment Opportunity Commission; and UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>      *Defendants.* | No. 1:24-cv-00142-DMT-CRH |

**PLAINTIFFS' MEMORANDUM**
**IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs, the Catholic Benefits Association ("CBA"), on behalf of its members, and the Bismarck Diocese, (collectively, "Plaintiffs" or "CBA Members"), file this memorandum in support of their motion for a preliminary injunction on their claims for violation of the Religious Freedom Restoration Act ("RFRA") and the Administrative Procedure Act ("APA").

## I.  INTRODUCTION

This case challenges portions of two recent EEOC actions that constitute regulatory overreach and burden the CBA Members' religious liberty.  Those actions are EEOC's promulgation of its final rule implementing the Pregnant Workers Fairness Act ("PWFA") and its publication of an enforcement guidance regarding sex harassment under Title VII. The combined effect of EEOC's pronouncements is that they require CBA Members, contrary to their Catholic faith, to accommodate their employees' abortions and immoral fertility treatments, to use false pronouns,

to abstain from expressing Catholic teaching regarding sexual issues, and to give employees of one sex access to private spaces reserved to those of the other sex.

On abortion and fertility treatment, the EEOC took the PWFA, which was originally supported by Catholic bishops and designed to provide accommodations for pregnant and postpartum employees, and regulatorily subverted it to require employers to accommodate employees seeking abortion and immoral fertility treatment. This was done despite the statute making no mention of abortion, and the bill sponsors assuring everyone that the legislation would not cover abortion.

To craft its new Speech Code the EEOC, first, read into Title VII the Enforcement Guidance that an employer commits sexual harassment if it declines to use the false pronouns requested by a transitioning employee. Next, the EEOC drew from both PWFA's anti-retaliation and anti-coercion provisions and Title VII's rule against sexual harassment to require conscientious Catholic employers to abstain from speaking or teaching Catholic beliefs about sexuality lest they be perceived as unwelcome, hostile, coercive, or retaliatory by employees who disagree.

Finally, the EEOC ruled that an employer engages in sexual harassment if it refuses to permit an employee of one sex to have access to private spaces reserved for those of the other sex. Through these actions the EEOC has violated RFRA and the APA.

## II.  BACKGROUND

Plaintiffs are CBA members. Each is a Catholic ministry or Catholic-owned business. Each subscribes to Catholic beliefs on the human sexuality and dignity and the sanctity of life as detailed in the Complaint that is verified by CBA's Chair, Archbishop William Lori of Baltimore and that is amplified in the declarations by Archbishop Bernard Hebda of Saint Paul and Minneapolis and

Bishop Liam Cary of Baker (all incorporated here by reference). Compl. at ¶¶ 22-24, 47-52, 59-84, Compl. Ex. E, Decl. of Bishop Cary, and F, Decl. of Archbishop Hebda.

    A.    <u>Catholic Teaching</u>.

        1.    <u>Catholic teaching on abortion</u>.

"The Catholic Church teaches that all people are created in the image and likeness of God and are thus imbued with human dignity." Compl. at ¶¶ 22-28, 60 (citing Catechism of the Catholic Church [2d ed. 2016] ¶ 1701) ["CCC"]). Because of the sanctity of human life beginning at conception, the Church holds that elective or "[d]irect abortion, that is to say, abortion willed either as an end or a means, is gravely contrary to the moral law." Compl. ¶ 65 (citing CCC ¶¶ 2270-71; *see also* Pope Francis, *Dignitas Infinita*, ¶ 47 (Apr. 4, 2024) (quoting Pope John Paul II, *Evangelium Vitae* ¶ 58 (March 25, 1995)). Catholics believe they must speak accurately about the nature of abortion. Compl. ¶ 70.

        2.    <u>Catholic teaching on artificial reproductive technology</u>.

The Catholic Church teaches that married couples "are called to give life [and]share in the creative power and fatherhood of God," Compl. ¶¶ 23, 71-76; CCC ¶ 2367; and that a child is neither owed nor owned but gift, *id.* ¶ 2378. It teaches that reproductive technologies destroying fertilized ova, involving third parties (medical technicians, donor gametes, or surrogate wombs); separating fertilization from the conjugal act; or entailing conception outside of a valid marriage violate the dignity of the persons involved and are gravely immoral. Compl. ¶¶ 23, 71-76; Compl. Ex. E, Decl. of Bishop Cary ¶¶ 18-22; Ex. F, Decl. of Archbishop Hebda ¶ 21; CCC ¶¶ 2261, 2270-74, 2376-77. Accordingly, Catholics may not support certain fertility treatments including but not limited to IVF, surrogacy, or gamete donation. *Id.*

3.      <u>Catholic teaching on gender ideology, false speech, and private spaces</u>.

The declaration of Archbishop Hebda contains an extended discussion of Catholic teaching regarding gender ideology. Compl., Ex. F ¶¶ 8-17. He begins with the observation that, as a matter of Scriptural revelation, "God made the human race 'in his image, male and female'" and declared this to be "good." *Id.* at ¶ 9 (citing *Genesis* 1:27-31). He notes that this is also biological fact, *Id.* at ¶ 12, and he explains the profound theological significance of this, *Id.* ¶¶ 8-17. Paragraph 50 of the complaint summarizes that gender transition violates Catholic values because it: "contradicts the teachings of the Bible," Compl. Ex. F ¶¶ 8-9; denies that humans are made in God's image, *id.* ¶¶ 9-10; denies the "complementary and reciprocal relations between a man and a woman in marriage," *id.* ¶ 9; suggests that human beings can remake themselves, *id.* ¶¶ 10, 17; "contradicts reason and truth," *id.* ¶ 8; denies biological fact, *id.* ¶ 12; lessens our understanding of the nature of God, *id.* ¶ 11; and "betray[s] our sacred obligation not to knowingly harm other persons," *id.* ¶¶ 8, 15-16. Archbishop Lori and Bishop Cary both affirm this summary. Ex. E, ¶ 23.

While the use of a transitioning employee's preferred but false pronouns may seem a matter of courtesy, it is, for CBA employers, an affirmation of these errors inherent in gender ideology.

