**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

| | |
|---|---|
| THE CATHOLIC BENEFITS ASSOCIATION, on behalf of its members; BISMARK DIOCESE, <br><br>         *Plaintiffs*, <br><br> v. <br><br> CHARLOTTE BURROWS, Chair of the United States Equal Employment Opportunity Commission; and UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, <br><br>         *Defendants*. | Case No. 1:24-cv-00142-DMT-CRH |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND ..................................................................................................................2

I.     THE PREGNANT WORKERS FAIRNESS ACT ...................................................2

    A.  Pre-PWFA Framework ................................................................................2

    B.  PWFA Statutory Framework ........................................................................3

    C.  EEOC's Rulemaking Implementing the PWFA ...........................................4

II.    THE TITLE VII GUIDANCE ................................................................................5

III.   PROCEDURAL HISTORY ....................................................................................7

STANDARD OF REVIEW ..................................................................................................8

ARGUMENT .......................................................................................................................8

I.     THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS ............8

    A.  Plaintiffs' Injuries Are Highly Speculative ................................................8

    B.  Plaintiffs Have Not Proven that Their Alleged Injuries Are Traceable to EEOC or Redressable by an Order Against EEOC .......................................................11

    C.  CBA Further Lacks Standing to Bring Claims on Behalf of Unnamed Members ....................................................................................................12

II.    PLAINTIFFS HAVE NOT OTHERWISE SHOWN A LIKELIHOOD OF SUCCESS ...........................................................................................................14

    A.  Neither the Final Rule nor the Guidance Violate RFRA ...........................14

          1.     The Final Rule and Guidance Lawfully Adopt a Case-By-Case Approach .......................................................................................14

          2.     The Court Should Not Grant Plaintiffs a Blanket RFRA Exemption ...........16

               i.   *Plaintiffs Do Not Demonstrate a Substantial Burden* ...........................17

               ii.  *The Government's Interests are Compelling* ....................................17

               iii. *The Government Applied Least Restrictive Means* ...............................19

B.  The Final Rule Properly Encompasses Abortion and CIT ................................... 19

    1.  The PWFA's Text Encompasses Abortion ........................................... 19

    2.  The PWFA's Text Encompasses CIT ................................................. 22

    3.  Materials Outside the Text Do Not Change that the PWFA
    Encompasses Abortion and CIT ...................................................... 23

C.  The Final Rule Correctly Interprets the PWFA's Rule of Construction ............................ 23

III.  THE BALANCE OF THE EQUITIES FORECLOSES RELIEF ........................................ 26

IV.  ANY REMEDY SHOULD BE LIMITED ................................................................. 27

CONCLUSION ........................................................................................................ 28

## INTRODUCTION

The Pregnant Workers Fairness Act (PWFA) builds on existing law to ensure workers with "known limitations related to . . . pregnancy, childbirth, or related medical conditions" can obtain reasonable accommodations that do not "impose an undue hardship" on their employer. 42 U.S.C. § 2000gg-1(1). The Equal Employment Opportunity Commission (EEOC) issued implementing regulations, *see Implementation of the Pregnant Workers Fairness Act*, 89 Fed. Reg. 29,096 (Apr. 19, 2024) (Final Rule), which recognize that the PWFA encompasses abortion and certain infertility treatments based on identical language affording those protections under Title VII of the Civil Rights Act. The Final Rule also discusses, across twelve pages, the various religion-related and other defenses available to employers, and commits to evaluating such defenses on a case-by-case basis. *Id.* at 29,144-55.

Separately, EEOC issued non-binding guidance discussing, *inter alia*, the scope of Title VII and its prohibitions on workplace harassment. *See* Enforcement Guidance on Harassment in the Workplace, Ex. A (Guidance). Relying on Title VII case law including *Bostock v. Clayton County*, the Guidance expresses the agency's view that Title VII's prohibition against sex discrimination extends to claims of unlawful harassment based on sexual orientation and gender identity. The Guidance summarizes types of conduct that courts have found may contribute to a hostile work environment in specific circumstances; it does not itself impose substantive requirements. Like the Final Rule, the Guidance recognizes the potential for religion-related concerns and explains that EEOC considers these issues as presented on a case-by-case basis.

Nevertheless, Plaintiffs here bring a pre-enforcement challenge to portions of both the Final Rule and the Guidance, claiming that they impose obligations that violate their Catholic religious beliefs and thus seeking the extraordinary remedy of a preliminary injunction. Plaintiffs' motion should be denied. They lack standing, including because they face no imminent enforcement action; they also cannot show a substantial likelihood of success on the merits. Both the Final Rule and the Guidance recognize religion-related concerns and make clear that EEOC will evaluate such issues on a case-by-case basis. Additionally, EEOC enhanced its procedures to facilitate the early submission and resolution of claims regarding religious defenses. *See* 89 Fed. Reg. 29,147-48; Guidance at 98.

Plaintiffs cannot prove that this approach is unlawful or that they are entitled to a categorical, blanket religious exception regardless of the specific facts presented in any individual case. Plaintiffs also fail to demonstrate irreparable harm, and enjoining the Final Rule or Guidance would cause confusion and potentially undermine protections for workers. At a minimum, any remedy should be limited to the identified entities in this suit.

## BACKGROUND

### I.    THE PREGNANT WORKERS FAIRNESS ACT

### A.    Pre-PWFA Framework

Congress enacted the PWFA to "fill a gap in the existing legal framework," H.R. Rep. No. 117-27, at 10 (2021), which offered only limited pregnancy-related protections for workers. *See id.* at 10-26; *see also* ECF No. 11 (PI Br.) at 5. In particular, Congress sought to build on and expand the protections in Title VII, which prohibits "discriminat[ion] against any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Initially, the Supreme Court interpreted Title VII's prohibition not to include pregnancy discrimination. *See Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976). In response, Congress quickly enacted the Pregnancy Discrimination Act (PDA) of 1978, which "unambiguously expressed its disapproval of both the holding and the reasoning of the . . . *Gilbert* decision," *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 678 (1983), and amended Title VII to clarify that sex-based discrimination encompasses pregnancy-related discrimination:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work[.]

42 U.S.C. § 2000e(k).

Congress understood the PDA to cover not only discrimination based on actual pregnancy, but also based on the "capacity to become pregnant," *see* H.R. Rep. No. 95-948, at 2 (1978) (discussing *Gilbert* dissent with approval); S. Rep. No. 95-331, at 2-3 (1977) (same). Congress also understood that the PDA's "basic language covers decisions by women who chose to terminate their pregnancies."

H.R. Rep. No. 95-948, at 7. In response to concerns about requiring employers to pay for abortions, however, Congress clarified that the PDA did "not require an employer to pay for health insurance benefits for abortion," except in certain circumstances implicating maternal health. 42 U.S.C. § 2000e(k); *see* H.R. Rep. No. 95-948, at 7. Shortly after the PDA's amendment, EEOC issued guidelines again recognizing that Title VII protects employees who have (or do not have) abortions. *See* 29 C.F.R. pt. 1604, App., Questions 34-37. Even after the PDA, however, Title VII requires accommodations related to pregnancy only in certain cases. *See Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 229 (2015). In enacting the PWFA, Congress concluded that such limitations create "an oftentimes insurmountable hurdle" for pregnant employees. H.R. Rep. No. 117-27, at 16.

Other statutes that establish protections for pregnant employees also have limitations. For example, Title I of the Americans with Disabilities Act (ADA) prohibits covered employers from "discriminat[ing] against a qualified individual on the basis of disability," 42 U.S.C. § 12112(a), which includes not making "reasonable accommodations to the known physical or mental limitations" of a qualified employee absent "undue hardship." *Id.* § 12112(b)(5)(A). Despite its amendment in 2008 to broaden the definition of "disability," *see* 42 U.S.C. § 12102(4)(A), the ADA has been construed to exclude many pregnancy-related conditions. *See* H.R. Rep. No. 117-27, at 19-21.

