UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| THE CATHOLIC BENEFITS ASSOCIATION, on behalf of its members; and BISMARCK DIOCESE, <br><br> *Plaintiffs,* <br><br> v. <br><br> CHARLOTTE BURROWS, Chair of the United States Equal Employment Opportunity Commission; and UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, <br><br> *Defendants.* | No. 1:24-cv-00142-CRH |

**CBA PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION FOR PRELIMINARY INJUNCTION**

Defendants's response argues that the CBA cannot sue on behalf of its members and that this case is premature. In Defendants' telling, it is not *Defendants'* hostility to religious freedom or their eagerness to force Catholic employers to accommodate abortions, immoral infertility treatments, access to single-sex spaces, or false pronouns that is extraordinary. It is instead CBA's seeking pre-enforcement review on an association-wide basis. But Defendants' suit is not procedurally unusual, and Defendants' justiciability arguments have been repeatedly rejected by this and other courts.[1]

---

[1] *E.g.*, *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 606-07 (8th Cir. 2022) (affirming pre-enforcement challenge by CBA to EEOC interpretation of Title VII); *Christian Emps. All. v. United States Equal Opportunity Comm'n*, 2022 WL 1573689, at *9 (D.N.D. May 16, 2022) (pre-enforcement preliminary injunction against EEOC for Christian membership organization); *Christian Emps. All. v. Azar*, 2019 WL 2130142, at *6 (D.N.D. May 15, 2019) (permanent injunction against HHS in favor of Christian membership organization on pre-enforcement basis); *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 695 (N.D. Tex. 2016) (permanent injunction against HHS in

1

Indeed, Defendants have already been preliminarily enjoined from applying the PWFA to cover abortion in a suit brought by a religious plaintiff. *Louisiana v. Equal Emp. Opportunity Comm'n*, 705 F. Supp. 3d 643, 664 (W.D. La. 2024). Because the Final Rule and the Guidance do violence to the statutory text, and because they violate Catholic beliefs, they must be preliminarily enjoined.

1. **This case is justiciable.**

Defendants do not contest CBA members adherence to Catholic teaching that abortion is the taking of a human life; that certain "treatments" for infertility betray the right of a child to be conceived by the loving act of his mother and father, and that biological sex is intertwined with scriptural understanding of God's creative design for humanity. Nor do Defendants challenge the fact that all CBA members agree, as a condition of membership, that they will provide employee benefits and services consistent with Catholic teaching on such matters. Compl. ¶¶ 36-38; Doc. 1-2, art. 3.1; Docs. 1-3, 1-4. And Defendants do not dispute that CBA members will not accommodate abortion, immoral infertility treatments, or false pronouns. Compl. ¶¶ 25-28, 36-38; Doc. 1-2, art. 3.1; Doc. 1-5, ¶¶ 12-16; Doc. 1-6, ¶ 22.

Defendants instead rest their defense on justiciability arguments that the CBA members' claims cannot be adjudicated on a pre-enforcement, association-wide basis—even though the PWFA Final Rule and Enforcement Guidance equally burden CBA members' religious exercise in one fell swoop. Defendants argue that the only way CBA members' religious freedom may be vindicated is as a *defense* to thousands of individual enforcement actions on a "*case-by-case*" basis. Doc. 22, p. 15. That is a radical legal position that has been repeatedly rejected by courts. Because

---

favor of Christian Medical & Dental Society on pre-enforcement basis); *Catholic Benefits Association v. Sebelius*, 24 F. Supp. 3d 1094, 1107 (W.D. Okla. 2014) (preliminary injunction against HHS in favor of CBA).

"[g]overnment harassment of religious organizations requiring them to prove they are religious or evaluating whether their religious preferences can withstand a case-by-case analysis is a sufficient injury" for Article III, *Christian Emps. All.*, 2022 WL 1573689, at *5, Defendants' arguments fail.

### 1.1. CBA Members are suffering Article III injury.

There are two types of injury here: constitutional and regulatory.

