**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| The Catholic Benefits Association, on behalf of its members; Bismarck Diocese, <br><br>                               Plaintiffs, <br><br> vs. <br><br> Charlotte Burrows, Chair of the United States Equal Opportunity Commission; United States Equal Employment Opportunity Commission, <br><br>                              Defendants. | Case No. 1:24-cv-00142 |

---

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

[¶ 1]    THIS MATTER comes before the Court upon a Motion for Preliminary Injunction filed by the Catholic Benefits Association and Bismarck Diocese (collectively, the "CBA")[1] on July 30, 2024. Doc. No. 8. Charlotte Burrows ("Burrows") and U.S. Equal Employment Opportunity Commission ("EEOC") (collectively, the "Agency") filed a Response on August 22, 2024. Doc. No. 22. The CBA filed a Reply on September 5, 2024. Doc. No. 27. A hearing on the motion was held on September 18, 2024. Doc. No. 28. For the reasons set forth below, the Court **GRANTS** the motion.

**INTRODUCTION**

[¶ 2]    It is a precarious time for people of religious faith in America. It has been described as a post-Christian age. U. Mary, From Christendom to Apostolic Mission: Pastoral Strategies for an

---

[1] The Bismarck Diocese is a CBA member. References to the religious beliefs of the CBA necessarily imply the beliefs of its members.

Apostolic Age (2020). One indication of this dire assessment may be the repeated illegal and unconstitutional administrative actions against one of the founding principles of our country, the free exercise of religion.

[¶ 3]    The current suit falls into a long line of cases that should be unnecessary in a country that was built on the concept of freedom of religion. Unfortunately, these cases are essential for faithful individuals where government mandates run counter to core religious beliefs.[2] One would think after all this litigation, the government would respect the boundaries of religious freedom. Instead, it seems the goal may be to find new ways to infringe on religious believers' fundamental rights to the exercise of their religions.

---

[2] Last year, two legal scholars warned the administrative record was a "regulatory war on religion." Nicole Stele Garnett and Meredith Holland Kessler, Biden Boils the Religious-Liberty Frog, Wall Street Journal: Houses of Worship (Apr. 13, 2023, 6:35 PM), https://www.wsj.com/articles/biden-boils-the-religious-liberty-frog-education-hhs-rulemaking-regulation-court-faith-walter-reed-7eb6c520. Time and again the First Amendment rights of American citizens has been the subject of litigation Federal court. Organizations must continually sue to keep the federal government from infringing on basic and well-settled rights to freedom of religion. In Religious Sisters of Mercy v. Becerra, eight Catholic entities received a permanent injunction to keep the government from requiring them to provide gender-identity-related services against their beliefs. 55 F.4th 583 (8th Cir. 2022). In Franciscan Alliance, Inc. v. Becerra, in prolonged litigation that reached the Fifth Circuit three times, Christian organizations finally received an injunction against a rule requiring them to perform abortions against their beliefs. 47 F.4th 368 (5th Cir. 2022). Christian businesses have successfully sued for the right to run their business in accordance with their beliefs. Braidwood Mgmt., Inc. v. EEOC, 70 F.4th 914 (5th Cir. 2023). A Christian medication organization sued for the right to not provide services against its members' beliefs, and likely would have been successful if the government hadn't promulgated a new rule before the case was heard. Am. Coll. of Pediatricians v. Becerra, No. 23-5053, 2024 WL 3206579 (6th Cir. 2024).

The list is even longer when including district court cases. See Christian Emps. All. v. EEOC, --- F. Supp. 3d ----, 2024 WL 935591 (D.N.D. Mar. 4, 2024); Holston United Methodist Home for Child., Inc. v. Becerra, No. 2:21-cv-00185, 2022 WL 17084226 (E.D. Tenn. Nov. 18, 2022); Knights of Columbus, Council 694 v. NPS, No. 3:24-cv-00363, (E.D. Va. May 20, 2024); Louisiana v.EEOC, 705 F. Supp. 3d 643 (W.D. La. 2024); Nat'l Cap. Presbytery v. Mayorkas, 567 F. Supp. 3d 230 (D.D.C. Oct. 19, 2021); Wyo. Rescue Mission v. EEOC, NO. 1:22-cv-00206 (D. Wyo. Sep. 20, 2022). Three more cases are currently pending: Cath. Benefits Assoc. v. Becerra, No. 3:23-cv-00203 (D.N.D. Oct. 13, 2023); Feds for Med. Freedom v. Garland, No. 4:23-cv-1817 (S.D. Tex. May 17, 2023); Nat'l Religious Broads. v. Werfel, No. 6:24-cv-311 (E.D. Tex. Aug. 28, 2024).