Furthermore, not only does "Scripture and basic human kindness forbid lying, *id.* ¶ 13 (citing CCC ¶ 2483), *Exodus* 20:15, *Deuteronomy*. 5:20; but to require CBA members to mis-identify another, including by a false pronoun, is "to demand that [they] knowingly obstruct another's development. *Id.* ¶ 15 (citing Vatican Congregation for Catholic Education, *"Male and Female He Created Them": Towards a Path of Dialogue on the Question of Gender Theory in Education*, 26, 33, 35).

In addition, Archbishop Hebda notes that "requiring a Catholic institution to admit persons of the opposite sex into a space reserved for one sex violates the Catholic theological commitment to modesty—the preservation of respect for the dignity of the person." Compl. Ex. F at ¶ 18.

B.    The Pregnant Workers Fairness Act and the PWFA Rule.

The PWFA was passed to provide protection for pregnant women seeking workplace accommodations. *See* Consolidated Appropriations Act, 2023, div. II, Pub. L. No. 117-328, 136 Stat. 4486, 6084 (2022) (codified at 42 U.S.C. § 2000gg et seq.). Prior to this law, federal protections for pregnant workers were limited and patchwork. The PWFA aimed to protect pregnant women and new mothers in the workforce by requiring employers to accommodate any "known limitation[s] . . . related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." 42 U.S.C. §§ 2000gg(4), 2000gg-1.

The PWFA prohibits employers from taking adverse employment actions or denying employment opportunities because an employee requested a reasonable accommodation related to pregnancy. Employers may not discriminate against pregnant women who seek an accommodation. Prohibited practices include: (1) refusing to provide reasonable pregnancy accommodations; (2) forcing an employee to accept a pregnancy accommodation that is not reasonable; (3) denying employment opportunities because of the employee's need for a reasonable pregnancy accommodation; (4) forcing an employee to take paid or unpaid leave rather than providing a reasonable pregnancy accommodation; or (5) taking an adverse employment action against an employee because they requested a reasonable pregnancy accommodation. *Id.* § 2000gg-1.

A reasonable accommodation for pregnancy might include: enhanced accessibility to the workplace; job restructuring (for example, part-time status, reassignment to vacant position);

remote work and telework; the option to change worksites, to take bathroom, food, or hydration breaks; lifting devices, accessing paid leave; preferred parking; unpaid time off for medical appointments or childbirth; and more. *See* 88 Fed. Reg. 54,714, 54,768 (Aug. 11, 2023) ("NPRM").

The PWFA also bars retaliation and interference against pregnant women: (i) "[n]o person shall discriminate against any employee because such employee has opposed any act or practice made unlawful by this chapter," 42 U.S.C. § 2000gg-2(f)(1), and (ii) "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of such individual having exercised or enjoyed, or on account of such individual having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." *Id.* § 2000gg-2(f)(2).

The PWFA applies to employers with fifteen or more employees, 42 U.S.C. § 2000gg(2)(B), and it incorporates the Title VII religious exemption. See *id.* § 2000gg-5(b). The PWFA provides for private enforcement actions from private parties. In addition, the EEOC has investigative and enforcement powers akin to those in Title VII. 42 U.S.C. § 2000gg-2(a)(1).

        1.    <u>The EEOC's Notice of Proposed Rulemaking interprets PWFA to require employer accommodation of abortion and immoral fertility treatment</u>.

One year ago, the EEOC promulgated a proposed rule. It stated that "having . . . an abortion" is included in the "examples of pregnancy, childbirth, or related medical conditions." 99 Fed. Reg. at 54,774. The implications of mandating direct abortion accommodations are immense: covered employers would be required to support and devote resources, including by providing extra leave time, and to assist employees' decisions to terminate their unborn child. *Id.* at 54,730.

The NPRM defines "pregnancy, childbirth, and related medical conditions" as including "current pregnancy; past pregnancy; potential or intended pregnancy . . ." with "related medical

conditions . . . including but not limited to, termination of pregnancy, . . . abortion;  infertility; fertility treatment . . ." *Id.* at 57,767 (to be codified at 29 C.F.R. § 1646.43(b)).[1]

The NPRM would require an employer to accommodate an employee's medical needs even if she seeks direct abortion or immoral fertility treatment even though both are contrary to Catholic values. The NPRM generated substantial comments opposing the radical expansion of the PWFA to include conduct, from direct abortion to immoral fertility treatments, that was not included in the statute passed by Congress. As the EEOC recognized, approximately 54,000 comments urged "the Commission to exclude abortion from the definition of 'pregnancy, childbirth, or related medical conditions.'" 89 Fed. Reg. 29,096, 29,104 (April 19, 2024).

> 2.  <u>The PWFA Rule mandates employer accommodation of abortion and immoral fertility treatment.</u>

The EEOC, unphased by this substantial opposition to the proposed inclusion of abortion to the PWFA, did just that in its final rule.  *See* Implementation of the Pregnant Workers Farness Act, 89 Fed. Reg. 29,096 (April 29, 2024) ("PWFA Rule"). The PWFA Rule implements the previously proposed abortion and fertility treatment accommodations, and where the statute was silent regarding abortion, the PWFA Rule mentions "abortion" 348 times.

The EEOC expanded the definition of "pregnancy, childbirth, or related medical conditions" to include "termination of pregnancy, including . . . abortion" and "fertility treatment." 89 Fed. Reg. at 29,106, 29,183, 29 C.F.R. § 1636.3(b). "Fertility treatment" includes immoral

---

[1] This list remained largely the same in EEOC's final rule except that the latter added "the use of contraception."  PWFA Rule, 89 Fed. Reg. 29,096, 29,183.

fertility treatments like in vitro fertilization ("IVF").  89 Fed. Reg. at 29,102, 29,190; Compl. Ex. E, Decl. of Bishop Cary ¶ 18.