### B.    PWFA Statutory Framework

To address the above limitations, Congress enacted the PWFA, *see* Pub. L. No. 117-328, div. II, 136 Stat. 4459, 6084-89 (2022), with an effective date of June 27, 2023, *see id.* § 109, 136 Stat. at 6089. In general, the PWFA requires covered employers to "make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee, unless . . . the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]" 42 U.S.C. § 2000gg-1(1). The PWFA borrows heavily from existing statutes. For example, Congress defined both "reasonable accommodation" and "undue hardship" by reference to the ADA. *See id.* § 2000gg(7). Congress also included anti-retaliation and anti-coercion provisions similar to those found in Title VII and the ADA—*i.e.*, making it unlawful to discriminate against employees who file charges or participate in investigations, or to "coerce, intimidate, threaten, or

interfere with any individual['s]" exercise of rights under the statute, *id.* § 2000gg-2(f)(1), (2); *see also id.* §§ 2000e-3(a) (Title VII anti-retaliation); 12203(b) (ADA anti-coercion). The PWFA's definition of employer is the same as Title VII's. *See id.* § 2000gg(2)(B).

The PWFA also incorporates Title VII's remedies and enforcement procedures. *See id.* § 2000gg-2. An individual who believes their rights have been violated must first file a Charge of Discrimination with EEOC within a statutorily defined time. *Id.* § 2000e-5(b). EEOC notifies the employer within ten days, investigates the charge—which may include soliciting a position statement from the employer—and then determines whether "reasonable cause" exists to believe discrimination occurred. *Id.* If EEOC does not find "reasonable cause" or determines that a defense applies, the charge is dismissed, EEOC issues the employee a Notice of Right to Sue (NRTS) letter, after receipt of which the employee may file suit within 90 days. *Id.* § 2000e-5(b), (f)(1). If reasonable cause exists, EEOC will attempt to conciliate the charge; if that fails, EEOC may file suit against the employer or inform the charging party that they may bring suit.[1] A court will review the matter *de novo. See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44-45 (1974).

### C.    EEOC's Rulemaking Implementing the PWFA

The PWFA directs EEOC to issue implementing regulations, 42 U.S.C. § 2000gg-3(a), which EEOC accomplished in the Final Rule. As relevant here, the Final Rule discusses the circumstances when accommodations may be required, and explains that because the PWFA uses the same statutory language as Title VII—"pregnancy, childbirth, or related medical conditions"—and because the PWFA was intended to fill a gap in the existing Title VII framework, that language in the PWFA should have the same meaning as in Title VII. *See* 89 Fed. Reg. at 29,105-14. Thus, because Title VII protects employees who choose to have (or not have) an abortion, so does the PWFA. *See id.* Similarly, because the Supreme Court had interpreted Title VII to include "discrimination based on the potential to be pregnant, not only current pregnancy," *id.* at 29,102 (citing *Int'l Union, United Auto., Aerospace &*

---

[1] The time limits for filing a charge and suit are not jurisdictional and are subject to waiver, estoppel, and tolling. *Zipes v. Trans World Airlines*, 455 U.S. 385, 393 (1982); *Tennessee v. EEOC*, -- F. Supp. 3d ---, 2024 WL 3012823, at *5 (E.D. Ark. June 14, 2024), *appeal filed,* No. 24-2249 (8th Cir. June 20, 2024).

*Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991)), the PWFA may encompass accommodations for infertility treatments "depending upon the facts of the case, including whether the infertility treatments are sought by an employee with the capacity to become pregnant for the purpose of becoming pregnant." *Id.* at 29,102-03. For both abortion and infertility treatments, however, there is no obligation that an employer or employer-sponsored health plan cover or pay for the procedures, or "that leave as an accommodation be paid leave." *Id.* at 29,101, 29,104.

As for the PWFA's anti-retaliation and anti-coercion provisions, the Final Rule borrows from the Title VII and ADA frameworks. *See id.* at 29,148. The anti-coercion provision "does not apply to any and all conduct or statements that an individual finds intimidating; it prohibits only conduct that is reasonably likely to interfere with the exercise or enjoyment of PWFA rights." *Id.* And as noted, EEOC acknowledged that employers may have defenses for not providing accommodations in particular circumstances—*e.g.*, undue hardship, constitutional, and other defenses[2]—and committed to evaluating those defenses on a case-by-case basis, as it does under Title VII, *see id.* at 29,145-55. EEOC also enhanced its procedures to more promptly consider defenses, including religious ones, that, if applicable, would result in dismissal of the charge. *Id.* at 29,147. *See also* Guidance at 98-99; EEOC, *Questions and Answers for Respondents on EEOC's Position Statement Procedures* 2, https://perma.cc/ED59-SNKR (explaining respondents may "request that the EEOC prioritize consideration of the religious defense before investigating the merits of the charge").

## II.    THE TITLE VII GUIDANCE

While the PWFA granted EEOC authority to issue implementing regulations, Title VII granted EEOC enforcement authority, but not authority to issue substantive regulations. *See EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 257 (1991). Thus, the Guidance is a statement of EEOC's position and "is not intended to be binding in its own right." 29 C.F.R. § 1695.1(a). It "addresses how harassment based on race, color, religion, sex, national origin, age, disability, or genetic information is

---

[2] One such constitutional defense is the "ministerial exception," which courts have applied to "laws governing the employment relationship between a religious institution and certain key employees." *Our Lady of Guadalupe Sch. v. Morrisey-Beru*, 591 U.S. 732, 737 (2020). The Final Rule also incorporates Title VII's religious employer exception as a Rule of Construction, 42 U.S.C. § 2000gg-5(b).

defined under EEOC-enforced statutes and the analysis for determining whether employer liability is established." Guidance at 2. Its contents "do not have the force and effect of law, are not meant to bind the public in any way, and do not obviate the need for EEOC and its staff to consider the facts of each case and applicable legal principles when exercising their enforcement discretion." *Id.* at 8. EEOC does not "prejudge the outcome of a specific set of facts presented in a charge." *Id.*

Plaintiffs assert that several portions of Section II of the Guidance require or prohibit certain speech consistent with Catholic doctrine. *E.g.*, PI Br. at 13; Guidance at 9. But Section II "identifies the legally protected characteristics covered by the federal [employment] laws enforced by the EEOC" and explains how to determine whether relevant harassing conduct is "because of" such a protected characteristic. Guidance at 9. It does not address whether an employer violates Title VII based on the examples cited. *See id.* In relevant part, the challenged portions rely on *Bostock v. Clayton Co.*, 590 U.S. 644, 662 (2020), to explain that "[s]ex-based discrimination under Title VII includes employment discrimination based on sexual orientation or gender identity." Guidance at 17. While *Bostock* was itself limited to "allegations of discriminatory discharge," the Guidance explains that other "courts have readily found post-*Bostock* that claims of harassment based on one's sexual orientation or gender identity are cognizable under Title VII." *Id.* at 110 (collecting cases). The Guidance also provides examples of "harassing conduct" that courts have found, in certain circumstances, contribute to unlawful harassment, including "repeated and intentional . . . misgendering" and "the denial of access to a bathroom or other sex-segregated facility consistent with the individual's gender identity." *Id.* at 17 (cleaned up). The Guidance also explains that "harassment based on pregnancy, childbirth, or related medical conditions," which "can include issues such as . . . deciding to have, or not to have, an abortion" may be considered sex-based harassment under Title VII. *Id.* at 15 (collecting cases).

Although the Guidance was designed to "communicate[] the Commission's position on important legal issues," it is not a "survey of all legal principles that might be appropriate in a particular case." *Id.* at 2, 8. For example, EEOC expressly did not address whether the "rights or requirements" of "the United States Constitution; other federal laws, such as the Religious Freedom Restoration Act (RFRA); or sections 702(a) and 703(e)(2) of Title VII" were implicated by the issues discussed in the

Guidance. *Id.* at 8. Though EEOC acknowledged that such rights may be implicated in specific circumstances, EEOC noted that it considers those defenses "on a case-by-case basis," and committed to enhancing its administrative procedures to facilitate prompt resolution of religious defenses. *Id.* at 8, 98-99. EEOC also emphasized that its Guidance should not be construed to prohibit "*any* workplace discussion of religious perspectives on certain issues, such as abortion or gender identity." *Id.* at 96.