First, Article III injury is present if CBA shows: "an intention to engage in a course of conduct arguably affected with a constitutional interest," "arguably proscribed by a statute," and there "exists a credible threat of prosecution thereunder." *Religious Sisters of Mercy*, 55 F.4th at 603 (Plaintiffs included CBA). Defendants do not dispute that CBA Plaintiffs' intended conduct is affected with a constitutional interest or that the PWFA Final Rule and the Enforcement Guidance require CBA members to accommodate and speak in favor of employee abortions, immoral infertility treatments, or gender ideology on their face. Doc. 22, p. 1 (The PWFA Final Rule "encompasses abortion and certain infertility treatments."); *id.*, p. 6 ("The Guidance also provides examples of 'harassing conduct' . . . including 'repeated and intentional . . . misgendering' and 'the denial of access to a bathroom or other sex-segregated facility consistent with the individual's gender identity.'"). That is sufficient for pre-enforcement standing. Courts "assume a credible threat of prosecution" in a "pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict" First Amendment rights. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020) (collecting cases). But were that not enough, Defendants' refusal to disavow enforcement of the Final Rule and the Enforcement Guidance is itself a credible threat. *Religious Sisters of Mercy*, 55 F.4th at 605. And EEOC regularly prosecutes covered employers for

"misgendering" employees and for "gender identity" discrimination. See Enforcement Guidance § 5.c, n.42 (collecting enforcement actions).[2]

Second, CBA's members have suffered regulatory harm. An "additional regulatory burden . . . undeniably [creates] a . . . 'case or controversy.'" *Ass'n of Am. Railroads v. Dep't of Transp.*, 38 F.3d 582, 586 (D.C. Cir. 1994); *see also Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019) (same). CBA's members are objects of the PWFA Final Rule and the Guidance. They have not adopted the requisite accommodating policies, and would incur compliance and training burdens if forced to do so. 89 Fed. Reg. 29,096, 29,175-77 (Apr. 19, 2024) (detailing compliance cost); *see also Louisiana*, 705 F. Supp. 3d at 656 (EEOC forcing religious employer to "choose between two untenable alternatives . . . constitutes injury").

**1.2. Defendants' arguments to the contrary are incorrect.**

Defendants first contend that CBA failed to "submit[] any evidence demonstrating" it is "actually or imminently" subject to an enforcement action. Doc. 22, p. 8 (cleaned up). But it is *Defendants'* burden to "identify a long history of nonenforcement against the plaintiffs and others like them." *Religious Sisters of Mercy*, 55 F.4th at 606. What Defendants themselves have actually offered proof of is the opposite: that an injunction would irreparably injure "employees" of CBA members who "require accommodations" for abortion, immoral infertility treatments, or gender ideology. Doc. 22, p. 29. This distinguishes *National Conference of Catholic Bishops v. Smith*, 653

---

[2] *E.g.*, *Roxanna B. v. Yellen*, EEOC DOC 2020004142, 2024 WL 277871, at *12 (Jan. 10, 2024)(liability imposed for "misgendering and deadnaming"); *Jameson v. U.S. Postal Serv.*, EEOC Appeal No. 0120130992, 2013 WL 2368729, at *2 (May 21, 2013) (misuse of pronoun may constitute sex-based harassment); *Lusardi v. Department of the Army*, EEOC Appeal No. 0120133395, 2015 WL 1607756 at *10-13 (Apr. 1, 2015) (liability imposed for supervisor's use of incorrect pronouns refusal to allow use of restroom consistent with gender identity).

4

F.2d 535, 543 (D.C. Cir. 1981), because there, "EEOC ha[d] not finally settled on its interpretation of the statute" and whose position was in "disarray."