## BACKGROUND

[¶ 4]   This action commenced on July 24, 2024, with the filing of a Complaint. Doc. No. 1. The Roman Catholic Diocese is a "portion of the people of God." Doc. No. 1, ¶ 19. The Diocese of Bismarck, located in western North Dakota, is entrusted to the Most Revered David Dennis Kagan and "carries out the spiritual, education, and social service mission of the Catholic Church." Id. As part of its religious beliefs, the Bismarck Diocese teaches certain ideas and practices are morally unacceptable including abortion,[3] artificial insemination, in vitro fertilization, gender ideology, "transgender affirmation through use of false pronouns," and "improper access to single sex spaces." Id. ¶¶ 22–29. The Diocese of Bismarck is a member of the CBA and employs approximately sixty people. Id. ¶¶ 20–21.

[¶ 5]   The CBA is a Section 501(c)(3) nonprofit organized in part to support Catholic employers and advocate for religious freedom. Id. ¶ 30. Membership in the CBA requires an organization to be a "Catholic employer" and includes "dioceses, parishes, religious orders, schools, charities, colleges, hospitals, and other Catholic ministries along with Catholic-owned businesses." Id. ¶¶ 36, 41. Nonprofit members are listed in *The Official Catholic Directory* or certified as Catholic by the CBA; for-profit members must control 51% of the organization or have a written commitment to not violate Catholic values. Id. ¶¶ 37–38.

---

[3] In the Complaint and Motion, the CBA uses the term "direct abortion" and defined it as a procedure with the purpose of ending a pregnancy, as opposed to other procedures with the purpose of "cur[ing] a proportionately serious pathological condition of a pregnant woman" if it cannot be postponed, "even if they will result in the death of the unborn child." Doc. No. 1, ¶¶ 65–66 (quoting United States Conference of Catholic Bishops, Ethical and Religious Directives for Catholic Health Care Services, ¶¶ 45, 47 (6th ed. 2018)). At the hearing, a contrasting example was given of an ectopic pregnancy, where a fertilized egg implants outside of the womb. An ectopic pregnancy is life threatening for the mother. A procedure to end an ectopic pregnancy would not be considered a "direct abortion" by the CBA. For purposes of this order, the Court will simply use "abortion" to indicate the contested procedures.

[¶ 6]    The CBA challenges the EEOC's final rule ("Final Rule") for the Pregnant Workers Fairness Act ("PWFA" or the "Act") and its "Enforcement Guidance on Harassment in the Workplace" ("Enforcement Guidance") of Title VII on nine counts for violations of the Religious Freedom Restoration Act ("RFRA"), the Administrative Procedure Act, the First Amendment, and Title VII. Doc. No. 1, ¶¶ 165–236. The CBA seeks declaratory and injunctive relief. Id. at 51–54.

## I.    Final Rule

[¶ 7]    Congress passed the PWFA requiring employers to "make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee." 42 U.S.C. § 2000gg-1. The Act applies to employers with fifteen or more employees. Id. § 2000gg(2)(B). The statute defines a "known limitation" as a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions" without regard to the definition of disability in the Americans with Disabilities Act. Id. § 2000gg(4). Employers may not take adverse actions against employees, including refusing to accommodate or taking employment action against an employee for requesting an accommodation. Id. § 2000gg-1. Also, employers may not "coerce . . . or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by the PWFA." 29 C.F.R. § 1636.5(f)(2). The PWFA allows private action after administrative remedies are exhausted, and the EEOC has investigative and enforcement powers under PWFA as it does under Title VII. Id. § 2000gg-2(a)(1).

[¶ 8]    Congress directed the EEOC to issue regulations to carry out the PWFA, specifically to include examples of reasonable accommodations. Id. § 2000gg-3. After generating over 100,000 comments to the proposed rule, the EEOC issued the Final Rule, effective June 18, 2024. 89 Fed. Reg. 29096 (Apr. 19, 2024) (codified at 29 C.F.R. pt. 1636). The Final Rule defines "related

medical conditions" to include termination of pregnancy—specifically listing abortion—and potential or intended pregnancy—namely fertility treatment. 29 C.F.R. § 1636.3(b). In vitro fertilization is listed in the appendix to the Rule as a qualifying event. Id. app. A § 1636.3(a)(2).

## II.   Enforcement Guidance

[¶ 9]   Also this year, the EEOC issued the Enforcement Guidance, "communicat[ing] the Commission's position on important legal issues." Doc. No. 22-1, p. 1. The document states its contents "do not have the force and effect of law and are not meant to bind the public in any way." Id. at 2. However, the document is intended to "provide clarity to the public regarding existing requirements" of Title VII. Id.