This unsupported interpretation of the PWFA lacks any basis in the text of the statute which never mentions abortion or IVF. It also contradicts legislative history that evinces a broad coalition of supporters, including the United States Conference of Catholic Bishops, who understood that the pro-woman, pro-baby legislation had nothing to do with abortion or immoral fertility treatments.  The EEOC's flimsy reasoning was that including abortion and IVF reflects the "plain meaning" of "pregnancy, childbirth, or related medical condition" because "individuals who are choosing whether or not to have an abortion are pregnant." 89 Fed. Reg. at 29,106. But, as the Catholic bishops said in their comment regarding the NPRM, "[a]bortion is neither pregnancy or childbirth.  And it is not 'related' to pregnancy or childbirth as those terms are used in the PWFA because it intentionally *ends* pregnancy and *prevents* childbirth."  USCCB Comment Regarding NPRM 3 (September 27, 2023), https://www.usccb.org/sites/default/files/about/general-counsel/rulemaking/upload/2023.USCCB_.CUA_.comments.PWFA_.regulations.pdf.  The intentional termination of pregnancy is not a *limitation* or *condition* relating to pregnancy.

The EEOC supported its pro-abortion interpretation of the PWFA by pointing to its 2015 enforcement guidance regarding pregnancy discrimination that claimed pregnancy discrimination "includes abortions." *Id.* at 29,106 n.65 (citing EEOC, *Enforcement Guidance on Pregnancy Discrimination and Related Issues,* at § (I)(A)(4)(c) https://www.eeoc.gov/laws/guidance/enforcement-guidance-pregnancydiscrimination-and-related-issues. Unlike the PWFA, The EEOC lacks any substantive rulemaking authority under Title VII.

Because EEOC expanded the PWFA to require accommodation for abortion, the prohibition against retaliation, under the EEOC's interpretation of the PWFA, restricts speech activity related to abortion and immoral fertility treatment and thus functions as a Speech Code. *See* Compl. ¶¶ 133-40. This restriction of speech activity is particularly problematic for Catholic ministries as they have, for decades, been in the vanguard opposing abortion and protecting the sanctity of human life. Because "a request for a reasonable accommodation" would cover direct abortion, the request would "constitute activity" under the retaliation prohibition of 42 U.S.C. § 2000gg-2, 89 Fed. Reg. at 29,188. The PWFA, according to the EEOC, would prohibit CBA members from disciplining an employee or taking any adverse action on account of the employee seeking, promoting, recommending, or obtaining an abortion, or speaking out against the CBA member's faith-informed policies regarding abortion.

The EEOC interprets the PWFA prohibition on harassment as applying to employee handbooks or policies that reject any effort to seek a direct abortion or immoral fertility treatment, and it appears to require employers to limit speech in the workplace that would criticize such choices lest that speech be characterized as "retaliation" or "harassment." *See, infra,* at 13-14.

While the PWFA incorporates Title VII's religious employer exemption, 42 U.S.C. § 2000gg-5e(b), the EEOC has made it meaningless. This exemption, 42 U.S.C. § 2000e-1(a), removes qualifying employers from the requirements of Title VII "with respect to the employment of individuals of a particular religion." The scope of this exemption is further defined at 42 U.S.C. § 2000e(j) which was adopted as part of the Equal Employment Opportunity Act of 1972. Section 2000e(j) defines "religion" as "includ[ing] all aspects of religious observance *and practice,* as well as belief." (Emphasis added). Thus, the plain text of §§ 2000e-1(a) and 2000e(j), when "[r]ead

together [define an] exemption [that] enables faith-based organizations to employ only those peo-
ple 'whose beliefs and conduct are consistent with the employer's religious precepts.'" Stephanie
Phillips, A Text-Based Interpretation of Title VII's Religious Employer Exemption, 20 Tex. Rev.
L & Pol. 295, 303 (2016); *see also* Carl H. Esbeck, Federal Contractors, Title VII, and LGBT Em-
ployment Discrimination: Can Religious Employers Continue to Staff on a Religious Basis?, 4 Ox-
ford J. of L. & Religion 368, 374-93 (2015).

While the EEOC coos that it will "take great care" in evaluating claims of religious exemp-
tion, 89 Fed. Reg. at 28,147, its PWFA Rule nowhere mentions § 2000e(j). Instead, the EEOC
requires adjudication of religious defenses on a "case-by-case" basis, and it limits the religious
employer exemption to instances of religious discrimination. 89 Fed. Reg. at 29,146-29,147. This
is EEOC chutzpah because the PWFA does not prohibit religious discrimination.

The EEOC also adopted a cramped interpretation of the protections afforded to religious
employers through the First Amendment or Religious Freedom Restoration Act. It noted again
that it would only consider such defenses "on a case-by-case basis," *id.* at 29,148, and it preemp-
tively and categorially announced that ""[n]ondiscrimination laws and policies have been found
to serve a compelling governmental interest." *Id.* at 29,148-49. If this were correct, it would also
make these protections meaningless.

Two of the five EEOC commissioners voted against the PWFA Rule, and one published a
rare statement expressing her dissent. Commissioner Andrea Lucas concluded the PWFA Rule
"cannot reasonably be reconciled with the text" of the PWFA. Andrew Lucas, Statement re: Vote
on   the   Final   Rule   to   Iplement   Pregnant   Workers   Fairness   Act   1,
https://www.linkedin.com/posts/andrea-lucas-a5b27513_a-lucas-statement-re-vote-re-pwfa-

final-activity-7185711161609232387-GtB1/. And the "Commission paradoxically interprets a stat-ute requiring employers to accommodate a worker's pregnancy and childbirth into a provision that also requires accommodation of a worker's inability to become pregnant." *Id.* at 7.

Since the PWFA Rule was published, numerous states and religious groups have filed legal challenges to the rule. *See Texas v. Garland*, 2024 WL 967838 (N.D. Tex. Feb. 17, 2014) (enjoining administrative or other adjudication of PWFA claims against State of Texas because Congress, having passed the bill through proxy voting, violated the quorum rule in U.S. Const., art. I, § 5); *Tennessee et al v. EEOC*, No. 24-cv-84 (E.D. Ark. April 25, 2024); *Louisiana et al. v. EEOC*, No. 24-cv-00629 (W.D. La. May 13, 2024); *United States Conference of Catholic Bishops et al. v. EEOC*, No. 24-cv-691 (E.D. La. May 22, 2024).

The U.S. District Court for the Western District of Louisiana recently issued a preliminary injunction finding that "the EEOC has exceeded its statutory authority to implement the PWFA and, in doing so, both unlawfully expropriated the authority of Congress." *Id.*, ECF No. 53 at 2. That court noted: "The Court's inquiry starts with the fact that the PWFA makes no reference to abortion: it does not contain the word 'abortion' even once . . . . The decision to obtain purely elective abortion is not undertaken to treat a 'medical condition' related to pregnancy or childbirth . . . the EEOC's arguments to the contrary amount to little more than semantic gymnastics." *Id.*, ECF No. 53 at 18, 20.