## III.   PROCEDURAL HISTORY

The Final Rule took effect on June 18, 2024, *see* 89 Fed. Reg. at 29,096, though the PWFA has been in effect since June 2023. The Guidance was issued on April 29, 2024. Plaintiffs filed suit on July 24, 2024, naming EEOC and its chair, Charlotte Burrows, as Defendants. *See* ECF No. 1. The named Plaintiffs are the Catholic Benefits Association (CBA) and the Bismarck Diocese, but the Complaint also attaches declarations from two CBA members: the Diocese of Baker, Oregon (ECF No. 1-5) and the Archdiocese of St. Paul and Minneapolis (ECF No. 1-6). Plaintiffs' motion for preliminary relief requests injunctive relief for Plaintiffs and "all present and future members of the [CBA]," prohibiting Defendants from enforcing the Final Rule "in a manner that would require them to accommodate direct abortion or immoral infertility treatments," or "speak in favor of . . . or refrain from speaking against the same"; and from enforcing the Guidance "in a manner that would require them to speak or communicate in favor of [or refrain from speaking or communicating against] direct abortion, immoral fertility treatments, or gender transition when such is contrary to the Catholic faith;" "use pronouns inconsistent with a person's biological sex; or allow persons to use private spaces reserved for the opposite sex." ECF No. 8 at 2-3.[3]

---

[3] Plaintiffs describe their religious beliefs in terms of opposition to "direct abortion" and "immoral infertility treatment." *E.g.* Compl. ¶ 172. They assert that "direct abortion" is an "abortion willed either as an end or a means," *id.* ¶ 65, and "immoral infertility treatments" are "methods that involve third parties"; "separate fertilization from the conjugal act"; or "entail conception outside of a marriage," *id.* ¶ 73. While the scope of Plaintiffs' objections is not clear, Defendants do not understand them to object to all abortions or infertility treatments. *E.g.*, *id.* ¶¶ 66, 72. Defendants' use of the word "abortion" is intended to mean what Plaintiffs refer to as "direct abortion" unless otherwise indicated. As to infertility treatments, the main objects of Plaintiffs' objections appear to be, as relevant to the

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy" that "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). To obtain such relief, Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that [the relief] is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

## I.   THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS

"Article III requires a plaintiff to show that she has suffered an injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Haaland v. Brackeen*, 599 U.S. 255, 291-92 (2023); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Moreover, "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Plaintiffs have not carried their burden to establish each element.

### A.   Plaintiffs' Injuries Are Highly Speculative

*Final Rule*: Plaintiffs' only theory of injury is that the Bismarck Diocese and CBA members are "subject to the EEOC's PWFA Rule[.]" PI Br. at 16. Plaintiffs have not claimed—let alone submitted any evidence demonstrating—that they would "actual[ly] or imminent[ly]" be subject to any EEOC enforcement actions, *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024), based on the Final Rule's coverage of abortion and CIT. To obtain pre-enforcement review, "plaintiffs must show a substantial risk [of enforcement against them] in the near future." *Id.*; *see California v. Texas*, 593 U.S. 659, 669-71 (2021). Plaintiffs have not made such showing, as another court in this circuit recently determined in a similar challenge to the Final Rule. *See Tennessee*, 2024 WL 3012823, at *4 (recognizing that a "regulated party" must still establish "Article III's 'irreducible constitutional minimum'" (quoting

---

Final Rule, care that involves oocyte (egg) retrievals, artificial inseminations, or embryo transfers. Defendants refer to the care here at issue as Challenged Infertility Treatments or "CIT."

*Lujan*, 504 U.S. at 560)) (appeal filed June 20, 2024).

For Plaintiffs' or their members' injury to be credible, numerous contingencies would all have to occur: one of their female employees must (1) become pregnant or seek to become pregnant; (2) need, and choose to pursue, care to which Plaintiffs object (abortion or CIT); (3) also need an accommodation for that abortion or CIT; (4) be unable to use existing leave to the extent time off is needed; and (5) notwithstanding her employment at a Catholic-affiliated employer and her employer's known beliefs, choose to seek an accommodation from her employer for that abortion or CIT. And even then, several more contingencies must occur before any EEOC enforcement is filed: (6) the employee, after being denied the accommodation, must file a charge; (7) EEOC must reject all of the employer's potential defenses, including based on undue hardship, the Rule of Construction, the ministerial exception and RFRA; and (8) EEOC must conclude that reasonable cause exists to believe a violation occurred, fail to resolve the matter through conciliation, and then decide to bring suit. Courts routinely reject such theories of injury that "rel[y] on a highly attenuated chain of possibilities[.]" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *Whitmore v. Arkansas*, 495 U.S. 149, 157-60 (1990); *see also Tennessee*, 2024 WL 3012823, at *4 (finding the "many-step series of events" required for a PWFA-enforcement action to materialize defeats standing); *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 998-99 (8th Cir. 2022); *Nat'l Conf. of Cath. Bishops v. Smith*, 653 F.2d 535, 540 (D.C. Cir. 1981) (Catholic membership organization lacked standing to challenge EEOC's Title VII guidelines encompassing abortion because they failed to establish any employees "have or would seek" abortion benefits, particularly where employees were "likely to be aware of [their employers'] opposition to abortions" and thus unlikely "to request such benefits."); *Religious Sisters of Mercy v. Becerra,* 55 F.4th 583, 602 (8th Cir. 2022) (citing *Summers*, 55 U.S. at 499).[4]

Indeed, despite the PWFA being in effect since June 2023, the Final Rule since June 2024, and

---

[4] Unlike in *Religious Sisters of Mercy*, here no Plaintiff can establish a non-speculative, imminent threat of enforcement. That case is also distinguishable because the HHS regulation at issue "contain[ed] no religious exemption," and as to the Title VII-related claim, Plaintiffs alleged that EEOC had pursued enforcement actions against entities in similar situations. 55 F.4th at 605, 607. By contrast, the Final Rule specifically contemplates that an employer may have defenses, including religious defenses, to a charge, and commits to evaluating them on a case-by-case basis. 89 Fed. Reg. at 29,145-55.

Title VII for decades more, Plaintiffs do not identify *any* employee who has sought an accommodation or leave for an abortion or CIT, let alone filed an EEOC charge for a related denial. Nor do they identify any EEOC enforcement actions brought under any of these circumstances, including against an employer with religious objections. *Cf.* 89 Fed. Reg. 29,155 n.313. Plaintiffs thus provide no reason to believe any of their employees will imminently request an accommodation to which Plaintiffs object, much less that EEOC would bring an enforcement action in that circumstance.

For many of the same reasons, Plaintiffs cannot claim a risk of enforcement based on the purported need to change their "speech." *See* PI Br. at 9-14. Plaintiffs express concern about liability under the Final Rule's anti-retaliation and anti-coercion provisions, but they provide no evidence that they are engaging in the type of conduct that would violate the Final Rule. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) (plaintiff must show "intended future conduct" that is "arguably proscribed" (cleaned up)). Similar provisions have existed in Title VII and the ADA for decades, yet Plaintiffs do not identify any history of allegedly unlawful enforcement under those statutes. And the Final Rule confirms that the type of speech Plaintiffs describe—*i.e.*, general statements about their views on abortion or CIT—does not constitute coercion under the PWFA. *See* 89 Fed. Reg. at 29,148 ("[T]he making of general statements regarding an employer's mission or religious beliefs is not the type of conduct that the Commission previously has determined would be prohibited by this provision."); *id.* at 29,216 (providing additional examples of violations, none of which involve expression of religious views). *Cf. Sch. of the Ozarks*, 41 F.4th at 998 (rejecting a "theory of injury" that "is based on a misunderstanding" of challenged action).

*Guidance*: For many of the same reasons, Plaintiffs also lack standing to challenge the separate Guidance document. *See Davis v. FEC*, 554 U.S. 724 (2008) ("[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (cleaned up)). Plaintiffs suggest, without explanation, that the Guidance "force[s]" them "to use false pronouns upon an employee's request, to refrain from expressing Catholic teaching regarding sexual issues, and to give employees of one sex access to private spaces reserved for those of the other sex." PI Br. at 18. But the Guidance requires no such thing. It does not purport to prejudge any particular case or conclude

that any employment practice related to these issues is *per se* unlawful harassment. Instead, the Guidance merely explains EEOC's non-binding view that applications of those kinds of practices may, in some circumstances, contribute to a viable hostile work environment claim under Title VII. But a plaintiff generally may not challenge a non-binding document outside the context of a specific application of the policy. *See, e.g., Cornish v. Blakey*, 336 F.3d 749 (8th Cir. 2003) (no standing to challenge agency memorandum related to guidelines for mandatory drug testing of federal employees); *see also Trump v. New York*, 592 U.S. 125, 129-30 (2020).