Second, Defendants argue that "numerous contingencies would all have to occur" for a threat of enforcement to be credible. Doc. 22, p. 12. This argument, too, has been oft rejected in similar litigation.[3] Moreover, CBA members are subject to the Final Rule and the Guidance, and thus standing is presumed. *Ass'n of Am. Railroads*, 38 F.3d at 586; *Texas*, 933 F.3d at 446. Finally, the eight-link chain of contingencies Defendants scare up is actually just one. After this case, a Commissioner can file a Commissioner's Charge against CBA's members based upon the CBA's statements herein. *See* 42 U.S.C. § 2000e-5(b) (empowering Commissioners to file charge).

Third, Defendants argue that CBA lacks standing because in the short time since the Enforcement Guidance and PWFA Final Rule have been in effect, no charge has been filed against a CBA member. Doc. 22, p. 9-10. The Fifth Circuit's rejected the same argument in *Braidwood Management*, and its analysis is on all fours here:

> Plaintiffs' credible-threat analysis is quite simple. First, they admit they are breaking EEOC guidance . . . . They posit statutory and constitutional issues with the laws under which they are at risk of being prosecuted: Those issues, they allege, are already forcing plaintiffs to choose either to restrict their religious practices or to risk potential penalties. . . . Finally, the EEOC refuses to declare affirmatively that it will not enforce Title VII against the plaintiffs' policies . . . .

70 F.4th at 926-927; *see also Louisiana*, 705 F. Supp. 3d at 655-56 (same). And yet, an enforcement action is just a matter of time. Catholic employers (and CBA members) are regularly sued for

---

[3] *Religious Sisters of Mercy*, 55 F.4th at 607 (no further factual development necessary to determine credible threat of enforcement from EEOC exists); *Braidwood Management*, 70 F.4th at 931 (rejecting "EEOC's near talismanic mantra that 'further factual development'" is necessary); *Louisiana*, 705 F. Supp. 3d at 656 (rejecting argument that religious plaintiffs' challenge to the Final Rule was not ripe because of possible contingencies).

5

policies related to Catholic teaching on IVF, *Herx v. Diocese of Fort Wayne-South Bend*, 48 F.Supp.3d 1168 (N.D. Ind. 2014); gender identity, *C. P. by & through Pritchard v. Blue Cross Blue Shield of Illinois*, 2022 WL 17788148 (W.D. Wash. Dec. 19, 2022) (concerning Catholic hospital); same-sex marriage, *Doe v. Cath. Relief Servs.*, 618 F. Supp. 3d 244 (D. Md. 2022) (subsequent history omitted); *Starkey v. Archdiocese of Indianapolis,* 41 F.4th 931 (7th Cir. 2022); and abortion, *Curay-Cramer v. Ursuline Acad.*, 450 F.3d 130 (3d Cir. 2006).

Fourth, Defendants assert that CBA Plaintiffs have provided no evidence they will speak in ways contrary to the PWFA Final Rule or the Enforcement Guidance, or discipline employees for speech contrary to Catholic values. Doc. 22, p. 13. That is incorrect. *See* Compl. ¶¶ 22-28, 60-65, 67-68, 77, 81-84, 133-141; Doc. 1-5, ¶ 8-10, 12-18; Doc. 1-6, ¶¶ 14-17, 22. The restriction on speech imposed by the Final Rule and the Enforcement Guidance arise from Title VII's prohibitions on harassment, retaliation, and coercion, the latter two of which are incorporated into the PWFA. *See* 42 U.S.C. § 2000gg-2(f)(1)-(2).

Fifth, Defendants say that the CBA cannot challenge the Enforcement Guidance because it is merely guidance, not a rule. Resp. at 11. Again, this argument has been repeatedly rejected by courts.[4] Like those previous cases, Defendants do not disavow their interpretation of Title VII, which gives rise to a credible fear of enforcement. Doc. 22, p. 11.

---

[4] *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1142 (D.N.D. 2021) (enjoining EEOC interpretation because EEOC would not disavow enforcement), *aff'd in part, remanded in part Religious Sisters of Mercy*, 55 F.4th 583; *see also Braidwood*, 70 F.4th 914, 927 (employer has standing to bring declaratory judgment action with regard to EEOC's guidance interpreting statutory prohibitions on sex discrimination to include sexual orientation and gender identity); *Christian Emps. All. v. United States Equal Opportunity Comm'n*, 2024 WL 935591 (D.N.D. Mar. 4, 2024) (permanently enjoining EEOC interpretation of Title VII).