[¶ 10]   Under Title VII an employer cannot discriminate based on sex, which includes pregnancy. Id. at 15. The Enforcement Guidance states discrimination against sex includes gender identity and how that identity is expressed. Id. at 17. The Guidance gives examples of gender identity discrimination: the use of pronouns inconsistent with individual's gender identity, denial of access to sex-segregated facilities consistent with gender identity. Id. The Guidance also states discrimination can occur related to pregnancy or related medical conditions, which can include "using or not using contraception; or deciding to have, or not to have, an abortion." Id. at 15.

## III.   Religious Exemption

[¶ 11]   Title VII includes an exemption for religious employers. 42 U.S.C. § 2000e(j). The PWFA incorporates this exemption. 42 U.S.C. § 2000gg-5(b). The Final Rule declines to adopt a blanket exemption for religious employers and states each determination will be made on a case-by-case basis and religious employers may raise religious defenses at any time. 89 Fed. Reg. at 29146–47. The Enforcement Guidance gives no mention of the exemption and instead discusses religious defenses in context of charges and investigations. Doc. No. 22-1, pp. 98–99. The EEOC states

harassment would not include "*any* workplace discussion of religious perspectives on certain issues, such as abortion or gender identity," and determinations can be reviewed de novo in subsequent litigation. Id. at 96, 99.

## STANDING

[¶ 12]  The Agency argues the CBA has not shown standing and ripeness to challenge future enforcement of PWFA and Title VII. Doc. No. 22, p. 11. Standing requires a concrete injury, caused by the defendant, that can be remedied by the Court. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992). The Agency argues the CBA's standing is faulty on several fronts: (1) the injuries are too speculative, (2) the injuries are not traceable to the EEOC and therefore not redressable by injunction, and (3) the CBA's unnamed members may not be covered by Title VII or RFRA. Doc. No. 22, p. 11. The Agency argues the claims are not ripe for the same reasons. Id. at 17. The Court finds there is standing and therefore the issues are ripe for adjudication.

### I.    Speculative Injury

[¶ 13]  The Agency argues the CBA has not identified an employee seeking accommodation or an EEOC enforcement action due to the Final Rule or the Enforcement Guidance.[4] Id. at 13. The CBA argues pre-enforcement review is warranted because the threat of enforcement is credible.

[¶ 14]  An "injury in fact" must be "actual or imminent." Defs. of Wildlife, 504 U.S. at 560. Pre-enforcement review is possible if there is "an intention to engage in a course of conduct arguably affected with a constitutional interest but proscribed by a statute" and "there exists a credible threat of prosecution." Religious Sisters of Mercy, 55 F.4th at 603 (quoting Susan B. Anthony List v.

---

[4] In this regulatory environment, agencies seem to be enacting illegal regulations but drafting them in such a way as to make a legal challenge difficult because of standing. See supra note 1 and accompanying text. The executive branch should not be permitted to prevent judicial review of agency actions that clearly violate the civil liberties of American citizens.

Driehaus, 573 U.S. 149, 159 (2014)). The CBA bears the burden of establishing standing. See id. at 601.

[¶ 15]  The Eighth Circuit evaluated a similar speculative injury argument in Religious Sisters of Mercy when the CBA and others sued the Chair of Health and Human Services ("HHS") over implementation of a statute that would violate its rights under RFRA. 55 F.4th at 605. The HHS regulation had no religious exemption. Id. The HHS claimed there was no credible threat of prosecution because the department had not yet evaluated if it would enforce the statute against the plaintiffs. Id. However, "the government's assertion that it has not to date evaluated whether it will enforce" the statute "is actually a concession that it may do so." Id. (cleaned up) (quoting Franciscan All., 47 F.4th at 376).

[¶ 16]  The Agency contends this case is distinguishable from Religious Sisters of Mercy because an employer has religious defenses to the PWFA, and the EEOC "commits to evaluating them on a case-by-case basis." Doc. No. 22, p. 12 n.4. A religious defense is not the same as a religious exemption. The burden of investigation and possible litigation, at the very least, provides "a substantial likelihood of added regulatory burden and compliance costs." Louisiana v. EEOC, 705 F. Supp. 3d 643, 664 (W.D. La. 2024). The EEOC's reliance on its case-by-case standard constitutes "a concession that it may" seek enforcement. See Franciscan All., 47 F.4th at 376. In fact, in the Enforcement Guidance, the EEOC lists a catalog of cases where organizations were prosecuted for misgendering employees. Doc. No. 22-1, p. 112. The EEOC has not "identif[ied] a long history of nonenforcement against the plaintiffs and others like them." Religious Sisters of Mercy, 55 F.4th at 606. In fact, the CBA identified a catalog of cases where it was prosecuted for similar conduct. Doc. No. 26, pp. 5–6. This history, combined with the refusal to issue an exemption for the organization, suggests the threat of prosecution is credible.