The U.S. District Court for the Western District of Louisiana likewise addressed the legis-lative history as contravening the EEOC's novel interpretation of the PWFA:

> The Court sees this issue as even more straightforward. "Abortion" is a term that is readily understood by everyone. If Congress had intended to mandate that employers ac-commodate elective abortions under the PWFA, it would have spoken clearly when enact-ing the statute, particularly given the enormous social, religious, and political importance

of the abortion issue in our nation at this time (and, indeed, over the past 50 years). The Court is therefore not persuaded, on the record before it, that Congress could reasonably be understood to have granted the EEOC the authority to interpret the scope of the PWFA in a way that imposes a nationwide mandate on both public and private employers--irrespective of applicable abortion-related state laws enacted in the wake of *Dobbs*--to provide workplace accommodation for the elective abortions of employees. *Id.*, ECF No. 53 at 20.

> C.   Title VII and the EEOC's Harassment Guidance.

Title VII makes it unlawful for an employer to discriminate against an employee or prospective employee "because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Concurrent with EEOC promulgating the PWFA Rule, it adopted enforcement guidance under Title VII addressing, *inter alia*, "sexual harassment." That guidance makes certain employer-employee conflicts related to abortion, fertility treatments, and gender transition subject to Title VII employment discrimination protections and sexual harassment rules. See EEOC, *Enforcement Guidance on Harassment in the Workforce*, § II(A)(5)(b)-(c) (April 29, 2024) ("Enforcement Guidance"), https://www.eeoc.gov/laws/guidance/enforcement-guidance-harassment-workplace.

When the EEOC issues an enforcement guidance, it "intend[s] to provide clarity to the public regarding the existing requirements under the law." *Id.*, Intro. The EEOC says that its Enforcement Guidance was formally approved by the EEOC Commission itself and that:

> This guidance serves as a resource for employers, employees, and practitioners; for EEOC staff and the staff of other agencies that investigate, adjudicate, or litigate harassment claims or conduct outreach on the topic of workplace harassment; and for courts deciding harassment issues.

*Id.* § I.A. In practice, an enforcement guidance reflects the official position of the EEOC in future enforcement actions. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, (1986) ("while not controlling upon the courts by reason of their authority" EEOC guidance does "constitute a body of experience and informed judgment to which courts and litigants may properly resort for

guidance") (citation omitted); *Kroll v. White Lake Ambulance Auth.*, 691 F.3d 809, 815 (6th Cir. 2012) (describing EEOC guidance under ADA "very persuasive authority").

The Harassment Guidance addresses many scenarios that may properly be understood as violating Title VII's prohibition on employment discrimination, with which Plaintiffs take no issue. However, EEOC also expands Title VII to cover potential employment conflicts for areas purportedly related to sex discrimination that burdens CBA members' Catholic values in these three scenarios: (1) use of pronouns contrary to biological sex, (2) the use of private spaces traditionally reserved to single sex, and (3) the ability to speak about human sexuality. *See* Enforcement Guidance. Scenarios 1 and 3, like the PWFA retaliation provision described earlier, function as the new EEOC imposed Speech Codes. *See, supra,* at 2, 9, Compl. ¶¶ 133-41.

As to pronouns, EEOC interprets Title VII to prohibit the "intentional use of a name or pronoun inconsistent with the individual's known gender identity (misgendering)." Enforcement Guidance n.42 and accompanying text. The Enforcement Guidance continues with an "Example 15: Harassment Based on Gender Identity" including "misgendering" as a basis for harassment liability. Id. § II(A)(5)(c). Thus, conscientious Catholic employers are required to use false pronouns upon employee request or face an EEOC enforcement action.

As to the use of private spaces traditionally reserved for a single sex, the EEOC reads Title VII as prohibiting "harassing conduct" on the basis of "gender identity" to include "the denial of access to a bathroom or other sex-segregated facility consistent with the individual's gender identity." *Id.* n.43 and accompanying text. Access to a bathroom traditionally reserved to one sex by a member of the opposite sex is given emphasis: "In addition to being part of a harassment claim, denial of access to a bathroom consistent with one's gender identity may be a discriminatory action

in its own right." Thus, conscientious Catholic employers are required to give biological men access to women's bathroom, showers, and other sex-segregated spaces upon employee request pr face an EEOC enforcement action if they refuse.

As to the ability to speak about human sexuality, the EEOC interprets Title VII to prohibit "harassment based on a woman's decision about contraception or abortion." *Id.* § II(A)(5)(b). There can be no doubt the EEOC also interprets Title VII to prohibit harassment based on an employee's decision to transition from his or her biological sex. *See id.* § II(A)(5)(c). And the cases, the EEOC discusses in its Enforcement Guidance make clear that sexual harassment can be based on employer communications that an employee considers to constitute "offensive comments," "derogatory terms," or "slurs." *Id.* ns. 30, 35, 38, 39. It is as if what college students characterize as triggering speech warranting college-provided safe spaces has now morphed into the EEOC Speech Codes enforced by the federal government itself. Compl. ¶¶ 133-40. Thus, under the Harassment Guidance, workplace statements about Catholic teaching related to abortion, infertility, and gender identity could offend certain employees and be characterized by the EEOC as sex-based workplace harassment. Conscientious Catholic employers may only express Catholic teaching regarding abortion, gender ideology, and similar subjects at risk of an EEOC enforcement action.

Accordingly, it is the policy and official position of the EEOC, based on the Harassment Guidance and the agency's enforcement actions, that an employer's continuing use of pronouns consistent with an employee's sex, its expression of Catholic values regarding abortion, fertility treatments, and gender transition; and its preservation of private spaces to one sex may now violate Title VII's ban on sex discrimination and harassment.

14

Whether by EEOC enforcement,  class action lawsuit, or employee lawsuit, a successful claim under the PWFA or Title VII could result in compensatory and punitive damages, attorneys fees, and costs. The EEOC has authority to investigate Title VII violations and will ask violators to take corrective action for the discriminatory behavior. 42 U.S.C. § 2000e-5(a). And the Department of Justice may bring a federal lawsuit to enforce Title VII and the PWFA. *See, e.g.*, 81 Fed. Reg. at 31,439, 31,441. Both the PWFA and Title VII create private rights of action.