Moreover, Plaintiffs again fail to show that they will "actual[ly] or imminent[ly]" be subject to any EEOC enforcement actions, *Murthy*, 144 S. Ct. at 1986, as their theory of injury glosses over the many necessary steps between the issuance of the Guidance (which does not itself create Title VII liability) and the initiation of an actual Title VII enforcement proceeding. Hostile work environment claims under Title VII are subject to the same multi-step EEOC enforcement process that applies to PWFA claims, making any claim of injury similarly reliant on a highly attenuated chain of possibilities. And Plaintiffs make no claim that they employ any transgender employee, making it wholly speculative whether Plaintiffs will ever confront a situation addressed by the challenged portions of the Guidance (let alone face an enforcement action under Title VII). Therefore, Plaintiffs do not sufficiently allege an injury-in-fact. *Sch. of the Ozarks*, 41 F.4th at 1000 (listing agency rejections of RFRA and First Amendment exemptions as necessary steps in "highly attenuated chain of possibilities" (quoting *Clapper*, 568 U.S. at 410)).

**B.      Plaintiffs Have Not Proven that Their Alleged Injuries Are Traceable to EEOC or Redressable by an Order Against EEOC**

*Final Rule*: Plaintiffs further lack standing because they have not established traceability or redressability. "Pausing all or part of the regulation or its enforcement will not . . . prevent an aggrieved employee" from filing a charge or lawsuit under the PWFA or Title VII alleging that their employer failed to accommodate their abortion or CIT. *Tennessee*, 2024 WL 3012823, at *4; *see Murthy*, 144 S. Ct. at 1995 (private entities "not parties to the suit" are not "obliged to honor an incidental legal determination the suit produced"). Plaintiffs will thus be exposed to their same claimed injuries

regardless of any relief provided here. *See Tennessee*, 2024 WL 3012823, at *5; *Digit. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015); *Sch. of the Ozarks*, 41 F.4th at 1001. Moreover, Plaintiffs have not established that their injuries are attributable to the Final Rule (or the PWFA), as opposed to separate, unchallenged laws like Title VII. *See, e.g., Adv. Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006) (no redressability where "unchallenged provisions" would still prohibit plaintiff's desired conduct).

    *Guidance*: Traceability and redressability are even more attenuated with respect to the Guidance. The Guidance is not a substantive regulation; it does not have the force or effect of law and does not itself impose any legal obligations on Plaintiffs or on any other regulated party. In other words, it is not the Guidance that imposes liability for claims of harassment; rather it is Title VII. Therefore, even if a court sets aside or enjoins EEOC's reliance on the Guidance, EEOC (and private parties) could still enforce Title VII against Plaintiffs. *School of the Ozarks* is instructive on this point. Even if an agency "were enjoined from enforcing its internal [guidance] directive, the agency would still be required by statute to investigate sex-discrimination complaints," including based on "gender identity or sexual orientation," and in doing so "must consider the meaning of [the underlying anti-discrimination statute] in light of *Bostock* and its interpretation of similar statutory language." 41 F.4th at 1001; *see also Tennessee*, 2024 WL 3012823, at *4. Moreover, as with the PWFA, private individuals not party to this suit would not be bound by any determination as to the Guidance's legality.

### C.    CBA Further Lacks Standing to Bring Claims on Behalf of Unnamed Members

    CBA lacks standing to assert claims on behalf of unidentified members. *See Religious Sisters*, 55 F.4th at 602. It has not established that those members suffer an injury-in-fact, and its claims "require[] the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343.

    CBA asserts that its three identified members (all Catholic dioceses) support standing for its approximately 8,480 members, Compl. ¶ 40, which include not only dioceses but "parishes, religious orders, schools, charities, colleges, hospitals, and other Catholic ministries along with Catholic-owned businesses," *id.* ¶ 41. CBA has not shown that any injuries attributable to the named dioceses extend to unidentified members. For example, the ministerial exception would apply to many employees of

the named dioceses. *See, e.g.*, 89 Fed. Reg. 29151. In contrast, some members, including certain for-profit entities, may not be covered by the ministerial exception, Title VII's religious employer exemption (and the PWFA's incorporation of that exemption), or RFRA, and thus those particular entities would lack standing to bring that claim. *See Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 348 (1987) ("[Section] 702 raises different questions as it is applied to nonprofit and for-profit organizations");[5] *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 717 (2014) (declining to consider RFRA's applicability to large, publicly traded corporations).

CBA has also not established that its diverse members hold identical views, including as to abortion, CIT, pronouns, Catholic teaching regarding sexual issues, or bathroom access for transgender employees such that they are injured in the same way as alleged by the identified dioceses. *See, e.g.*, *United States v. Ali*, 682 F.3d 705, 710 (8th Cir. 2012) (individuals of same religion may have "inconsistent . . . interpretations" of religious "doctrine"); 89 Fed Reg. at 29,104 ("[B]eliefs about when an abortion may be morally or religiously permissible, even within religious traditions, are not monolithic."). For this reason, too, "participation of individual members . . . is essential to a proper understanding and resolution of" their claims. *Harris v. McRae*, 448 U.S. 297, 321 (1980) (Free exercise claim "ordinarily requires individual participation" because it requires showing "coercive effect of the enactment as it operates against [individual] in the practice of his religion").

Indeed, the diversity of CBA's membership, coupled with the fact-specific analysis inherent to PWFA and Title VII claims, demonstrate why individual participation of CBA's members is necessary. There are numerous factual issues that would need to be resolved before evaluating Plaintiffs' actions under the PWFA and whether any religious or other defenses apply, such as: the specific accommodation requested; if the abortion or CIT sought violated the employer's religious beliefs; the employer's leave policies; the burdens on the employer of granting the accommodation, including undue hardship; and any allegedly retaliatory or coercive acts. The Guidance similarly does not purport

---

[5] Tests developed by Circuit courts are in alignment that for-profit employers, even those majority owned and governed by Catholics, *cf.* Compl. ¶ 38, have a harder time qualifying for Title VII's religious employer exception. *See, e.g.*, *Spencer v. World Vision, Inc.*, 633 F.3d 723, 724 (9th Cir. 2011); *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 226, 229 (3d Cir. 2007).

to impose specific employment practices on Plaintiffs, thus any alleged burdens can only be assessed within a specific factual scenario. Each element of a harassment case presents a question that "can be determined only by looking at all the circumstances" of a particular claim. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). For these same reasons, Plaintiffs' claims are not ripe, *see Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), and are best adjudicated in the context of a concrete scenario, should one ever materialize, where the Court would have the "benefit [of] further factual development," *Sch, of the Ozarks*, 41 F.4th at 998, and the certainty that "there is even a dispute here to resolve," *Nat'l Right to Life PAC v. Connor*, 323 F.3d 684, 694 (8th Cir. 2003); *see also Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808-12 (2003).

## II. PLAINTIFFS HAVE NOT OTHERWISE SHOWN A LIKELIHOOD OF SUCCESS

### A. Neither the Final Rule nor the Guidance Violate RFRA

Plaintiffs' RFRA claim portrays the Final Rule and Guidance as requiring them to violate their religious beliefs, and EEOC as rendering religious employer protections in the Final Rule "meaningless." PI Br. at 10, 18-19. In reality, the Final Rule and Guidance do not purport to resolve any RFRA defenses and commit to evaluating such issues on a fact-specific basis, and EEOC's enhanced procedures allow for expedited review of defenses, including religious ones. This case-by-case approach is fully consistent with RFRA.