Sixth, Defendants argue that CBA's claims are unripe because a private plaintiff could still sue a CBA member. Doc. 22, p. 11. But CBA requests the Court to stay and ultimately vacate the PWFA Final Rule and declare that neither the PWFA nor Title VII require CBA members to accommodate abortion, immoral infertility treatments, false pronouns, or access to single-sex spaces. Further, "Private enforcement is simply an additional available remedy." *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 62 (9th Cir. 2024). And, as such, it "does not undercut redressability." *Id.* [5]

**1.3. CBA has associational standing to sue on behalf of its present and future members.**

An association may sue on behalf of its members if: "(1) the individual members would have standing to sue in their own right; (2) the organization's purpose relates to the interests being vindicated; and (3) the claims asserted do not require the participation of individual members." *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 986 (8th Cir. 2011). Defendants dispute only prong three of this test, arguing that CBA's members must sue individually. Doc. 22, p. 12-13. If that were true, then the Christian Employers Alliance and organizations like it would not have had standing in their challenges to HHS's contraceptive mandate and EEOC's gender-transition-services mandate. *See* note 1, *supra*. Defendants' argument misunderstands the doctrine of associational standing. "Where," as here, "an organizational plaintiff seeks only declaratory and prospective injunctive relief, the participation of individual members is not required." *Christian Emps. All.*,

---

[5] Concerning CBA's challenge to the Enforcement Guidance, Defendants argue that *School of the Ozarks v. Biden*, 41 F.4th 992 (8th Cir. 2022) supports their position that CBA's harm here is speculative. Doc. 22, p. 12. Not so. In *Ozarks*, the government defendant had expressly agreed to provide the plaintiff in that case a blanket religious exemption from the challenged interpretation. *Id.* at 999. And in *Ozarks* the government had never enforced the interpretation that was being challenged. *Id.* Here by contrast, Defendants have neutered Title VII's blanket religious exemption and have specifically enforced their errant readings of the statutes as recently as January 2024. *See Roxanna B.*, 2024 WL 277871, at *12.

7

2024 WL 935591, at *4. It also misunderstands the nature of CBA membership, which requires members to provide employee services consistent with Catholic values, Compl., ¶¶ 38-39, which prohibit *any* accommodation of abortion, immoral infertility treatments, or false pronouns, Compl. ¶¶ 59-84; Doc. 1-5 (Cary Declaration); Doc. 1-6 (Hebda Declaration). Again, the Fifth Circuit rejected a similar argument in *Braidwood*, 70 F.4th at 927. Like the religious employers in *Braidwood*, who adopted policies in opposition to EEOC guidelines, CBA members "are entitled to receive clarification from this court before stifling their constitutional practices or otherwise exposing themselves to punishment or enforcement action." *Id.* at 927-28.

### 1.3.1. The Government is precluded from relitigating this issue.

Over the last decade, the government has repeatedly litigated and lost the argument that the CBA lacks associational standing absent the participation of individual CBA members. In *Catholic Benefits Association v. Sebelius*, 24 F. Supp. 3d 1094, 1100–01 (W.D. Okla. 2014), for example, the government argued that the religious burden on CBA members "vary from employer to employer" and thus CBA could not satisfy prong three of the test for associational standing. *Id.* at 1100. The court rejected that argument, reasoning that it "is abundantly clear that all of the CBA's members abide by Catholic conviction" and thus could sue on an associational basis. *Id.* at 1101. The court explained that where "[t]he CBA is seeking an injunction on its members' behalf, . . . this is the type of relief [that] . . . if granted, will inure to the benefit of those members of the association actually injured." *Id.* (cleaned up). This Court has also ruled that participation of individual CBA members is not required in suits like this. *Religious Sisters of Mercy*, 513 F. Supp. 3d at 1137.