[¶ 17]   The Fifth Circuit case <u>Braidwood</u> is persuasive because the EEOC made a similar credible threat argument. 70 F.4th 914, 926–27 (5th Cir. 2023). In <u>Braidwood</u>, the plaintiffs admitted to violating EEOC guidance that raised issues of possible prosecution which chilled their religious rights, and the EEOC declined to declare non-enforcement. <u>Id.</u> The Fifth Circuit held the plaintiffs were "entitled to receive clarification . . . before stifling their constitutional practices or otherwise exposing themselves to punishment or enforcement action." <u>Id.</u> at 927–28.

[¶ 18]   The Agency petitions the Court to follow <u>Tennessee v. EEOC</u> and hold there is no credible threat of prosecution. Doc. No. 22, pp. 11–12. In that case, Tennessee alleged sovereign and economic harms. --- F. Supp. 3d ----, 2024 WL 3012832 (appeal filed June 20, 2024). As discussed in the analysis below, religious harms under RFRA fall into an entirely different category. <u>See, e.g.</u>, <u>Braidwood</u>, 70 F.4th at 938.

[¶ 19]   The Agency also argues "numerous contingencies would all have to occur" for the CBA's injury to be credible. Doc. No. 22, p. 12. This argument has been previously rejected by this Court, the Fifth Circuit in <u>Braidwood</u>, and the Western District of Louisiana. <u>See</u> <u>Religious Sisters of Mercy</u>, 55 F.4th at 607; <u>Braidwood</u>, 70 F.4th at 931; <u>Louisiana</u>, 705 F. Supp. 3d at 656.

[¶ 20]   Here, the CBA has shown accommodating an abortion or forced usage of different pronouns would violate its religious beliefs. Doc. No. 11, pp. 3–4. The Final Rule gave no guidance to religious organizations on what speech or conduct based on sincerely held beliefs would or would not violate the coercion provision. <u>See</u> 89 Fed. Reg. at 29145. Even though it could have, the EEOC declined to give a religious exemption to specific employers. <u>Id.</u> at 29145–48, 29151. In the Enforcement Guidance, misgendering is given as a clear example of a violation of Title VII, along with a list of cases where that action has been prosecuted. Doc. No. 22-1, pp. 46–47, 112.

[¶ 21]  The Agency argues the CBA has not proven they are now or will in the future violate the Final Rule by speech since the Final Rule accounts for "general statements regarding an employer's mission or religious beliefs." Doc. No. 22, p. 13 (quoting 89 Fed. Reg. at 29148). However, the Complaint clearly shows the CBA uses language that goes far beyond general statements. See, e.g., Doc. No. 1, ¶¶ 68–70, 77, 82–83, 133. Without further guidance from the EEOC, the CBA legitimately fears they will be prosecuted for this language. The free exercise of religion establishes a safe zone for believers to speak and think without fear that the government will question them for "misgendering" a person and stating their beliefs. See Trinity Lutheran Church of Columbia, Inc. v. Comer, 582 U.S. 449, 461 (2012) ("A law . . . may not discriminate against 'some or all religious beliefs.'" (quoting Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 532 (1993))). The Bill of Rights does not allow the government to act as language police. W. Va. S. Bd. of Edu. v. Barnette, 319 U.S. 624, 634 (1943).[5] "A commitment to speech for only *some* messages and *some* persons is no commitment at all." 303 Creative LLC v. Elenis, 600 U.S. 570, 602 (2023).[6] The Supreme Court endorsed the words of George Orwell in its 303 Creative decision, stating "[i]f liberty means anything at all, it means the right to tell people what

---

[5] "To sustain the compulsory [conduct] we are required to say that a Bill of Rights which guards the individual's right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind." Barnette, 319 U.S. at 634. "[F]reedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order. If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." Id. at 642.

[6] "[A]pproving a government's effort to eliminate disfavored ideas . . . is emblematic of an unfortunate tendency by some to defend First Amendment values only when they find the speaker's message sympathetic." 303 Creative, 600 U.S. at 602.

they do not want to hear." Id. (quoting 303 Creative LLC v. Elenis, 6 F.4th 1160, 1190 (10th Cir. 2021) (Tymovich, J., dissenting)).[7]

[¶ 22]  Under either the PWFA or Title VII with the new guidance, the CBA's conduct will be chilled by the choice between possible violation of federal law and free expression of sincerely held religious beliefs. The CBA, therefore, has the concrete and imminent harm that conduct based on sincerely held religious beliefs will violate both the PWFA and Title VII.

### II.        Injury Traceable to the EEOC

[¶ 23]  The Agency argues the injury alleged is not traceable to the EEOC because employees can still file suit under the PWFA or Title VII and, therefore, an injunction would not redress any harm. Doc. No. 22, pp. 14–15. The CBA argues part of the requested relief is a declaratory judgment that "neither the PWFA nor Title VII require CBA members to accommodate" the contested portions of these laws. Doc. No. 26, pp. 6–7.