### III.  ARGUMENT

A.  <u>Associational Standing</u>.

The CBA, invoking associational standing, is suing on behalf of its members. Associational standing is established when "(1) the individual members would have standing to sue in their own right; (2) the organization's purpose relates to the interests being vindicated; and (3) the claims asserted do not require the participation of individual members." *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 986 (8th Cir. 2011) (citations omitted).  Associational standing in the Eighth Circuit also requires evidence establishing that "one or more of [the organization's] members would be directly affected" by the challenged actions.  *See Religious Sisters of Mercy v. Becerra*,[2] 55 F.4th 583, 602 (8th Cir. 2022).

The CBA easily establishes associational standing to sue on behalf of its members. *See* Compl. ¶¶ 19-42, 44-57, 59; *Christian Emps. All. v. United States Equal Opportunity Comm'n*, No. 1:21-CV-195, 2024 WL 935591, at *5 (D.N.D. Mar. 4, 2024) (reviewing factors for associational standing). Just as the Christian Employers Alliance established in a recent case in this District, the CBA here

---

[2] The Catholic Benefits Association's lawsuit was included in *Religious Sisters of Mercy*.

has identified the Archdiocese of Saint Paul and Minneapolis and the Diocese of Backer as CBA members who would have standing in their own right to bring suit. It, thus, satisfies the Eight Circuit's application of associational standing doctrine. *Id.* (distinguishing *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 588-97 (8th Cir. 2022)).

As to the first element, all of CBA's members are Catholic organizations and a substantial number of them have fifteen or more employees making them subject to the EEOC's PWFA Rule and its Enforcement Guidance. Compl. ¶¶ 30, 34, 36. They have Catholic values burdened by these rules, and they would have standing on their own right to sue. Compl. ¶¶ 30, 34, 38. This is also the situation for the Bismarck Diocese which is a named plaintiff. Compl. ¶¶ 19-21. It also extends to sworn evidence from two additional CBA members, the Archdiocese of Saint Paul and Minneapolis and the Diocese of Baker, both of which also satisfy the elements of standing to sue on their own behalf. Compl. Ex. F, Decl. of Archbishop Hebda ¶¶ 4-22, Compl. Ex. E, Decl. of Bishop Cary ¶¶ 4-24. As to the second element, the CBA is organized "[t]o support Catholic employers . . . that, as part of their religious witness and exercise, provide health or other benefits to their respective employees in a manner that is consistent with Catholic values"; and "[t]o work and advocate for religious freedom of Catholic and other employers seeking to conduct their ministries and businesses according to their religious values". Compl. ¶ 30; Compl. Ex. A, CBA Articles, art. IV. Finally, as to the third element, the claims asserted are declaratory and pre-enforcement and as such do not require the participation of individual members. *Religious Sisters of Mercy v. Becerra,* 513 F.Supp.3d 1113, 1137 (D.N.D. 2021) (citing *Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 533 (8th Cir. 2005). Organizational standing for the CBA is easily satisfied.

B.   <u>Plaintiffs Are Likely to Succeed on the Merits</u>.

When issuing a preliminary injunction, the Court considers (1) the movant's likelihood of suc-

cess on the merits, (2) the threat of irreparable harm to the movant, (3) the balance of harms be-

tween the parties, and (4) the public interest. *Sharpe Holdings, Inc. v. U.S. Dep't of Health & Hum.*

*Servs.*, 801 F.3d 927, 937 (8th Cir. 2015). The APA requires courts to "hold unlawful and set aside"

agency regulations that are "contrary to constitutional right, power, privilege, or immunity," or

"in excess of statutory … authority." 5 U.S.C. § 706.

Absent relief from this Court, CBA members that are covered entities are currently threatened

by the interpretation of the PWFA to support abortion and immoral fertility treatment, and to

speak in favor thereof, in violation of Catholic convictions.

Plaintiffs are likely to succeed on claims under the APA and RFRA challenging EEOC's actions

to create an abortion and immoral fertility treatment accommodation mandate  and to target reli-

gious speech and commitments not to use false pronouns or allow intimate spaces to be violated by

members of the oppose sex.

1.   <u>Plaintiffs Are Likely to Succeed on Under the Religious Freedom Restora-</u>
<u>tion Act.</u>

Plaintiffs are likely to succeed in claiming the PWFA violates the CBA members' rights under

RFRA, 42 U.S.C. § 2000bb. Congress enacted RFRA "to provide very broad protection for reli-

gious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014).  RFRA forbids gov-

ernment from "substantially burden[ing] a person's exercise of religion" unless the burden (1) "is

in furtherance of a compelling governmental interest" and (2) "is the least restrictive means of

furthering that compelling interest." 42 U.S.C. § 2000bb-1(b). "A person whose religious prac-

tices are burdened in violation of RFRA 'may assert that violation as a claim or defense in a judicial

proceeding and obtain appropriate relief.'" *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 424 (2006) (quoting 42 U.S.C. § 2000bb-1(c)). If a substantial burden exists, then the government assumes the obligation to meet the "exceptionally demanding" strict scrutiny standard. *Hobby Lobby*, 573 U.S. at 728.  RFRA requires courts to interpret the "broad protection of religious exercise" to the "maximum extent" possible. *Hobby*, 573 U.S. at 696 & n.5.

***Substantial Burden.*** The EEOC's interpretations of the PWFA and Title VII resulting in the PWFA Rule and the Harassment Guidance impose a substantial burden on the CBA members' religious exercise. See, e.g., Compl. ¶¶ 14, 43, 129-30, 157, 159. A substantial burden is one that imposes "substantial adverse practical consequences" on an employer for following its religious beliefs or that "cause[s] the objecting party to violate its religious beliefs" to comply with the law. *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 591 U.S. 657, 692 (2020) (Alito, J., concurring) (citation omitted). The CBA members religious beliefs prevent CBA Members from cooperating with the portions of the laws and interpretations challenged here. Compl. ¶¶ 14, 43, 129-30, 157, 159. As a result, being required to provide accommodations under the PWFA or the PWFA Rule for abortion and immoral fertility treatment, or being forced under Title VII or the Harassment Guidance to use false pronouns upon an employee's request, to refrain from expressing Catholic teaching regarding sexual issues, and to give employees of one sex access to  private spaces reserved for those of the other sex would be contrary to sincerely held religious beliefs. *See also Christian Emps. All. v. United States Equal Opportunity Comm'n*, No. 1:21-CV-195, 2024 WL 935591, at *8 (D.N.D. Mar. 4, 2024) (finding substantial burden when Plaintiff "must either comply with the EEOC and HHS mandates by violating their sincerely held religious beliefs or else face harsh consequences like paying fines and facing civil liability.")