#### 1. The Final Rule and Guidance Lawfully Adopt a Case-By-Case Approach

Contrary to Plaintiffs' portrayal, the Final Rule and Guidance acknowledge that employers may have RFRA defenses and commit to a fact-sensitive, case-by-case analysis. *See* 89 Fed. Reg. at 29,148-49; Guidance at 8. In cases relied on by Plaintiffs, *see* PI Br. at 17-19, courts concluded that the challenged agency policy actually required plaintiffs to take action in violation of their religious beliefs. Here, in contrast, EEOC has not asserted that Plaintiffs (or any employer) are required to accommodate abortions or CIT to which they have a religious objection (or that otherwise pose an undue burden), or that Plaintiffs are required to have any specific employment practice related to pronouns or bathrooms. *Compare Hobby Lobby*, 573 U.S. at 720 ("[T]he HHS mandate demands that [plaintiffs] engage in conduct that seriously violates their religious beliefs"); *Braidwood Mgmt., Inc. v.*

*EEOC*, 70 F.4th 914, 929 (5th Cir. 2023) (EEOC's legal position conceded that employer's conduct violated the law), *with* 89 Fed. Reg. at 29,149; Guidance at 7.

Plaintiffs fail to grapple with EEOC's commitment to evaluate RFRA (and other defenses) "consistent with the facts presented and applicable law," 89 Fed. Reg. at 29,147 (Final Rule), and to "consider the implication of such rights and requirements on a case-by-case basis," Guidance at 7. Indeed, RFRA itself recognizes that sometimes the statute may need to be asserted "as a . . . defense in a judicial proceeding." 42 U.S.C. § 2000bb-1(c). Plaintiffs do not provide any reason such a case-by-case approach to evaluating RFRA would itself violate RFRA. *See Brown v. Collier*, 929 F.3d 218, 230 (5th Cir. 2019) ("[W]hether the government action or regulation in question imposes a substantial burden on an adherent's religious exercise requires a case-by-case fact-specific inquiry."). They do not assert that participating in the case-by-case process itself burdens their religious observance, or that the case-by-case process is inadequate to protect their rights. Nor could they. EEOC's charge process is a non-adversarial, administrative proceeding and EEOC "take[s] great care in evaluating [any] asserted religious or other defenses." 89 Fed. Reg. at 29,147 (cleaned up); *see* Guidance at 98. For example, as the Final Rule explains, using EEOC's enhanced procedures, employers can raise religious (or other) defenses at any stage of the process, request prioritization of such defenses, and "easily inform [EEOC] of a potential defense" via an online portal. *Id.* at 29,147-48. And EEOC is committed to "resolv[ing] the charge based on the information submitted in support of asserted defenses, including religious defenses, in order to minimize the burden on the employer and the charging party." *Id.* at 29,148. These enhanced procedures were not at issue in *Christian Employers Alliance v. EEOC*, --- F. Supp. 3d ---, 2024 WL 935591 (D.N.D. Mar. 4, 2024).

EEOC could not have adopted an alternative approach as to the Final Rule given the nature of the PWFA framework. Whether an accommodation is covered by the PWFA, is "reasonable," and is not an undue hardship are all based on the specific circumstances of the employer and employee. *See, e.g., id.* at 29,100 ("whether a specific condition is related to pregnancy or childbirth is a fact-specific determination"); *id.* at 29,125 (whether "accommodations may cause an undue hardship in a specific situation . . . is fact-specific"); *id.* at 29,122 ("The amount of leave under the PWFA depends

on the employee and the known limitation[.]"); *id.* at 29,102 ("whether infertility and fertility treatments are covered by the PWFA will be based on the particular circumstances of the situation"). Similarly, whether a specific accommodation burdens an employer's religious views will depend on the relevant details. *See id.* at 29,153 ("the specific facts and circumstances in a given situation may affect whether the employer objects to an employee's actions on religious grounds"). Indeed, Plaintiffs here do not claim to oppose all abortions and infertility treatments. *See* Compl. ¶¶ 66, 72. EEOC thus cannot say, "in the abstract, in the absence of a concrete factual context," whether a particular accommodation would fall under an undue hardship, RFRA, or other exception. 89 Fed. Reg. at 29,147. And even if it could, other structural barriers prevent EEOC from addressing religious concerns earlier in the process. For one, because EEOC has no investigatory authority until a charge of discrimination is filed, "[t]he PWFA does not provide a mechanism for [EEOC] to provide legally binding responses to employer inquiries about the potential applicability of religious or other defenses before th[at] point." *Id.* at 29,147. Similarly, "[c]reating a per se rule that an employer's beliefs automatically and always create an undue hardship would be fundamentally inconsistent with [the PWFA and ADA's statutory] requirement that undue hardship be assessed as a defense on a case-by-case basis, and would therefore be inconsistent with the PWFA." *Id.* at 29,153.

Nor could the Guidance have declared certain conduct *per se* non-harassing for certain employers given Supreme Court precedent stressing the importance of context in harassment claims. *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (per curiam). The Final Rule's and Guidance's case-by-case approaches thus both address Plaintiffs' concerns and adhere to RFRA's demand for "a case-by-case, fact-specific inquiry." *Brown*, 929 F.3d at 230 (citation omitted); *see also O Centro*, 546 U.S. at 430, 436 (reaffirming "the feasibility of case-by-case consideration of religious exemptions to generally applicable rules"); 89 Fed. Reg. at 29,148-49.

### 2. The Court Should Not Grant Plaintiffs a Blanket RFRA Exemption

Even if some additional RFRA analysis were necessary beyond upholding the Final Rule's and Guidance's case-by-case approach, Plaintiffs are not entitled to a preemptive declaration that religious employers will always prevail under RFRA.

### i.    Plaintiffs Do Not Demonstrate a Substantial Burden.

*Final Rule*: It is not clear that Plaintiffs' religious exercise is substantially burdened by every accommodation associated with abortion or CIT, as opposed to only knowing accommodations. *See, e.g.,* Compl. ¶ 96 (alleging that PWFA's makes it "more likely [an employer will] become aware of an employee's [abortion or CIT], that, before the PWFA, might have remain hidden or left undiscussed"); Hebda Decl. ¶ 8 (describing "sacred obligation not to knowingly harm other persons"); Cary Decl. ¶ 23 (same). It is far from clear that every accommodation request will necessarily burden Plaintiffs' (and every CBA member's) religion. *See supra* Pt. I.C. Plaintiffs cannot salvage this defect by asserting EEOC "target[s] religious speech." PI Br. at 17. Plaintiffs fail to identify any speech that they claim must be altered. Regardless, the Final Rule does not restrict their abortion- or CIT-related speech; it only prohibits retaliation and coercion, similar to Title VII and the ADA. *See supra* at 10.

*Guidance*: The Guidance likewise does not require or prohibit any specific speech, and indeed explains that Title VII does not prohibit "workplace discussion of religious perspectives on certain issues, such as abortion or gender identity." Guidance at 96. Plaintiffs put forward no plausible explanation as to how the agency's nonbinding Guidance burdens them. The Guidance, moreover, addresses employer liability only under Title VII theories related to harassment, which require, considering "the totality of the circumstances," conduct that is "sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment." *Hairston v. Wormuth*, 6 F.4th 834, 841 (8th Cir. 2021). Plaintiffs do not appear to contend they intend to permit severe or pervasive harassment of any individual, and therefore cannot establish that the Guidance imposes a substantial burden on the exercise of their religion.

### ii.    The Government's Interests are Compelling.

*Final Rule*: Even assuming a substantial burden, Plaintiffs still could not obtain a blanket exemption without demonstrating that the Government will *never* have a compelling interest in ensuring that an employee receives a challenged accommodation, or that less restrictive means are *always* available. They cannot make that showing. First, contrary to Plaintiffs' allegation, *see* PI Br. at 20, the PWFA furthers multiple compelling Governmental interests. This includes the Government's

interest in ensuring that qualified employees can remain in the workforce while receiving healthcare. *See* 89 Fed. Reg. at 29,103-04 n.57; *cf. HCI Distrib. Inc. v. Peterson*, --- F.4th ---, 2024 WL 3630135, at *6 (8th Cir. 2024) (collecting cases). The Government also has compelling interests in eradicating workplace discrimination against women and "removing the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups, including women." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 626 (1984); *see also Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987); *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 736 (2003); 167 Cong. Rec. H2338 (PWFA targets "sex discrimination against pregnant workers [which] often takes the form of reliance on insidious gender role stereotyping concerning women's place in the home and in the workplace"); *id.* at H2331; H.R. Rep. No. 117-27, at 13. This is a more narrowly formulated interest than simply a "compelling interest in combating discrimination in the workplace." *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1148 (D.N.D. 2021).