The Government is precluded from re-litigating this issue under the doctrine of "mutual defensive collateral estoppel" which "is applicable against the government to preclude relitigation of the same issue already litigated against the same party in another case involving virtually identical

8

facts." *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 169 (1984). Because this "issue of . . . law"—whether the CBA may assert a RFRA claim on behalf of its members—"[wa]s actually litigated and determined by a valid and final judgment, and the determination [wa]s essential to the judgment, the determination is conclusive in [this] subsequent action between the parties." *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 148(2015).

2. **CBA is likely to succeed on the merits.**

    2.1. **The PWFA Final Rule exceeds statutory authority.**

*Text*. Defendants only textual argument is that because the PWFA requires accommodation for "related medical conditions" to "pregnancy" *or* "childbirth," Congress "intended to cover 'pregnancy' regardless of its outcome," including abortion. Doc. 22, p. 21. But elective abortion is not an "outcome" of pregnancy like miscarriage or birth; it is a voluntary choice to *end* a pregnancy. And even if it were, Congress protected only one such "outcome," childbirth, not abortion. Nor is abortion a "medical *condition*" related to pregnancy; it is "better described as a medical 'procedure,'" sought to terminate a pregnancy. *Louisiana*, 705 F. Supp. 3d at 658. So too with fertility treatments. Defendants do not contest that infertility is a "known limitation . . . related to pregnancy, childbirth, or related medical conditions," 42 U.S.C. § 2000gg-1(1), because a woman who is *infertile* is definitionally *not pregnant*. They instead cite inapposite sex-discrimination caselaw that discrimination on the basis of the ability to become pregnant is necessarily sex-based discrimination because only women can become pregnant. Doc. 22, p. 21-22. But the PWFA does not bar sex discrimination; it requires accommodation of conditions related to pregnancy.

*Legislative intent*. Defendants' primary argument is that Title VII, as amended by the Pregnancy Discrimination Act ("PDA"), set "pregnancy, childbirth, and related medical conditions" as a "term of art" that was "transplanted" to the PWFA. Doc. 22, p. 20. Yet the case it cites,

9

*George v. McDonough*, says that establishing a term of art takes not "a few stray [court] decisions," but a "mountain" of "regulatory authority" that "captures 'the state of [a] body of law.'" 596 U.S. 740, 749-50 (2022). The "thin stuff" Defendants supply here, *id.* at 749, fall short of establishing that PDA's alleged "meaning was 'well-settled' before the [alleged] transplantation," *Kemp v. United States*, 596 U.S. 528, 539 (2022). EEOC's argument is that: (1) "pregnancy, childbirth, and related medical conditions" in the PDA covers abortion; (2) the PWFA uses that phrase; (3) the PWFA covers abortion. But this ignores significant contextual differences between the statutes. *Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*, 9 F.4th 803, 807 (8th Cir. 2021) (courts must consider "statutory context"). Namely, the PDA concerns sex discrimination, whereas PWFA concerns accommodation for medical conditions related to pregnancy. Indeed, the statute's words aren't even the same. The PDA's uses the phrase "*include, but are not limited to … pregnancy, childbirth, or related medical conditions.*" 42 U.S.C. § 2000e(k) (emphasis added). The PWFA lacks any such expansive language, narrowing coverage to "known limitation[s]."

*Major questions doctrine*. Defendants' argument ignores that "[a]bortion" and "IVF" are terms "readily understood by everyone." *Louisiana*, 705 F. Supp. 3d at 658. "If Congress had intended to mandate that employers accommodate elective abortions [or infertility treatments] under the PWFA, it would have spoken clearly when enacting the statute, particularly given the enormous social, religious, and political importance of the[se] issue[s]." *Id.*

*Religious exemption*. The PWFA incorporates Title VII's religious exemption. The PWFA Final Rule improperly limits this exemption to claims of religious discrimination. Doc. 11, p. 25.