[¶ 24]  For pre-enforcement constitutional challenge, causation only "requires the named defendants to possess authority to enforce the complained-of provision." Calzone v. Hawley, 866 F.3d 866, 869 (8th Cir. 2017) (citation omitted). The issue is also redressable because the Court's decision would "relieve a discrete injury" of potential enforcement. Massachusetts v. EPA, 549 U.S. 497, 525 (2007) (citation omitted). "If the rules were vacated as substantively unlawful, it is indeed likely that the members' injuries would be redressed." Iowa League of Cities v. EPA, 711 F.3d 844, 870 (8th Cir. 2013).

---

[7]   See also George Orwell, The Freedom of the Press, (Dec. 29, 2019) http://www.orwell.ru/library/novels/Animal_Farm/english/efp_go.

### III.     The CBA Has Associational Standing

[¶ 25]  For associational standing, (1) members must be able to sue in their own right, (2) the interests at issue relates to the organization's purpose, and (3) individual members need not participate. Sierra Club v. U.S. Army Corps of Eng'rs, 645 F.3d 978, 986 (8th Cir. 2011). The Agency argues the CBA must prove the "injuries attributable to the named dioceses extend to unidentified members." Doc. No. 22, p. 12. However, plaintiffs "need not establish that all of its members would have standing to sue individually." Iowa League of Cities, 711 F.3d at 869.

[¶ 26]  In Religious Sisters of Mercy, the Eighth Circuit found the CBA did not have standing because it failed to identify non-party members subject to the harm at issue. 55 F.4th at 602. This case is distinguishable from Religious Sisters of Mercy because the CBA has identified the Archdiocese of Saint Paul and Minneapolis and the Diocese of Baker as non-plaintiff members with standing to sue. Doc. No. 11, p. 16. Because the CBA need not prove every member has standing, the identified members satisfy the injury requirement.

[¶ 27]  The Court does not find merit in the argument that the CBA has not established all its members hold identical views and therefore participation of individual members is essential. Doc. No. 22, p. 16. First, where an organizational plaintiff "seeks only declaratory and prospective injunctive relief, the participation of individual [members] . . . is not required." Heartland Acad. Cmty. Church v. Waddle, 427 F.3d 525, 533 (8th Cir. 2005). And second, the CBA does not represent every member of the Catholic faith, but only those who have chosen to be part of its organization. Doc. No. 1, pp. 11–14. The CBA states its purpose is to support employers that are "committed to providing no such benefits or services inconsistent with Catholic values." Id. at 11. Therefore, membership in the voluntary organization sufficiently establishes identical views.

[¶ 28]  The Agency also argues some the CBA members may be for-profit entities engaged in secular activities that do not qualify for a religious exemption. Doc No. 22, pp. 15–17. The Agency relies on LeBoon v. Lancaster Jewish Community Center Association, where the Third Circuit stated: "Of course the religious organization exemption would not extend to an enterprise involved in a wholly secular and for-profit activity." 503 F.3d 217, 229. First, the Third Circuit is not binding to this Court. Second, a careful study reveals the statement is dicta and the Circuit ended up holding the religious exemption did apply in that case. And third, membership in the CBA requires these businesses to be "committed to providing no benefits or services inconsistent with Catholic values." Doc. No. 1, ¶ 38. This declaration and membership in a voluntary organization necessarily means that no organization is "wholly secular."

[¶ 29]  The Court finds the CBA has associational standing and therefore the Court has jurisdiction over this suit, and the issues are ripe for adjudication.

## PRELIMINARY INJUNCTION

[¶ 30]  For a preliminary injunction, a plaintiff must establish: (1) irreparable harm if relief is not granted, (2) the balance of equities favors the plaintiff, (3) likelihood of success on the merits, and (4) the injunction serves the public interest. Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 114 (8th Cir. 1981). Analyzed first here, the most important factor is success on the merits, though it is not dispositive. Brady v. Nat'l Football League, 640 F.3d 785, 789 (8th Cir. 2011). When the government is the opposing party, the balance of harms factor and the public interest factor merge. General Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 316 (8th Cir. 2009). The Court finds the CBA's claim under RFRA to be dispositive and addresses that claim first.

- 12 -

### I.      Success on the Merits

[¶ 31]   The Agency argues it is not clear every accommodation request will necessarily burden the CBA's religion and no speech is restricted, only retaliation and coercion. Doc. No. 22, p. 20. The Enforcement Guidance also does not prohibit "workplace discussion." Doc. No. 22-1, p. 96.

[¶ 32]   A RFRA violation is comparable to the deprivation of a First Amendment right and therefore if success on the merits is established, then "the other requirements for obtaining a[n] . . . injunction are generally deemed to have been satisfied." Minn. Citizens Concerned for Life, Inc. v. Swanson, 692 F.3d 864, 870 (8th Cir. 2012) (en banc) (citation omitted).