Under the PWFA and Title VII as interpreted by the EEOC under the PWFA Rule and the Harassment Guidance, CBA members face the choice of complying with laws that are manifestly contrary to their Catholic values or facing civil liability, injunctive relief, and entangling litigation by either the EEOC or private parties. *See* 42 U.S.C. § 2000gg-2(a) (remedies), 42 U.S.C. § 2000e-5 (remedies). In a challenge to EEOC guidance, the Fifth Circuit recently held that religious employers are substantially burdened when the religious employment relationship is interfered with. *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 938 (5th Cir. 2023) ("Being forced to employ someone to represent the company who behaves in a manner directly violative of the company's convictions is a substantial burden and inhibits the practice of [Plaintiff's] beliefs."); see also *Hobby Lobby*, 573 U.S. at 724-25 (discussing moral complicity).

***Compelling Interest.*** The EEOC does not have a compelling interest in burdening CBA members' religious beliefs. Under RFRA, the burden shifts to the government to show that it has a "compelling interest" in applying the law to the person whose sincerely held religious belief is "being substantially burdened." 42 U.S.C. § 2000bb–1(b). To meet this burden , the government must do more than identify "broadly formulated interests justifying the general applicability of government mandates." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006); *see also Sharpe Holdings, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 801 F.3d 927, 937 (8th Cir. 2015), cert. granted, judgment vacated sub nom on other grounds.  Thus, an assertion by the EEOC of its broad "interest in combating discrimination in the workforce" will not suffice. *Religious Sisters of Mercy v. Azar*, 513 F.Supp. 3d 1113, 1148 (D. N.D. 2021).

To prove its compelling interest, the government must do more than identify the general interest in forcing employers to provide women with accommodations for abortion or immoral

fertility treatment, or requiring them to use false pronouns or to grant access to single sex facilities by employees of the opposite sex. In the PWFA Rule, spanning well more than 100 pages, the EEOC has a single sentence stating that "[n]ondiscrimination laws and policies have been found to serve a compelling governmental interest." 89 Fed. Reg. at 29,148. This is the very definition of a broadly formulated interest. *O Centro*, 546 U.S. at 431; *303 Creative LLC v. Elenis*, 600 U.S. 570, 591-92 (2023) (however "compelling" an antidiscrimination interest might be, it cannot violate "the demands of the Constitution"). Courts are required to "scrutinize the asserted harm of granting specific exemptions to particular religious claimants and to look to the marginal interest in enforcing the challenged government action in that particular context." *Holt v. Hobbs*, 574 U.S. 352, 363 (2015) (cleaned up). The EEOC cannot and has not articulated how granting specific exemptions for the CBA members will harm the asserted interests in preventing discrimination.

***Least Restrictive Means.*** To satisfy the least-restrictive-means test, the government must "come forward with evidence" to show that its policies "are the only feasible means . . . to achieve its compelling interest." *Sharpe Holdings*, 801 F.3d at 943. "If a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt*, 574 U.S. at 365 (cleaned up). In the RFRA context, "a regulation may constitute the least restrictive means of furthering the government's compelling interests if 'no alternative forms of regulation' would accomplish those interests without infringing on a claimant's religious-exercise rights." *Sharpe Holdings*, 801 F.3d at 943 (quoting *Sherbert v. Verner*, 374 U.S. 398, 407 (1963)). The EEOC fails to meet this high burden.

The government has many less restrictive alternatives beyond forcing the CBA members to comply with the mandates addressed in this motion.

The EEOC has thus violated CBA members' rights under RFRA.

> 2.    Plaintiffs Are Likely to Succeed on Under the Administrative Procedure Act.

Defendants are "agencies" under the APA, 5 U.S.C. § 551(1). The PWFA Rule is a "rule" under the APA. 5 U.S.C. § 551 and "final agency action" subject to judicial review. 5 U.S.C. § 704. The APA prohibits agency actions that are "not in accordance with law, in excess of statutory authority, or limitation, or short of statutory right." *Id.* § 706(2)(A), (C). The PWFA Rule is not in accordance with law for several independent reasons.

The PWFA Rule requires employers to accommodate direct abortion and immoral fertility treatments. It is not in accordance with the PWFA statutory text, which does require employers to accommodate abortion or immoral fertility treatments. Accordingly, the PWFA Rule exceeds the EEOC's authority and is contrary to the PWFA statute.

Under the APA, courts are "not obliged to stand aside and rubberstamp" administrative decisions that are "inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Friends of Boundary Waters Wilderness v. Bosworth*, 437 F.3d 815, 821 (8th Cir. 2006) (quoting *Nat'l Lab. Rel. Bd. v. Brown*, 380 U.S. 278, 291, (1965)). An agency administrative decision may be set aside if it is "arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory . . . authority," *id.* § 706(2)(C), or "without observance of procedure required by law." *Id.* § 706(2)(D). Indeed, "If congressional intent is clearly discernable, the agency must act in accordance with that intent and the court need not defer to the agency's interpretation of its mandate." *Ark. AFL-CIO v. F.C.C.*, 11 F.3d 1430, 1440 (8th Cir. 1993). Court "start, as we always do, with the text." *Sackett v. Env't*

*Prot. Agency*, 598 U.S. 651, 671 (2023); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012) ("[T]he best evidence of Congress's intent is the statutory text.").