*Guidance*: Plaintiffs claim that EEOC cannot articulate how exempting "CBA members will harm the asserted interests in preventing discrimination." PI Br. at 20. But the harm is self-evident, *i.e.*, "allowing a particular person . . . to suffer discrimination" would be "directly contrary to the EEOC's compelling interest in combating discrimination in the workforce." *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 591 (6th Cir. 2018), *aff'd sub nom. Bostock v. Clayton Cnty.*, 590 U.S. 644. Indeed, Plaintiffs' contention that the Guidance could *never* satisfy a compelling governmental interest is contrary to *Bostock* itself, in which the Court suggested that RFRA "might supersede Title VII's commands *in appropriate* cases," but did not suggest it would in every case. 590 U.S. at 682 (emphasis added). Instead, courts must be "mindful of the potential for abuse" by "use of the First Amendment as a pretextual shield to protect otherwise prohibited employment decisions." *Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.2d 360, 363 n.3 (8th Cir. 1991). Thus, courts must consider "on a case-by-case basis" whether "a plaintiff's employment discrimination claim can be adjudicated without entangling the court in matters of religion," *id.*, which is antithetical to a blanket exemption, *see Braidwood*, 70 F.4th at 938 (agreeing with "the inapplicability of deciding RFRA claims class-wide"). To be sure, "the government's compelling interest in purportedly eradicating sex

discrimination [is not] a trump card against every RFRA claim." *Id.* at 939. By the same token, however, Plaintiffs cannot claim that, regardless of fact or circumstance, they will always prevail under RFRA.

### iii. The Government Applied Least Restrictive Means.

Finally, the Government uses the least restrictive means. EEOC could not have adopted an alternative approach in the Final Rule due to the nature of the PWFA framework. *See supra* at 15-16. Accommodations like leave from work can only be extended by employers, so EEOC "lacks other means of achieving its desired goal." *Hobby Lobby*, 573 U.S. at 728. Other proffered options, such as governmental "subsidies, reimbursements, tax credits, or deductions," *Christian Emps. All.*, 2024 WL 935591, at *9, would not ensure that individuals can manage pregnancy- or childbirth-related conditions without suffering workplace penalties. As to the Guidance, again, the only way to address harassment is action by the employer—subsides, reimbursements, and tax credits or deductions cannot be used. Indeed, "Title VII is itself the least restrictive way to further EEOC's interest in eradicating discrimination" in the workplace. *Harris Funeral Homes, Inc.*, 884 F.3d at 594; *cf. Hobby Lobby*, 573 U.S. at 733 ("prohibitions on racial discrimination are precisely tailored to achieve" the "critical goal" of "providing an equal opportunity to participate in the workforce"). Plaintiffs should therefore not be granted a blanket RFRA exemption.

### B.     The Final Rule Properly Encompasses Abortion and CIT

Plaintiffs also seek preliminary relief in connection with their Administrative Procedure Act (APA) claims related to the Final Rule. To the extent the Court provides relief under RFRA, there is of course no need to decide these claims. In any event, Plaintiffs' claims are meritless.

### 1.     The PWFA's Text Encompasses Abortion

*Title VII's Text*: In challenging the Final Rule's inclusion of abortion in the definition of "pregnancy, childbirth, or related medical conditions," Plaintiffs ignore Title VII's text, which confirms that "pregnancy, childbirth, or related medical conditions" includes abortion. By using identical language in the PWFA, Congress made clear that accommodations under the PWFA also cover abortion. And the PWFA's text likewise confirms this.

Over four decades ago, Congress amended Title VII to clarify that "[t]he terms 'because of

sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions[.]"42 U.S.C. § 2000e(k). In that same subsection, Congress provided that "[t]his subsection shall not require an employer to pay for health insurance benefits for abortion, *except where* the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion." *Id.* (emphasis added). That latter sentence—and particularly its confirmation that employers *can* be required to pay for abortion when "the life of the mother would be endangered" or "where medical complications have arisen from an abortion"—necessarily means that abortion is included within the first sentence's prohibition of discrimination based on "pregnancy, childbirth, or related medical conditions." Indeed, the legislative history of the PDA makes clear that Congress intended to expand Title VII to include abortion. *See* H.R. Conf. Rep. No. 95-1786, at 4; H.R. Rep. No. 95-948, at 7; H.R. Rep. No. 95-948, at 2.

Thus, when Congress enacted the PWFA with the purpose of expanding Title VII's protections and used the same phrase "pregnancy, childbirth, or related medical conditions" that appears in Title VII, Congress intended the identical phrase in the PWFA to have the same meaning. *See* 89 Fed. Reg. at 29,104-08; *see also George v. McDonough*, 596 U.S. 740, 746 (2022) ("Where Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it."); *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) ("[W]hen Congress uses the same language in two statutes having similar purposes . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."). This alone confirms abortion is covered by the PWFA, given that statute's purpose of *expanding* employees' rights beyond what Title VII offered.

Moreover, the Circuits to have considered the issue are in accord that Title VII's protections for "pregnancy, childbirth, or related medical conditions" include abortion. *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008); *Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1214 (6th Cir. 1996); *see also In re Union Pac.*, 479 F.3d at 942 ("[A]bortion arguably would be 'related to' pregnancy . . . because abortion can only occur when a woman is pregnant."). And these judicial decisions are on top of EEOC's own guidance, which has, for decades, defined the phrase to include abortion. *See* 29 C.F.R. pt. 1604, app., Questions 34-37 (1979); *cf. Bragdon v. Abbott*, 524 U.S. 624, 645 (1998).

_PWFA's Text_: Even absent the longstanding interpretation of "pregnancy, childbirth, or related medical conditions" in Title VII, the same conclusion obtains under the PWFA, as explained in the Final Rule. The PWFA requires reasonable accommodation of "limitations related to . . . pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg-1(1). By including "childbirth" separately from "pregnancy," Congress made clear that it intended to cover "pregnancy" regardless of its outcome (whether birth, miscarriage, abortion, or otherwise). 89 Fed. Reg. at 29,107. And individuals who have an abortion are, definitionally, pregnant. _Id._ at 29,106. Thus, if an employee is denied an accommodation because they are seeking an abortion, they necessarily have been denied an accommodation for reasons related to pregnancy. 42 U.S.C. § 2000gg-1(1); _see_ 89 Fed. Reg. at 29,107.

Plaintiffs claim that an abortion is "not a 'condition' that is related to pregnancy" because it is a "voluntary decision to terminate a pregnancy[.]" PI Br. at 22 (emphasis omitted). Accepting Plaintiffs' contention _arguendo_, the statutory language would still cover abortion. Even when no medical necessity precipitates an abortion, there are conditions accompanying an abortion—like cramping, nausea, or needing to recover—that constitute "related medical conditions" to pregnancy, even under Plaintiffs' cited caselaw. _See EEOC v. Houston Funding II, Ltd._, 717 F.3d 425, 428-29 (5th Cir. 2013) (sources "broadly construe" "medical condition" to include "[a] disease, illness, or injury" or "[a]ny condition—_e.g._, physiological, mental, or psychologic conditions or disorders"). And to the extent those conditions create limitations, like unavailability for work, they can constitute "physical or mental condition[s]," 42 U.S.C. § 2000gg(4), subject to the reasonable accommodation requirement. In circumstances where pregnancy results in complications that threaten a woman's life or health and termination is medically recommended, _see_ 89 Fed. Reg. at 29,103 n.57, those complications are also "related medical conditions" to pregnancy that may create limitations that fall within the PWFA's text.

### 2.    The PWFA's Text Encompasses CIT

The PWFA's plain language also covers CIT. Something is "related to pregnancy," under Title VII, and thus the PWFA, _see supra_ at 20, where it bears directly on a woman's "capacity to become pregnant" or "potential pregnancy." _Johnson Controls, Inc.,_ 499 U.S. at 197, 199, 204, 206 (policy excluding "fertile women" but not "[f]ertile men" from "lead-exposed jobs" violated Title VII by

treating "all its female employees as potentially pregnant"). Because CIT can only be administered to those with the "capacity to become pregnant," for the purpose of pregnancy, it is "related to pregnancy." *Id.* at 206. This Circuit has similarly recognized that "[p]otential pregnancy . . . is a medical condition that is sex-related [under Title VII] because only women can become pregnant." *Walsh v. Nat'l Comput. Sys., Inc.*, 332 F.3d 1150, 1160 (8th Cir. 2003) (quoting *Krauel v. Iowa Methodist Med. Ctr.*, 95 F.3d 674, 680 (8th Cir. 1996)). And to the extent that CIT produces limitations, like unavailability while seeking and recovering from an impregnation procedure, those "physical and mental conditions" are "related to, affected by, or arising out of pregnancy . . . or related medical conditions" and are subject to the PWFA's reasonable accommodation requirements. 42 U.S.C. § 2000gg(4); *see* 89 Fed. Reg. 29,102-03.