Defendants first argue that not all CBA members subject to the PWFA would qualify for Title VII's religious exemption incorporated by reference into the PWFA. Doc. 22, p. 23. Not so. All of

10

CBA's members are "religious corporation[s], association[s], educational institution[s], or societ[ies]" within the meaning of Title VII's religious exemption, 42 U.S.C. § 2000e-1(a). *See* Compl., ¶¶ 37-39 (defining membership criteria for CBA).

Defendants argue that because CBA members might have other religious defenses, Defendants need not import Title VII's religious exemption. Doc. 22, p. 24. But whether PWFA imports Title VII's religious exemption turns on the statutory text, not whether other defenses may be available.

Defendants' last-ditch argument is that the PWFA Final Rule does not actually narrow the religious exemption to only discrimination based on religious status, and "instead entities are free to invoke religion as a defense to *any* PWFA charge of discrimination" on a case-by-case basis. Doc. 22, p. 24. But in the next paragraph, Defendants about face and argue that the religious exemption does not reach "religiously motivated sex discrimination by religious organizations." *Id.*

*Constitutional avoidance.* Defendants argue that the doctrine of constitutional avoidance is inapplicable because "Title VII's religious exemptions implement the First Amendment's command to avoid intrusive inquiry into religious belief." Doc. 22, p. 25 (cleaned up). But that is precisely the point. Defendants' refusal to give Title VII's religious exemption its proper scope invites an "intrusive inquiry" into CBA members' religious beliefs on a case-by-case basis.

### 2.2. The PWFA Final Rule and the Enforcement Guidance violate the Religious Freedom Restoration Act.

*Substantial burden.* As a condition of membership, CBA members may not "provid[e] . . . benefits or services" to their employees "inconsistent with Catholic values." Compl. ¶ 38; *see also id.* ¶¶ 59-84. As Bishop Cary, Bishop Kagan, and Archbishop Hebda explain, among other things: CBA members "will not provide any workplace accommodation for an employee to obtain a direct abortion" and "obtaining a direct abortion is grounds for adverse employment action, up to and

11

including termination," Doc. 1-5, ¶ 13; CBA members "will not provide any workplace accommodation for an employee to . . . participate in immoral infertility procedure," *id.* ¶ 24; "[r]equiring [CBA members] to identify another by a sex other than their God-gifted sex would be to require him or her to act against central, unchangeable and architectural teachings of the Catholic faith," Doc. 1-6 ¶ 8; and "[r]equiring a Catholic institution to admit persons of the opposite sex into a space reserve for one sex violates the Catholic" teaching, Doc. 1-6, ¶ 19.

Defendants argue that "it is far from clear every accommodation request will necessarily burden" CBA members' religious beliefs. Doc. 22, p. 17. But if Defendants are correct, and the PWFA and Title VII *ever* require accommodation for abortion, immoral infertility treatment, access to single-sex spaces by a member of the opposite sex, or use of false pronouns, then CBA members' Catholic beliefs have been burdened. *See Braidwood*, 70 F.4th at 931 (religious employers' policies prohibiting conduct inconsistent with faith enough to adjudicate right to religious exemption).

*Strict scrutiny.* As anticipated, Doc. 11, p. 19-20, Defendants merely offer broadly formulated, generalized interests in "eradicating workplace discrimination," and "ensuring that qualified employees can remain in the workforce while receiving healthcare," Doc. 22, p. 17-18. These asserted interests are not even specific to the challenged aspects of the Rule and Enforcement Guidance (abortion, immoral infertility treatments, access to single-sex spaces, and false pronouns), let alone specific to the CBA members as required by law. *See Sharpe Holdings, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 801 F.3d 927, 937 (8th Cir. 2015). Unphased, Defendants attempt to shift their burden to satisfy strict scrutiny to the CBA, arguing that CBA must prove that Defendants lack a compelling interest. Doc. 22, p. 17. But it is *Defendants* who must prove *their* compelling interest.