[¶ 33]   RFRA "provide[s] very broad protection for religious liberty." Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 693 (2014). The government may not "substantially burden a person's exercise of religion" unless the burden (1) furthers a compelling government interest and (2) "is the least restrictive means of furthering that compelling interest." 42 U.S.C. § 2000bb-1(b). Persons may sue under RFRA for relief. 42 U.S.C. § 2000bb-1(c).

[¶ 34]   A substantial burden is found if "non-compliance [would] have substantial adverse practical consequences" and "compliance [would] cause the objecting party to violate its religious beliefs, as it sincerely understands them." Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania, 591 U.S. 657, 692 (2020) (J. Alito, concurring). Braidwood's conclusion is persuasive: "Being forced to employ someone to represent the company who behaves in a manner directly violate of the company's convictions is a substantial burden and inhibits the practice of [the plaintiff's] beliefs." 70 F.4th at 938.

[¶ 35]   The Agency also argues the Enforcement Guidance is non-binding and therefore cannot be a substantial burden. The Eighth Circuit has held a rule is binding if the agency "bases enforcement actions on the policies or interpretations formulated in the document" or "if it leads private parties

to believe" the agency will take action "unless they comply with the terms of the document" <u>Iowa League of Cities</u>, 711 F.3d at 870.

[¶ 36]   The CBA has detailed its sincerely held beliefs about human sexuality and procreation. <u>See</u> Doc. Nos. 1, 11. This belief includes a witness that these actions are immoral. <u>Id.</u> At the very least its actions would violate the retaliation provision because the employee would be fired for violating the Catholic faith by asking for an accommodation for the conduct at issue here. Because the interpretations of PWFA and Title VII threaten litigation for adhering to sincerely held beliefs, these guidelines and the underlying statutes place a substantial burden on the exercise of religion.

### a.  Compelling Interest

[¶ 37] With a substantial burden present, the government must show the challenged implementations of federal law advance "interests of the highest order." <u>Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah</u>, 508 U.S. 520, 546 (1993) (citations omitted). The PFWA Rule states nondiscrimination laws have been found to be a compelling interest. <u>EEOC v. Harris R.G. & G.R. Harris Funeral Homes, Inc.</u>, 884 F.3d 560, 591 (6th Cir. 2018). However, the Supreme Court has directed courts to look "beyond broadly formulated interests." <u>Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal</u>, 546 U.S. 418, 431 (2006). The Agency points out the interests of eradicating workplace discrimination against women and ensuring access to healthcare are more specific than the rejected general interest of "discrimination in the workplace" in <u>Religious Sisters of Mercy</u>. Doc. No. 22, p. 20–21.

[¶ 38]   Courts must "scrutinize the asserted harm of granting specific exemptions to particular religious claimants" and assess "the marginal interest in enforcing the challenged government action." <u>Holt v. Hobbs</u>, 574 U.S. 352, 363 (2015). The Agency argues the CBA could not receive an exemption without proving the Government would never have a compelling interest. Doc.

No. 22, pp. 20–21. The Eighth Circuit and the Fifth Circuit found this same argument unpersuasive. See Religious Sisters of Mercy, 55 F.4th at 604; Franciscan All., 47 F.4th at 380. Also, this argument impermissibly shifts the burden to the other party. It is the EEOC's burden to prove, assuming a compelling interest, that a specific exemption to these particular religious claimants would hinder that interest.

[¶ 39]  The Agency argues *any* discrimination hinders the interest of nondiscrimination. Doc. No. 22, p. 21. The EEOC relied on similar arguments in Braidwood to no avail, and this Court finds them equally unpersuasive. 70 F.4th at 940. "Any discrimination" does not meet the standard that a "specific exemption" to a "particular religious claimant" would result in a hinderance.

### b.  Least Restrictive Means

[¶ 40]  Even if the Court found a compelling interest, RFRA requires the use of the least restrictive means. 42 U.S.C. § 2000bb-4. The government must prove with evidence its policies are the only feasible means to achieve its compelling interest, including alternative forms of regulation. Hobby Lobby, 573 U.S. at 727–28.

[¶ 41]  The Agency argues accommodations must come from the employer and Title VII has been recognized as the least restrictive means to combat discrimination. Doc. No. 22, p. 22 (quoting Harris Funeral Homes, 884 F.3d at 594). The CBA argues the exemption is a reasonable alternative. Doc. No. 26, p. 13.

[¶ 42]  The Agency argues the case-by-case standard is a lawful option; however, even if that is true, that does not make it the least restrictive means. Doc. No. 22, pp. 17–18. The Agency also argues the EEOC could not have adopted an alternative approach because each case is fact specific, the EEOC cannot investigate before a charge is filed, and the laws' framework disallow a per se

rule. Id. at 19. Again, the CBA is not asking for a per se rule, but a specific exemption for religious employers.