*Statutory text.* First, the PWFA text is clear: abortion and immoral fertility treatment are not covered by the new law. The PWFA requires that employers accommodate "known limitations related to . . . pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg-1(1). Abortion and fertility treatment are not mentioned anywhere in the text. Moreover, "known limitations" include "physical or mental conditions," none of which can be understood as covering direct abortion, which is a voluntary decision to *terminate* a pregnancy, not a "condition" that is related to pregnancy. Likewise with immoral fertility treatment, those actions are, by definition, attempts to bring about a pregnancy, not a limitation or condition of pregnancy that already has come into existence. For this reason, when it comes to Title VII, a "condition" related to pregnancy has been found to include things that are "initiated by pregnancy" not attempts to bring about pregnancy that does not already exist. *See generally E.E.O.C. v. Houston Funding II, Ltd.*, 717 F.3d 425, 429 (5th Cir. 2013).

*Legislative history.* Second, the PWFA's legislative history, as summarized by the Ethics and Public Policy Center, affirms the lack of any application to abortion or immoral fertility treatment.

> One of the PWFA's cosponsors, Senator Bill Cassidy (R-LA), explained that the PWFA was meant to help ensure "a safe environment for pregnant women and their unborn children in the workplace," calling the Act "pro-mother" and "pro-baby."[3]

> When abortion concerns in the PWFA were raised on the Senate floor by Senator Thom Tillis (RNC) on behalf of himself and Senators James Lankford (R-OK) and Steve Daines (R-MT), Cassidy responded, "I reject the characterization that [the PWFA] would do

---

[3] 168 Congressional Record 191 (December 8, 2022), https://www.congress.gov/congressional-record/volume-168/issue-191/senate-section/article/S7049-2.

22

anything to promote abortion."[4] Lead Democrat co-sponsor Senator Bob Casey agreed, explaining that the EEOC "could not … issue any regulation that requires abortion leave, nor does the act permit the EEOC to require employers to provide abortion leave in violation of State law."[5]

[T]he bill sponsors' statements were never contradicted by any Democrat member of Congress. . . . During the passage of the Act, Senator Steve Daines (R-MT) stated:

> [T]he purpose of the [PWFA] is to help pregnant mothers in the workplace receive accommodations so that they can maintain a healthy pregnancy and childbirth. Therefore, I want to make clear for the record that the terms "pregnancy" and "related medical conditions," for which accommodations to their known limitations are required under the legislation, do not include abortion.

> On December 8, the sponsor of this legislation, Senator Bob Casey stated on the Senate floor as follows: "I want to say for the record, however, that under the act, under the Pregnant Workers Fairness Act, the Equal Opportunity Employment Commission, the EEOC, could not—could not—issue any regulation that requires abortion leave, nor does the act permit the EEOC to require employers to provide abortions in violation of State law."[6]

After the EEOC issued its proposed rule, Cassidy called out the EEOC for "go[ing] rogue" and "completely disregard[ing] legislative intent and attempt[ing] to rewrite the law by regulation."[7]

Ethics and Public Policy Center, EPPC Scholars Comment on Regulations To Implement the

Pregnant Workers Fairness Act Proposed Rule, RIN 3046–AB30, Docket ID EEOC-2023-0004

(October 10, 2023), https://eppc.org/wp-content/uploads/2023/10/EPPC-Scholar-Comment-

EEOC-Regulations-to-Implement-the-Pregnant-Workers-Fairness-Act.pdf.

---

[4] *Id.*

[5] *Id.*

[6] 168 Cong. Rec. S10081 (daily ed. Dec. 22, 2022), https://www.congress.gov/congressional-record/volume-168/issue-200/senate-section/article/S10081-2.

[7] *Ranking Member Cassidy Blasts Biden Administration for Illegally Injecting Abortion Politics into Enforcement of Bipartisan PWFA Law*, August 8, 2023, https://www.help.senate.gov/ranking/newsroom/press/ranking-member-cassidy-blasts-biden-administration-for-illegally-injecting-abortion-politics-into-enforcement-of-bipartisan-pwfa-law.

*Major Questions Doctrine.* Third, the Supreme Court's recently affirmed major questions doctrine provides additional reason to reject the EEOC's efforts to change the meaning of the PWFA by creating a mandate to accommodate abortion and immoral fertility treatment. Abortion is a paradigmatic example of a major question of national importance. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 229, 269 (2022). Congress does not inadvertently legislate on the topic of abortion.

The major questions doctrine prevents agencies from "highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (rejecting "delegation claimed to be lurking" in ambiguous statutory text). In *West Virginia*, the Supreme Court reasoned that "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,'" or "subtle device[s].'" *Id.* If agencies are to regulate in areas of national concern, Congress must clearly express an intent to delegate such authority to the agency. *See NFIB v. OSHA*, 595 U.S. 109, 124 (2022) (Gorsuch, J., concurring) ("If administrative agencies seek to regulate the daily lives and liberties of millions of Americans, . . . they must at least be able to trace that power to a clear grant of authority from Congress."); *Biden v. Nebraska,* 143 S. Ct. 2355, 2380 (2023) (Barrett, J., concurring) (similar). Absent a "clear delegation," the agency is not free to regulate on the subject of major questions. See *Biden*, 143 S. Ct. at 2374 (rejecting agency attempt to permit student loan forgiveness).

Consistent with the PWFA's clear text and uniform legislative history, the EEOC cannot claim to have authority to create new substantive regulations governing the major questions of abortion accommodation and immoral fertility accommodation without providing a "clear congressional authorization." *West Virginia*, 597 U.S. at 722-23. There is no such clear congressional

authorization here and the EEOC even admits that the PWFA lacks "an explicit mention of abortion." PWFA Rule, 89 Fed. Reg. at 29,111. Just the opposite; the PWFA provides a specific carve-out for health insurance coverage whereby the PWFA cannot "require an employer-sponsored health plan to pay for or cover any particular item, procedure, or treatment," which would include any attempt to mandate insurance coverage for abortion or immoral fertility treatment, among others. 42 U.S.C. § 2000gg-5(a)(2). Congress did not give the EEOC the authority to add an abortion or immoral fertility requirement to the PWFA.