To be sure, some cases have found fertility-related claims not actionable under Title VII where there is no disparate treatment between sexes—a requirement for a discrimination claim. *See, e.g.*, *Krauel*, 95 F.3d at 680 (employer's failure to cover *any* fertility treatments, including for male infertility, is not sex discrimination under Title VII). Those cases have no bearing on the CIT at issue here, which can only be provided to those with pregnancy capacity, since "[p]otential pregnancy, unlike infertility, is a medical condition that is sex-related because only women can become pregnant." *Id.* Indeed, consistent with *Johnson Controls*, claims by women seeking leave for CIT are actionable under Title VII. *See, e.g.*, *Hall v. Nalco Co.*, 534 F.3d 644, 648-49 (7th Cir. 2008) (Because "IVF . . . involves a surgical impregnation procedure," employee's "terminat[ion was] not for the gender-neutral condition of infertility, but rather for the gender-specific quality of childbearing capacity"); *Govori v. Goat Fifty, L.L.C.*, No. 10-cv-8982, 2011 WL 1197942, at *3 (S.D.N.Y. Mar. 30, 2011) (finding similarly).

Plaintiffs' sole argument for why CIT is not covered by the PWFA is because such care is "not a limitation or condition of pregnancy that *already has come into existence*." PI Br. at 22 (emphasis added). But as described, the Supreme Court has already disposed of this argument in holding that "pregnancy . . . or related medical conditions" extends to "pregnancy and *potential pregnancy*." *Johnson Controls*, 499 U.S. at 199, 204, 206 (emphasis added); *see also Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005) ("Whether one is or is not pregnant at the time does not control").

### 3. Materials Outside the Text Do Not Change that the PWFA Encompasses Abortion and CIT

Plaintiffs cannot overcome the PWFA's text by relying on legislative history. None of the materials they quote says anything about CIT. Multiple Members of Congress have also recognized that the PWFA protects employees who have (or do not have) an abortion. *E.g.*, H.R. Rep. No. 117-27, at 60 (stating in Minority Report that the statute "could require [an] organization to comply with" a request for "time off to have an abortion procedure"); 167 Cong. Rec. H2228-29 (daily ed. May 12, 2021) (statement of Rep. Taylor Greene declining to support PWFA because it covers abortions); *id.* at H2325 (statement of Rep. Letlow expressing same); *see also* 89 Fed. Reg. at 29,110 n.92 (discussing comments from other Members supporting Final Rule). That includes Senate Sponsor Bob Casey, who recognized that "'pregnancy, childbirth, and related medical conditions,' . . . has been previously defined to include . . . abortion." Cmt. EEOC-2023-0004-98384 at 2 (Oct. 10, 2023), https://perma.cc/HEP8-QMSM; *contra* PI Br. at 23.

The Major Questions Doctrine is also not implicated. EEOC was not exercising discretion in deciding what conditions should be covered by the PWFA but enforcing "policy decisions" made by "Congress . . . itself" in the statutory text. *West Virginia v. EPA*, 597 U.S. 697, 723, 725 (2022); *see* 89 Fed. Reg. at 29,106. In any event, this is not an "extraordinary case[]" implicating "decisions of vast economic and political significance," *EPA*, 597 U.S. at 716, 721, as the Final Rule provides general workplace protections for workers who choose to, *and choose not to*, have an abortion or CIT. Plaintiffs are thus incorrect that the PWFA does not cover accommodations related to abortion and CIT.

### C. The Final Rule Correctly Interprets the PWFA's Rule of Construction

Plaintiffs also challenge the Final Rule's interpretation of PWFA § 107(b), *see* 42 U.S.C. § 2000gg-5(b), which incorporates Title VII's religious employer exception as a Rule of Construction. As an initial matter, Plaintiffs' narrow focus on § 107(b) ignores that not all of CBA's membership necessarily qualifies for every exception, including § 107(b), *see supra* at 12-13, and the Final Rule includes multiple exceptions that pertain to religious employers. This includes the First Amendment's ministerial exception and undue hardship, both of which may well apply to entities like the dioceses. *See* 89 Fed. Reg. at 29,150 (such exception would "likely apply" to "a religious school instructor

employed by the Catholic Church as a Catechist" who is denied an accommodation "because the teacher is pregnant but not married"); *id.* at 29,154 (undue hardship applies where "granting a particular reasonable accommodation would 'fundamentally alter the nature of the business'").

Plaintiffs do not challenge EEOC's interpretation of these defenses, arguing instead only that the Final Rule's interpretation of § 107(b) is too narrow. PI Br. at 25-26. But that provision cannot be considered in isolation; many of the same facts that might implicate § 107(b) could result in successful defenses under the ministerial exception and/or undue hardship. And those fact-specific defenses are properly considered first. *Cf. Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 327-29 (4th Cir. 2024). Plaintiffs have not specifically identified any employees they allege are outside the ministerial exception, nor have they alleged that EEOC would reject their undue hardship defense. Thus, Plaintiffs cannot establish that the Final Rule's interpretation of § 107(b) fails to protect them.

Regardless, Plaintiffs misconstrue what the Final Rule says about § 107(b). Plaintiffs assert that the Final Rule's reference to the religious employer exemption has been "narrowed to cover only claims of religious status discrimination." PI Br. at 25. But as the Final Rule makes clear, entities are free to invoke religion as a defense to *any* PWFA charge of discrimination:

> If a qualifying religious organization asserts as a defense to a claim under the PWFA that it took the challenged action on the basis of religion and that section 107(b) should apply, the merits of any such asserted defense will therefore be determined on a case-by-case basis consistent with the facts presented and applicable law.

89 Fed. Reg. at 29,147.

Plaintiffs suggest that the Final Rule should have been more explicit, and contend that "as with Title VII, a religious employer does not have to provide accommodations under the PWFA when doing so would require accommodation of beliefs, observance, or practices that conflict with the employer's religion." PI Br. at 26. But as the Fourth Circuit recently recognized, "[n]o federal appellate court in the country has embraced the . . . argument that Title VII permits religiously motivated sex discrimination by religious organizations." *Billard*, 101 F.4th at 328; *see also Religious Sisters of Mercy*, 513 F. Supp. 3d at 1141 n.10 (noting most courts deem the religious employer exemption inapplicable to, *e.g.*, "a religious organization charged with discrimination on the basis of sex"). Certainly it is not

unlawful for EEOC, in a Final Rule with nationwide effect, to implement a case-by-case approach for deciding § 107(b) exceptions—as is done with Title VII's religious employer exception, which § 107(b) references—rather than Plaintiffs' preferred categorical rule. That is particularly true in the context of the PWFA, given that Congress itself refused to adopt such a categorical rule. *See* 168 Cong. Rec. S10069-70 (daily ed. Dec. 22, 2022) (rejecting amendment that the PWFA "not be construed to require a religious entity . . . to make an accommodation that would violate the entity's religion"). Moreover, the choice of whether to proceed "through rulemaking or case-by-case adjudication" "lies primarily in the informed discretion of the administrative agency." *N.D. ex rel. Bd. of Univ. & Sch. Lands v. Yetter*, 914 F.2d 1031, 1036 (8th Cir. 1990) (citation omitted)).

Finally, Plaintiffs' invocation of the doctrine of constitutional avoidance is meritless. *See* PI Br. at 26-27. Plaintiffs do not challenge EEOC's implementation of the constitutionally based ministerial exception, and a number of Circuits have already confirmed that Title VII's religious employer exception may be applied consistent with the First Amendment. *E.g.*, *Billard*, 101 F.4th at 329 ("Title VII's religious exemptions . . . implement[] the First Amendment's command to avoid 'intrusive inquiry into religious belief'"); *Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 306 (4th Cir. 2004); *EEOC v. Miss. Coll.*, 626 F.2d 447, 486-89 (5th Cir. 1980). Thus, EEOC's case-by-case approach for evaluating these issues does not inherently raise constitutional concerns.