12

Nor can Defendants carry their burden on less-restrictive means. Defendants argue that any application of the PWFA Final Rule or the Enforcement Guidance must proceed on a case-by-case basis because that is the least restrictive means. Doc. 22, p. 19. But "[d]etermining on a case-by-case basis if a religious exemption should apply is certainly not the least restrictive means, especially in the absence of evidence supporting this position." *Christian Emps. All.*, 2024 WL 935591, at *9. Indeed, Title VII provides an alternative: a religious exemption 42 U.S.C. § 2000e-1(a).

*Case-by-case approach.* Defendants once again argue that RFRA cannot be asserted by a religious association on behalf of its members. Doc. 22, p. 14-16. But there is nothing unusual about CBA's case. Numerous decisions have adjudicated RFRA claims asserted by a religious association.[6]

3. **The remaining preliminary injunction factors favor the CBA and its members.**

*Irreparable harm.* Citing *Ng v. Bd of Regents of Univ. of Minn.*, 64 F.4th 992, 998 (8th Cir. 2023), Defendants argue that CBA members have forfeited their right to a stay or preliminary injunction because CBA filed suit a month after the PWFA Final Rule became effective on June 18, 2024. Doc. 22, p. 25. But *Ng* is distinguishable. First, *Ng* did not arise from a RFRA claim, and "the loss

---

[6] *See, e.g.*, *Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 303 n.26 (1985) ("The Foundation also has standing to raise the free exercise claims of the associates, who are members of the religious organization…."); *Arizona Yage Assembly v. Garland*, 2023 WL 3246927, at *4 (D. Ariz. May 4, 2023) (holding church had associational standing to assert RFRA claim); *Christian Emps. All.*, 2022 WL 1573689, at *8 (holding that Christian association had standing on behalf of its members); *Word Seed Church v. Vill. of Hazel Crest*, 533 F. Supp. 3d 637, 649 (N.D. Ill. 2021)(holding association of churches had associational standing to assert claims); *Fields v. Speaker of the Pennsylvania House of Representatives*, 251 F. Supp. 3d 772, 783 (M.D. Pa. 2017) (holding association could assert free-exercise claim); *Franciscan All.*, 227 F. Supp. 3d at 680 (holding that the CMDA could assert RFRA claim on behalf of 18,000 members); *Big Hart Ministries Assoc., Inc. v. City of Dallas*, 2013 WL 12304552, at *9-10 (N.D. Tex. 2013) (holding that religious organization had associational standing); *S. Fork Band v. U.S. Dep't of Interior*, 643 F. Supp. 2d 1192, 1205–06 (D. Nev. 2009) (holding that group of Indian tribes could assert religious-freedom claims on behalf of their members) (subsequent history omitted); *C.L.U.B. v. City of Chicago*, 1996 WL 89241, at *15 (N.D. Ill. 1996) (holding association could assert free-exercise claim).

13

of freedoms guaranteed by RFRA constitutes per se irreparable harm." *Religious Sisters of Mercy*, 55 F.4th at 608–09. Second, the Plaintiff in *Ng* waited 13 months to file, whereas CBA filed suit the next month. *Ng*, 64 F.4th at 996, 998 (explaining delay must be "significant"). Third, the *Ng* plaintiff, who sought an injunction allowing him to compete as a college gymnast, could not be returned to the status quo, because by the time he sought an injunction, all gymnastic coaches had left for other coaching positions. *Id.* at 998. No such impediment exists here.

*Balance of the equities*. Oddly, Defendants argue that the balance of the equities favor them because "an injunction would severely harm . . . employees who may require accommodations or are subject to unlawful workplace harassment." Doc. 22, p. 26. But the premise of that argument—that CBA members' employees "may require accommodations or are subject to unlawful workplace harassment" for, say, abortion—is why Defendants' action must be enjoined. And in any event, Defendants concede that the Rule and Guidance are underinclusive and thus fail to justify their burden on CBA members' religious rights. Doc. 11, p. 28.