[¶ 43]   The Agency has not met its burden in proving the Final Rule and its Enforcement Guidance are the least restrictive means. Therefore, the CBA is likely to succeed on the merits of its claim under RFRA.

## II.   Irreparable Harm

[¶ 44]   "[T]he loss of freedoms guaranteed by . . . RFRA . . . constitute per se irreparable harm." Franciscan All., 47 F.4th at 380. Parties agree that the CBA would have irreparable harm under a violation of RFRA.

## III.   Balance of Equities and Public Interest

[¶ 45]   The Agency argues the CBA should be barred from relief because it filed after the Final Rule has been effective for two months and was published nearly a year ago. Doc. No. 22, p. 28. A delay is significant if "harm has occurred and the parties cannot be returned to the status quo." Ng v. Bd. Of Regents of Univ. of Minn., 64 F.4th 992, 998 (8th Cir. 2023) (quoting McKinney ex rel. NLRB v. S. Bakeries, LLC, 786 F.3d 1119, 1125 (8th Cir. 2015)). The Court does not find a two-month delay significant. The Agency admits the CBA's goal is to prevent irreparable harm. Doc. No. 22, p. 28. Therefore, the harm cannot be said to have occurred. Right now, there is the threat of harm and chilled rights, but no harm that would qualify towards this significant delay analysis. Parties can also be returned to the status quo of these laws before the Final Rule and the Enforcement Guidance, and the injunction would do just that.

[¶ 46]   The Agency argues, since the CBA has a defense to charges and workers have no recourse against discrimination, an injunction harms the public interest. Doc. No. 22, p. 29. The Agency would have the Court evaluate the merits of religious freedom against workplace discrimination

and decide discrimination is more important. Since, as the EEOC stated there are no current claims against the CBA under these laws, no investigations will be halted, while religious conduct is at this moment being chilled by the threat of such prosecution. Congress has given directive in the form of RFRA and other legislation that puts religious freedom above other legitimate interests.[8] RFRA violations have been compared to First Amendment violations. <u>Minn. Citizens Concerned for Life, Inc.</u>, 692 F.3d at 870. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." <u>Brandt ex rel. Brandt v. Rutledge</u>, 47 F.4th 661, 672 (8th Cir. 2022) (quoting <u>D.M. ex rel. Bao Xiong v. Minn. State High Sch. League</u>, 917 F.3d 994, 1004 (8th Cir. 2019)). Therefore, the balance of harms and public interest weigh in favor of the CBA.

[¶ 47]  For a preliminary injunction, the CBA has shown they are likely to succeed on the merits of its claim under RFRA. Harm under RFRA is irreparable. Finally, the balance of equities favors an injunction because of the possible Constitutional right violations.

[¶ 48]  Because the Court finds the CBA has met its burden for a preliminary injunction under RFRA, the Court will not address the other grounds at this time.

## SCOPE OF INJUNCTION

[¶ 49]  The Agency argues any relief should be limited: (1) only contested portions of Final Rule and Enforcement Guidance, (2) only identified CBA members for the same reasons contested above in standing, (3) not future CBA members, or at least require the entities to be members at time of violation, and (4) not prohibit notification of a charge, requiring the employer to

---

[8] RFRA was passed in response to the Supreme Court's decision in <u>Employment Division, Department of Human Resources of Oregon v. Smith</u>, which changed the legal analysis from a balancing test to a neutral law generally applied. <u>See</u> 494 U.S. 872 (1990). Perhaps it is time for the Supreme Court to reexamine the value of <u>Smith</u>, considering the precarious statutory protection to which religious freedom currently clings and the perpetual potential for repeal.

affirmatively tell EEOC they are precluded from pursuing the charge and issue notice of right to sue letters ("NRTS") to employees when investigation is not conducted. Doc. No. 22, pp. 29–31.

[¶ 50]  First, the CBA has only requested that the contested portions are enjoined, not the entire PWFA. Doc. No. 26, p. 14–15. Therefore, the parties agree. Second, the Agency's arguments against standing were unpersuasive and therefore do not apply here either. Also, the CBA has only asked for protection for those members not already covered by other litigation. Id. Third, Judicial efficiency weighs in favor of protecting future members. Christian Emps. All. v. EEOC, --- F. Supp. 3d ----, 2024 WL 935591, at *10. In CBA v. Sebelius, the court initially granted the injunction only for present members and then changed course to include future members after repeated subsequent litigation to have the injunction apply to additional members. No. 5:14-cv-00240 (W.D. Okla. Mar. 12, 2014) at Doc. No. 184. However, the Court agrees that entities should be members of the CBA at the time of the charged conduct and cannot run for protection under CBA membership after the fact.