*Eviscerating the Statutory Religious Exemption.* Fourth, the PWFA Rule also violates the APA by so narrowing the religious employer exemption built into the PWFA to make it pointless. According to the EEOC, the reference to the religious exemption in Title VII, grafted into the PWFA, 42 U.S.C. § 2000gg-5(b), must be narrowed to cover only claims of religious status discrimination. 89 Fed. Reg. at 29,146-47 & n.239. This cannot be correct. Many courts have affirmed that the religious exemption in Title VII extends beyond mere religious status discrimination and protects religious belief and conduct of the exempt employers. *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 229 (3d Cir. 2007) (collecting cases). Here, the PWFA does not prohibit religious status or class discrimination, making the EEOC's narrow interpretation of the exemption a nullity. *See Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249 (1985) (describing "elementary canon on construction that a statute should be interpreted so as not to render one part inoperative.") (quotation and citation omitted).

The far sounder interpretation of the PWFA religious exemption would apply the protection to "faith-based organizations to employ only those people 'whose beliefs and conduct are consistent with the employer's religious precepts.'" Stephanie Philips, *supra*, at 10. The Title VII

religious exemption protects religious entities from the scope of the "subchapter," all of Title VII, not merely the narrow category of religious class discrimination. See *Starkey v. Roman Catholic Archdiocese of Indianapolis*, 41 F.4th 931, 946 (7th Cir. 2022) (Easterbrook, J., concurring) (broadly construing religious exemption in Title VII); *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571, 590 (N.D. Tex. 2021) ("Read plainly . . . Title VII does not apply to religious employers when they employ individuals based on religious observance, practice, or belief.").

Contrary to the PWFA Rule, then, Title VII's religious exemption is not so flimsy as to exempt religious employers *only* "from Title VII's prohibition against discrimination on the basis of religion." 89 Fed. Reg. at 29,146. Rather, it protects religious employers from *any* Title VII claim if they made an employment decision based on an individual's particular religious belief, observance, or practice. Therefore, as with Title VII, a religious employer does not have to provide accommodations under the PWFA when doing so would require accommodation of beliefs, observance, or practices that conflict with the employer's religion.

*Canon of Constitutional Avoidance.* Finally, the canon of constitutional avoidance counsels against the EEOC's interpretation of the PWFA. Under constitutional avoidance "a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018); *Union Pac. Ry. Co. v. U.S. Dep't of Homeland Sec.*, 738 F.3d 885, 900 (8th Cir. 2013) (describing "hallowed rules of constitutional avoidance" and choosing to "avoid these 'difficult and sensitive questions'" by interpretation).

There are a plethora of constitutional issues arising from the PWFA Rule. Consider just four examples. (1) Strict scrutiny is required under the Free Exercise Clause because the PWFA Rule

is not neutral and generally applicable due to its statutory religious exemption and its exclusion of employers with fewer than fifteen employees. *Church of Lukumi* Babalu *A*ye v. City of Hialeah*, 508 U.S. 520, 546 (1993), (2) Under the Free Exercise Clause, strict scrutiny applies when the law categorically exempts some for secular reasons but denies categorical exemption for religious reasons. *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999). (3) The EEOC has taken the position thirty-three times in the PWFA Rule that it may only determine the applicability the mandates to particular employers on a "case-by-case" basis. If this were so, strict scrutiny is required when "individualized assessment" is necessary to determine the applicability of a law burdening religious exercise. *Employment Div. v. Smith*, 494 U.S. 872, 884 (1990). (4) First Amendment analysis is required when a law forces an employer to employ a person to represent it "who behaves in a manner directly violative of the company′s convictions . . . and inhibits the practice of [the employer's] beliefs." *Braidwood Mgmt.,* 70 F.4th at 938 (5th Cir. 2023).

Constitutional avoidance confirms that the EEOC's interpretive rewriting of the PWFA must be rejected.

### C.   Plaintiffs Face Irrevocable Harm from the EEOC.

CBA members will suffer irreparable harm from the EEOC's actions: "the loss of freedoms guaranteed by . . . RFRA . . . constitute[s] per se irreparable harm." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 380 (5th Cir. 2022) (citing *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 294 (5th Cir. 2012)); *see also Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 608–09 (8th Cir. 2022) (footnotes omitted). Because the CBA remains likely to succeed on the merits of its RFRA claim, irreparable harm is established in this case.

D.   <u>Balance of Equities and Public Interest</u>.

Since CBA members are likely to succeed, EEOC must "present powerful evidence of harms to [their] interests" to prevent CBA members from meeting the balancing requirement. *Opulent Life Church v. City of Holly Spring, Miss.*, 697 F.3d 279, 297 (5th Cir. 2012). Here, the harms faced by CBA members are severe, and the harms to government are minimal. The EEOC admits, as it must, that both the PWFA and Title VII exempt employers with fewer than fifteen employees. "[W]here the regulation [is underinclusive and] fails to address significant influences that impact the purported interest, it usually flushes out the fact that the interest does not rise to the level of being 'compelling' . . . enough to justify abridging core constitutional rights." *281 Care Comm. v. Arneson*, 766 F.3d 774, 785 (8th Cir. 2014) (second alteration in original).

The public interest "factor overlaps considerably with the previous one, and most of the same analysis applies." *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015). "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). It is not in the public interest to force the CBA Members, contrary to their Catholic faith, to accommodate their employees' abortions and immoral fertility treatments, to use false pronouns, to abstain from expressing Catholic teaching regarding sexual issues, and to give employees of one sex access to private spaces reserved to those of the other sex.

The public interest favors an injunction.

## IV.  CONCLUSION

For the foregoing reasons, the Plaintiffs[8] respectfully request that the Court provide pre-liminary injunction as described in the motion filed contemporaneously herewith.

DATED: July 31, 2024.

Respectfully submitted,

*/s/ L. Martin Nussbaum*
L. Martin Nussbaum
Andrew Nussbaum
First & Fourteenth PLLC
2 N. Cascade Ave., Suite 1430
Colorado Springs, CO 80903
(719) 428-2386
martin@first-fourteenth.com
andrew@first-fourteenth.com

and

Michael Francisco (pro hac vice pending)
First & Fourteenth PLLC
800 Connecticut Ave NW, Suite 300
Washington, DC 20006
(202) 754-0522
michael@first-fourteenth.com
*(application for admission forthcoming)
*Attorneys for Plaintiffs*

---

[8] Unless indicated otherwise, "Plaintiffs" or "CBA members" as used throughout this lawsuit, does not include the one CBA member to the extent that it has filed a separate lawsuit seeking relief that overlaps with the relief requested here.