## III.   THE BALANCE OF THE EQUITIES FORECLOSES RELIEF

Plaintiffs cannot demonstrate the other requirements for preliminary relief. *See Winter*, 555 U.S. at 20. Notably, Plaintiffs seek an injunction only "after it would have been possible 'to preserve the status quo.'" *Ng v. Bd of Regents of Univ. of Minn.*, 64 F.4th 992, 998 (8th Cir. 2023) (citation omitted). The Final Rule has been in effect for over two months, the PWFA for over a year, and the Guidance was issued nearly four months ago. ECF No. 8 at 2-3. Such delay in seeking injunctive relief is "unreasonable," and "defeat[s]" Plaintiffs' "goal of preventing irreparable harm." *Ng*, 64 F.4th at 998. "[A]n absence of a finding of irreparable injury is alone sufficient ground for [denying] the preliminary injunction." *Id.* at 999. CBA offers no reason for its delay, or rationale for altering the status quo.

Moreover, "the speculative nature of the threatened harm support[s] the denial of injunctive

relief." *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*, 602 F.2d 150, 154 (8th Cir. 1979); *see supra* Pt. I.A. Indeed, even if Plaintiffs face an enforcement action, they can still avoid liability by raising their defenses in that proceeding—a possibility that forecloses irreparable injury. *See Sampson v. Murray*, 415 U.S. 61, 88 (1974)); *see also FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980). On the other hand, an injunction would severely harm the Government and employees who may require accommodations or are subject to unlawful workplace harassment. "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up). An injunction against the Final Rule would interfere with Congress's judgment about how best to "eliminate discrimination and promote women's health and economic security." H.R. Rep. No. 117-27, at 1. Those are compelling governmental interests. *See Hobby Lobby*, 573 U.S. at 733. Enjoining the Final Rule and Guidance could also "force into court matters that the EEOC might otherwise have resolved," and "prevent[] earlier resolution" of charges, thereby "increas[ing] the burdens of both time and expense." *West v. Gibson*, 527 U.S. 212, 219 (1999). The requested relief will confuse employers and employees about their obligations and rights under the PWFA and Title VII. Plaintiffs have not shown that any speculative benefits outweigh these harms.

## IV.     ANY REMEDY SHOULD BE LIMITED

If the Court disagrees with the above, any remedy must be limited in four important respects.

*First*, any preliminary relief entered should only extend to the portions of the Final Rule and Guidance from which Plaintiffs claim injuries, and should also extend only to the Parties before the Court. *See, e.g., Lytle v. HHS*, 612 F. App'x 861, 862 (8th Cir. 2015) ("[I]njunctive relief must be narrowly tailored to remedy only the specific harms established by the plaintiff.") (collecting cases). This is particularly true because the Civil Rights Act, the PWFA, and the Final Rule all contain severability clauses. 42 U.S.C. §§ 2000h-6; 2000gg-6; 29 C.F.R. § 1636.8.

*Second*, any preliminary relief for CBA should be limited to its identified Members. The Eighth Circuit has previously declined to grant relief to unidentified CBA members, *see Religious Sisters of Mercy*, 55 F.4th at 602, and CBA has not shown that the injuries allegedly incurred by the named

dioceses extend to its diverse unidentified members. *See supra* at 12-13. Relief to unidentified members is also unwarranted because CBA has not established that CBA's approximately 8,480 members are aware of this suit, let alone that they have agreed to be bound by any judgment. Without such assent, nothing prevents CBA's members from individually suing (or joining a different associational plaintiff) in another jurisdiction. *See, e.g.*, *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 322 F.3d 1064, 1084 (9th Cir. 2023) ("If the individual members of the Association were not bound by the result of the former litigation, the organization would be free to attack the judgment *ad infinitum* by arranging for successive actions by different sets of individual member plaintiffs."). Indeed, at least one CBA member has already filed their own suit, *see* PI Br. at 29 n.8, underscoring the fundamental problem with affording relief to all members. Unidentified CBA members could wait to decide whether to take advantage of any relief awarded in this case or seek to follow a more favorable ruling in a different jurisdiction. Such scenarios present complex preclusion issues, *e.g.*, *Taylor v. Sturgell*, 553 U.S. 880, 894 (2008), and run counter to the equitable concerns of "administrative convenience and efficiency" that the associational-standing doctrine seeks to promote, *United Food and Com. Workers Union Local 751 v. Brown*, 517 U.S. 554, 557 (1996). Relief that applies to thousands of non-parties who have not authorized CBA to litigate on their behalf further amounts to an inequitable one-way class action. *Cf. Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 547 (1974) (describing rule against one-way intervention as preventing potential parties from litigation gamesmanship). Accordingly, any relief entered by this Court should only apply to the Dioceses of Bismarck, Baker, and Saint Paul and Minneapolis. *Cf. Chamber of Comm. of the U.S. v. FTC*, --- F. Supp. 3d ---, 2024 WL 1954139 (E.D. Tex. May 3, 2024).

   *Third*, the Court additionally should not extend relief to CBA's "future members" who were not members at the time of suit, much less to a loosely defined category of "anyone acting in concert with or participating with them." ECF No. 8 at 3. The Supreme Court has never recognized an association's standing to bring suit on behalf of *non-members* who may become members in the future or those merely acting in concert with members. *See Hunt*, 432 U.S. at 342 (recognizing that an association may have "standing to bring suit *on behalf of its members*" (emphasis added)). This would stretch traditional principles of standing beyond recognition. *See, e.g.*, *Lujan*, 504 U.S. at 571 n.5; *Valley*

*Forge Christian Coll. v. Ams. United for Sep. of Church & State, Inc.*, 454 U.S. 464, 474 (1982) ("plaintiff . . . cannot rest his claim to relief on the legal rights or interests of third parties"); *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 397 (2024) (Thomas, J., concurring). Traditional equitable principles further counsel against extending relief beyond current members. *E.g.*, *Gill v. Whitford,* 585 U.S. 48, 73 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury"); *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 765 (1994) ("injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" (citation omitted)). By definition, any present injury is limited to the current, identified CBA members.[6]

*Fourth*, any relief should not prohibit EEOC from complying with its statutory duty to send notices of charges to employers, including CBA members, *see* 42 U.S.C §§ 2000e–5(b), 2000gg–2, and issue NRTS letters to members' employees, regardless of the conduct at issue. If a beneficiary of any relief receives a charge notice that they believe EEOC is foreclosed from pursuing, that employer may inform EEOC and EEOC would cease investigating the portion of the charge affected by any injunction. This approach ensures EEOC is not hindered in its ability to take action based on claims unrelated to the narrow challenges in this case and allows the beneficiary of any relief to identify the conduct that conflicts with their religious beliefs. Continued issuance of NRTS is also important because it triggers a ninety-day period for the recipient to file suit. *See id.* §§ 2000e-5(f)(1), 2000gg–2; 29 C.F.R. § 1601.28. Absent an NRTS, the limitations period would never be triggered, creating uncertainty for employers about whether and when employees might sue and functionally nullifying the statutory limitations period, *see supra* n.1 (discussing non-jurisdictional nature of Title VII's requirements). This Court should avoid triggering such administrative confusion and the attendant burden it would present to courts. *Cf. Christian Emps. All.*, 2024 WL 935591, at *11.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary relief should be denied.

---

[6] If the Court extends relief to future members, it should not extend to any entity that was not a member at the time of an alleged violation. Doing so encourages manipulation and further confusion about employee' rights. Such an entity could raise its own defenses independent of this litigation.

Dated: August 22, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

EMILY B. NESTLER
Assistant Branch Director

DANIEL SCHWEI
Special Counsel

*/s/ Laura B. Bakst*
LAURA B. BAKST (D.C. Bar No. 1782054)
ALLYSON SCHER (D.C. Bar No. 1616379)
JACOB S. SILER (D.C. Bar No. 1003383)
ALEXANDRA WIDAS (D.C. Bar No. 1645372)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 514-3183
Facsimile: (202) 616-8460
Email: Laura.b.bakst@usdoj.gov

*Counsel for Defendants*