4. **CBA's requested injunction is properly scoped.**

Defendants raise concerns about the CBA's requested preliminary injunction, all of which are unfounded. First, Defendants request that any preliminary relief be limited to the challenged portions of the PWFA Final Rule and the Guidance. Doc. 22, p. 26. That is what CBA has requested. Doc. 8, p. 2-3, ¶¶ 1-3. Second, Defendants argue that an association-wide injunction is improper because CBA members might take advantage "a more favorable ruling in a different jurisdiction" or could be precluded from receiving the benefit of this Court's injunction. Doc. 22, p. 27. But the CBA's proposed injunction accounts for that. It is limited to "employer[s] [who have] not yet protected from the" Rule or the Guidance or who are not "subject to an adverse ruling on the merits

in another case involving the PWFA, the PWFA Rule, Title VII, or the Harassment Guidelines with regard to the employer practices described in paragraphs 1 and 2 above." Doc. 8, p.4.

Third, Defendants argue that relief should be limited to only CBA's present members. Doc. 22, p. 27-28. CBA seeks relief protecting all of its members, because protecting Catholic employers from government coercion is at the heart of its mission.[7] Once again, collateral estoppel applies because Defendants have litigated and lost this argument before. In *CBA v. Sebelius*, 24 F. Supp. 3d 1094 (W.D. Okla. 2014), CBA filed suit on behalf of its members, seeking an injunction against the Government's contraceptive mandate. The court initially sided with the Government and refused to issue relief that extended to the CBA's future members. *Id.* at 1106-07. The Government's opposition to protection of CBA's future members resulted in the CBA having to file a second lawsuit to seek the same relief for new members: *CBA v. Burwell*, 5:14-cv-685 (W.D. Okla.). After numerous successful motions to extend the Court's preliminary injunction to protect new CBA members, the court found that it was more judicially efficient to issue a permanent injunction that protects the CBA's future members. *See* ECF No. 184 at p.2, *Catholic Benefits Association v. Hargan*, 14-cv-240 (W.D. Okla. Mar. 7, 2018). Having litigated and lost this argument, the Government is estopped from re-raising it. Nor is there anything unusual about CBA's request. This Court has previously entered an injunction protecting future members of a religious association. *Christian Emps. All.*, 2019 WL 2130142, at *5.[8]

---

[7] Restricting relief to the CBA's present members would cripple the CBA. The CBA was established "[t]o work and advocate for religious freedom of Catholic and other religious employers" and "[t]o support Catholic employers" who, "as part of their religious witness and exercise," wish to provide employee benefits "in a manner that is consistent with Catholic values." Compl., ¶ 46.

[8] *See also Christian Emps. All.*, 2022 WL 1573689, at *9 (injunction inuring to the benefit of "present or future members"); *Religious Sisters of Mercy*, 513 F. Supp. 3d at 1153 ("[I]njunctive relief

DATED: September 5, 2024.

                Respectfully submitted,

*/s/ L. Martin Nussbaum*
L. Martin Nussbaum
Andrew Nussbaum
First & Fourteenth PLLC
2 N. Cascade Ave., Suite 1430
Colorado Springs, CO 80903
(719) 428-2386
martin@first-fourteenth.com
andrew@first-fourteenth.com
*-and-*
Michael Francisco (pro hac vice pending)
First & Fourteenth PLLC
800 Connecticut Ave NW, Suite 300
Washington, DC 20006
(202) 754-0522
michael@first-fourteenth.com
*(application for admission forthcoming)
*Attorneys for Plaintiffs*

---

should extend to the Catholic Plaintiffs' present and future members . . . ."); ECF No. 82 at p. 2-3, *Little Sisters of the Poor Home for the Aged v. Azar*, 13-cv-02611 (D. Colo. May 29, 2018) (enjoining HHS mandate enforcement against "all current and future participating employers in the Christian Brothers Employee Benefit Trust Plan"); ECF No. 95, *Reaching Souls Int'l Inc. v. Azar*, 13-cv-1092 (W.D. Okla. March 15, 2018) (extending Mandate-related injunction to "all current and future participating employers in the Guidestone plan").