[¶ 51]  Fourth, the CBA does not object to the EEOC issuing a notice of charges to employers. 42 U.S.C. § 2000e-5. However, the CBA does object to the Agency sending a NRTS. 29 C.F.R. § 1601.28. The Agency argues a NRTS letter tolls the time for a citizen's right to file and the EEOC has a statutory obligation to send the letter. Doc. No. 22, p. 31. In reality, the EEOC's obligation pertaining to the letter is self-inflicted and the argument unpersuasive. A letter to an employee from an agency detailing a right to sue is still a determination of the agency that the organization is not subject to a religious exemption, which would bar any suit.

[¶ 52]  The Agency pointed to two cases during the hearing that allowed the EEOC to continue issuing NRTS letters, but in both cases the issue was not in dispute. See Christian Emps. All., 2024 WL 935591; Religious Sisters of Mercy v. Cochran, Nos. 3:16-cv-00386, 3:16-cv-00432, 2021

- 18 -

WL 1574628 (D.N.D. Feb. 19, 2021). But see Louisiana, 705 F. Supp. 3d at 664 (enjoining the issuance of NRTS under the PWFA). The key difference here is the issue is in dispute. Therefore, for purposes of this preliminary injunction, the Court will enjoin the EEOC from sending notices of the right to sue. The EEOC is free to issue letters to employees saying the investigation cannot move forward by court order.

## **CONCLUSION**

[¶ 53]   This challenge to religious liberty is a reminder of the danger of government action that is clearly anti-religion.[9] It should not take a legal challenge for the Agency to stop violating the constitutional rights of Americans. Wisely, our founders provided a separate but equal branch to keep this lawlessness in check.

[¶ 54]   This case is not hard. The CBA has met its burden to establish associational standing because its members, both named as a party and identified non-party entities, would be harmed by the implementation of the Final Rule and Enforcement Guidance. The CBA is likely to succeed on the merits of the RFRA violation claim because the law forces members to choose between expressing sincerely held beliefs and compliance. This harm is irreparable and upholding Constitutional rights always weighs in favor of the public interest and an injunction. The Agency should have known it would not be allowed to force individuals to violate sincerely held religious beliefs.

---

[9]  Unchecked government power creates martyrs like Dietrich Bonhoeffer, imprisoned and executed for expressing opposition to euthanasia and the persecution of Jews; Miguel Pro, arrested and eventually executed for violation of Mexico's anti-Catholic Calles Law; and Thomas More, famous for being executed by the British king for the crime of not saying anything.

[¶ 55]   The <u>Dataphase</u> factors weigh in favor of granting the CBA's Motion for a Preliminary Injunction and requires the Court to intervene until the merits of the case are determined. As such, the CBA's Motion for a Preliminary Injunction is **GRANTED**.

[¶ 56]   For purposes of the CBA's Motion for Preliminary Injunction, the Court **ORDERS**:

(1) The EEOC and its agents are enjoined from interpreting or enforcing the Pregnant Workers Fairness Act and any implementing regulations, including the Implementation of the Pregnant Workers Fairness Act, against the Diocese of Bismarck and the CBA, including present and future members, in a manner that would require them to accommodate abortion or infertility treatments that are contrary to the Catholic faith, speak in favor of the same or refrain from speaking against the same.

(2) The EEOC and its agents are enjoined from interpreting or enforcing Title VII of the Civil Rights Act of 1964, any implementing regulations or guidances, including the Enforcement Guidance on Harassment in the Workplace, against the Diocese of Bismarck and the CBA, including present and future members, in a manner that would require them to speak or communicate in favor of abortion, fertility treatments, or gender transition when such is contrary to the Catholic faith; refrain from speaking or communicating against the same when such is contrary to the Catholic faith, use pronouns inconsistent with a person's biological sex; or allow persons to use private spaces reserved for the opposite sex.

(3) The EEOC and its agents are enjoined from applying or enforcing these same regulations against anyone acting in concert with or participating with the CBA's present and future members.

(4) The EEOC and its agents are specifically enjoined from initiating any investigation into claims that a covered employer has violated the PFWA or Title VII in the manner listed above and issuing any notice of right-to-sue under prohibited claims.

(5) To come within this injunction, CBA members must: be a member of the CBA at the time of the alleged violation, not yet be protected from the laws at issue here, be approved by the CBA for meeting membership criteria, the membership criteria has not substantively changed since filing this Complaint, and the member is not subject to an adverse ruling on the merits in another case involving the laws at issue here.

[¶ 57]   Nothing in this order shall prevent the EEOC or its agents from accepting of a charge against a CBA member, serving notice of charges to employers protected by this injunction, or

issuing a letter to employees saying the employer is covered under this injunction and investigation is precluded.

[¶ 58]  **IT IS SO ORDERED.**

DATED September 23, 2024.

Daniel M. Traynor, District Judge
United States District Court