**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

THE CATHOLIC BENEFITS
ASSOCIATION, on behalf of its members;
and BISMARCK DIOCESE,

*Plaintiffs,*

v.

CHARLOTTE BURROWS, Chair of the
United States Equal Employment Oppor-
tunity Commission; and UNITED
STATES EQUAL EMPLOYMENT OP-
PORTUNITY COMMISSION,

*Defendants.*

No. 1:24-cv-00142-DMT-CRH

**CBA PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**THEIR MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................................ 2

    1.   The members of the Catholic Benefits Association ............................................... 2

    2.   Catholic teaching on abortion ............................................................................... 3

    3.   Catholic teaching on artificial reproductive technology ...................................... 3

    4.   Catholic teaching on gender ideology, false speech, and private spaces ............. 4

THE PWFA RULE AND THE ENFORCEMENT GUIDANCE ........................................... 5

    1.   The Pregnant Workers Fairness Act ..................................................................... 5

    2.   Pregnant Workers Fairness Act Rule .................................................................... 6

    3.   The Enforcement Guidance ................................................................................... 7

PROCEDURAL HISTORY .................................................................................................. 10

STANDARDS OF REVIEW ................................................................................................ 11

    1.   Summary Judgment .............................................................................................. 11

    2.   Permanent Injunction .......................................................................................... 12

    3.   Declaratory Judgment .......................................................................................... 12

i

ARGUMENT ................................................................................................................... 13

1.   The Court should convert its motion for preliminary injunction into a permanent
     injunction. .......................................................................................................... 13

  1.1.  No further factual development is necessary, and the Court can simply convert its
        injunction from preliminary to permanent under FRCP 65(a)(2). ........................... 13

  1.2.  The preliminary injunction order was correct on the merits. ................................... 14

     1.2.1.   CBA Members have suffered Article III injury. ................................................. 14

     1.2.2.   The CBA has associational standing. ............................................................... 16

     1.2.3.   Redressability and traceability are present. ..................................................... 17

     1.2.4.   The PWFA Rule and the Harassment Guidance violate RFRA (Count V). ...... 17

  1.3.  The PWFA Rule and the Enforcement Guidance violate the Free Exercise Clause
        (Count VI). ........................................................................................................ 20

  1.4.  The PWFA Rule and the Enforcement Guidance violate CBA members' right to free
        speech (Count IV). .............................................................................................. 22

  1.5.  The PWFA Rule violates the Administrative Procedure Act (Counts I-III). ............. 24

  1.6.  Plaintiffs will suffer irreparable harm without permanent injunctive relief. ............... 30

  1.7.  The balance of the equities and the public interest favor permanent injunctive relief.
        30

2.   Plaintiffs' requested relief is proper. ......................................................................... 32

CONCLUSION ............................................................................................................... 34

## INTRODUCTION

The parties agree that this case presents purely legal issues, and no further factual development is needed. Therefore, and for all the reasons stated in the Court's September 9, 2024 order preliminarily enjoining Defendants from forcing the members of the Catholic Benefits Association to accommodate and speak in favor of abortion, immoral infertility treatments, and false pronouns, and to grant access to single-sex spaces by members of the opposite sex, CBA Plaintiffs respectfully request that the Court permanently enjoin the challenged aspects of the Pregnant Worker Fairness Act Rule ("PWFA Rule") and EEOC's recent sexual harassment Enforcement Guidance forthwith. *See Cath. Benefits Ass'n v. Burrows*, 2024 WL 4315021 (D.N.D. Sept. 23, 2024). Plaintiffs also request the Court enter declaratory relief in their favor that the PWFA and Title VII do not require CBA members to violate their Catholic consciences in their employment practices. Declaratory judgment is proper in this case because there is an actual controversy between the parties regarding the scope of the PWFA and Title VII, which will be resolved by a declaratory judgment, and declaratory judgments are routinely granted in conjunction with permanent injunctive relief when the federal government seeks to enforce laws in violation of the First Amendment. *See Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 926 (5th Cir. 2023) (declaratory judgment proper to resolve First Amendment challenge to scope of Title VII); *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 609 (8th Cir. 2022) (affirming declaratory judgment and injunctive relief in First Amendment challenge to scope of Title VII and Section 1557 of the ACA). Plaintiffs also respectfully request an award of their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### 1. The members of the Catholic Benefits Association

Plaintiffs are Catholic Benefits Association ("CBA") members. Each CBA member is a Catholic ministry or Catholic-owned business.  Compl. ¶¶ 20, 34-40 (Doc. 1). Each subscribes to Catholic beliefs on the human sexuality, human dignity, and the sanctity of life as detailed in the Complaint that is verified by CBA's Chair, Archbishop William Lori of Baltimore, and by Bishop David Kagan of Bismarck, and that is amplified in the declarations by Archbishop Bernard Hebda of Saint Paul and Minneapolis and Bishop Liam Cary of Baker (all incorporated here by reference). Compl. ¶¶ 22-24, 37-39, 47-53, 59-84 (Doc. 1); Compl. Ex. E, Decl. of Bishop Cary ("Cary Decl.") (Doc. 1-5); Compl. Ex. F, Decl. of Archbishop Hebda ("Hebda Decl.") (Doc. 1-6). It is a condition of CBA membership that members provide employee services consistent with Catholic values. Compl. ¶¶ 38-39. This commitment forecloses CBA members from providing *any* accommodation of abortion or immoral infertility treatments, from using false pronouns, and from granting access to single-sex spaces by those of the opposite sex. Compl. ¶¶ 59-84; Cary Decl. ¶¶ 19-22, 24 ("The Diocese also does not accommodate employees to engage in violation of the moral teachings of the Catholic Church."); Hebda Decl. ¶ 22 ("The Archdiocese does not make accommodation for its employees to engage in the violation of the moral teachings of the Church."). As Bishop Cary, Bishop Kagan, Archbishop Lori, and Archbishop Hebda explain, among other things: CBA members "will not provide any workplace accommodation for an employee to obtain a direct abortion" and "obtaining a direct abortion is grounds for adverse employment action, up to and including termination," Cary Decl. ¶ 13; CBA members "will not provide any workplace accommodation for an employee to . . . participate in immoral infertility procedure," Cary Decl. ¶ 24; "[r]equiring [CBA members] to identify another by a sex other than their God-gifted sex would be to require

2

him or her to act against central, unchangeable and architectural teachings of the Catholic faith," Hebda Decl. ¶ 8; and "[r]equiring a Catholic institution to admit persons of the opposite sex into a space reserved for one sex might also conflict with the Church's" teaching. Hebda Decl. ¶ 19.

**2. Catholic teaching on abortion**

"The Catholic Church teaches that all people are created in the image and likeness of God and are thus imbued with human dignity." Compl. ¶ 60 (citing *Catechism of the Catholic Church* ¶ 1701 (2d ed. 2016) ("CCC")). Because of the sanctity of human life beginning at conception, the Church holds that elective or "[d]irect abortion, that is to say, abortion willed either as an end or a means, is gravely contrary to the moral law." Compl. ¶ 65 (citing CCC ¶¶ 2270-71; *see also* Pope Francis, *Dignitas Infinita* ¶ 47 (Apr. 4, 2024) (quoting Pope John Paul II, *Evangelium Vitae* ¶ 58 (March 25, 1995)). Catholics believe they must speak accurately about the nature of abortion. Compl. ¶ 70.

**3. Catholic teaching on artificial reproductive technology**

The Catholic Church teaches that married couples are called to give life and thereby participate in co-creation and the fatherhood of God, and that a child is neither owed nor owned, but gift. Compl. ¶ 71 (citing CCC ¶¶ 2367, 2378). The Church teaches those reproductive technologies destroying fertilized ova; involving third parties (medical technicians, donor gametes, or surrogate wombs); separating fertilization from the conjugal act; or entailing conception outside of a valid marriage violate the dignity of the persons involved and are gravely immoral. Compl. ¶¶ 23, 71-76; Cary Decl. ¶¶ 18-22; Hebda Decl. ¶¶ 21-22. Accordingly, Catholics may not support certain fertility treatments including but not limited to IVF, surrogacy, or gamete donation. Compl. ¶¶ 23, 71-76; Cary Decl. ¶¶ 18-22; Hebda Decl. ¶¶ 21-22.

**4. Catholic teaching on gender ideology, false speech, and private spaces**

The declaration of Archbishop Hebda contains an extended discussion of Catholic teaching, and CBA member beliefs, regarding gender ideology. Hebda Decl. ¶¶ 8-17. He begins with the observation that, as a matter of Scriptural revelation, "God made the human race 'in his image, male and female' and declared this to be 'good.'" Hebda Decl. ¶ 9 (citing Genesis 1:27-31). He notes that this is also biological fact, Hebda Decl. ¶ 12, and explains the profound theological significance of this. Hebda Decl. ¶¶ 8-17. Paragraph 50 of the complaint summarizes Archbishop Hebda's declaration that gender transition violates Catholic values because it: "[c]ontradicts the teachings of the Bible," Hebda Decl. ¶¶ 8-9; "[d]enies that humans are made in God's image," Hebda Decl. ¶¶ 9-10; "[d]enies the 'complementary and reciprocal relations between a man and a woman in marriage,'" Hebda Decl. ¶ 9; "[s]uggests that 'human beings can remake ourselves,'" Hebda Decl. ¶¶ 10, 17; "[c]ontradicts reason and truth," Hebda Decl. ¶ 8; "[d]enies biological fact," Hebda Decl. ¶ 12; "[l]essens our understanding of the nature of God," Hebda Decl. ¶ 11; and "[b]etray[s] our sacred obligation not to knowingly harm other persons," Hebda Decl. ¶¶ 8, 15-16. Compl. ¶ 50. Archbishop Lori and Bishop Cary both affirm this summary. Compl. at 56 (Lori verification); Cary Decl. ¶ 23.

While the use of a transitioning employee's preferred but false pronouns may seem a matter of courtesy, it is, for CBA employers, an affirmation of these harmful errors inherent in gender ideology. Hebda Decl. ¶ 8. Furthermore, not only does "Scripture and basic human kindness forbid lying," Hebda Decl. ¶ 13 (citing CCC ¶ 2483), but to require CBA members to mis-identify another, including by a false pronoun, is "to demand that [they] knowingly obstruct another's development." Hebda Decl. ¶ 15 (citing Vatican Congregation for Catholic Education, *"Male and Female He Created Them": Towards a Path of Dialogue on the Question of Gender Theory in Education*

26, 33, 35 (2019)).  In addition, Archbishop Hebda notes that "[r]equiring a Catholic institution to admit persons of the opposite sex into a space reserved for one sex violates the Catholic theological commitment to modesty - the preservation of respect for the dignity and purity of the person." Hebda Decl. ¶ 18.

**THE PWFA RULE AND THE ENFORCEMENT GUIDANCE**

**1. The Pregnant Workers Fairness Act**

Congress passed the Pregnant Workers Fairness Act ("PWFA") to provide protection for pregnant women seeking workplace accommodations. *See* Pregnant Workers Fairness Act, Pub. L. No. 117-328, 136 Stat. 6084 (2022) (codified at 42 U.S.C. § 2000gg et seq.). Prior to this law, federal protections for pregnant workers were limited and patchwork. The PWFA aimed to protect pregnant women and new mothers in the workforce by requiring employers to accommodate any "known limitation[s] . . . related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." 42 U.S.C. §§ 2000gg(4), 2000gg-1.

The PWFA prohibits employers from taking adverse employment actions or denying employment opportunities because an employee requested reasonable accommodation related to pregnancy. 42 U.S.C. § 2000gg-1. Employers may not discriminate against pregnant women who seek an accommodation.  Prohibited practices include: (1) refusing to provide reasonable pregnancy accommodations; (2) forcing an employee to accept a pregnancy accommodation that is not reasonable; (3) denying employment opportunities because of the employee's need for a reasonable pregnancy accommodation; (4) forcing an employee to take paid or unpaid leave rather than providing a reasonable pregnancy accommodation; or (5) taking an adverse employment action against an employee because they requested a reasonable pregnancy accommodation. *Id.*

5

The PWFA also bars retaliation and interference against pregnant women: (i) "[n]o person shall discriminate against any employee because such employee has opposed any act or practice made unlawful by this chapter," 42 U.S.C. § 2000gg-2(f)(1), and (ii) "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of such individual having exercised or enjoyed, or on account of such individual having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter," 42 U.S.C. § 2000gg-2(f)(2).

The PWFA applies to employers with fifteen or more employees, 42 U.S.C. § 2000gg(2)(B), and it incorporates the Title VII religious exemption. *See* 42 U.S.C. § 2000gg-5(b). The PWFA provides for private enforcement actions from private parties. 42 U.S.C. § 2000gg-2. In addition, the EEOC has investigative and enforcement powers akin to those in Title VII. 42 U.S.C. § 2000gg-2(a)(1).

**2. Pregnant Workers Fairness Act Rule**

In 2023, the EEOC issued a proposed rule implementing the PWFA. The proposed rule stated that "having . . . an abortion" is included in the "examples of pregnancy, childbirth, or related medical conditions," Regulations to Implement the Pregnant Workers Fairness Act, 88 Fed. Reg. 54,714, 54,774 (Aug. 11, 2023), and defined "pregnancy, childbirth, and related medical conditions" as including "current pregnancy; past pregnancy; potential or intended pregnancy . . .." *Id.* at 54,774 n.11. The proposed rule generated substantial comments opposing the radical expansion of the PWFA to include conduct, from direct abortion to immoral fertility treatments, that was not included in the text of the Act. Approximately 54,000 comments urged "the Commission to exclude abortion from the definition of 'pregnancy, childbirth, or related medical conditions.'"

Implementation of the Pregnant Workers Fairness Act, 89 Fed. Reg. 29,096, 29,104 (April 19, 2024) ("PWFA Rule").

The PWFA Rule doubles down on the proposed rule's definition and requires covered employers to, among other things, accommodate employee abortions and immoral fertility treatments. *See id.* at 29,183. This duty to accommodate, coupled with the anti-harassment and anti-coercion provisions at 42 U.S.C. § 2000gg-2(f), effectively imposes a speech code through the EEOC's interpretation of those provisions. *See generally* 89 Fed. Reg. at 29,188, 29,215-218. The EEOC expanded the definition of "pregnancy, childbirth, or related medical conditions" to include "termination of pregnancy, including . . . abortion" and "fertility treatment." *Id.* at 29,106, 29,183; 29 C.F.R. § 1636.3(b). "Fertility treatment" includes immoral fertility treatments like in vitro fertilization ("IVF"). 89 Fed. Reg. at 29,102, 29,190. Two of the five EEOC commissioners voted against the PWFA Rule, and one, Commissioner Andrea Lucas, published a rare statement expressing her dissent.  Commissioner Lucas explained that the PWFA Rule "cannot reasonably be reconciled with the text" of the PWFA.[1] And the "Commission paradoxically interprets a statute requiring employers to accommodate a worker's pregnancy and childbirth into a provision that also requires accommodation of a worker's inability to become pregnant." *Id.* at 7.

### 3.  The Enforcement Guidance

Title VII makes it unlawful for an employer to discriminate against an employee or prospective employee "because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Concurrent with EEOC promulgating the PWFA Rule, it adopted Enforcement Guidance under Title VII

---

[1] Andrea Lucas, Statement re: Vote on the Final Rule to Implement Pregnant Workers Fairness Act 1,  https://perma.cc/7YFL-85GT.

addressing sexual harassment. *See* U.S. Equal Emp. Opportunity Comm'n, *Enforcement Guidance on Harassment in the Workplace* at 15-18 §§ II(A)(5)(b)-(c) (Apr. 29, 2024) (Doc. 22-1) ("Enforcement Guidance").[2] The Enforcement Guidance makes certain employer-employee conflicts related to abortion, fertility treatments, and gender transition subject to Title VII employment discrimination protections and sexual-harassment rules. The Enforcement Guidance addresses many scenarios that may properly be understood as violating Title VII's prohibition on employment discrimination, with which Plaintiffs take no issue. Yet EEOC also expands Title VII to cover potential employment conflicts for areas purportedly related to sex discrimination that burden CBA members' Catholic values in at least three scenarios: (1) use of pronouns contrary to biological sex, (2) the use of private spaces traditionally reserved to single sex, and (3) the ability to speak about human sexuality. *See id.* at 17-18.

As to pronouns, EEOC interprets Title VII to prohibit the "intentional use of a name or pronoun inconsistent with the individual's known gender identity (misgendering)." Enforcement Guidance n.42 and accompanying text. The Enforcement Guidance continues with an "Example 15: Harassment Based on Gender Identity" including "misgendering" as a basis for harassment liability. *Id.* at 17-18, § II(A)(5)(c).

As to the use of private spaces traditionally reserved for a single sex, the EEOC reads Title VII as prohibiting "harassing conduct" on the basis of "gender identity" to include the "denial of access to a bathroom" or other sex-segregated facility "consistent with one's gender identity." *Id.* at 17 n.43. Access to a bathroom traditionally reserved to one sex by a member of the opposite sex

---

[2] The Enforcement Guidance itself is not paginated, but the Defendants ECF Document 22-1 copy of the Enforcement Guidance is. Hence, all page cites to the Enforcement Guidance herein are to Defendants' exhibit.

is given emphasis: "In addition to being part of a harassment claim, denial of access to a bathroom consistent with one's gender identity may be a discriminatory action in its own right." *Id.* at 17 n.43.

As to the ability to speak about human sexuality, the EEOC interprets Title VII to prohibit "harassment based on" a woman's decision about abortion or contraception. *Id.* at 15, § II(A)(5)(b). EEOC also interprets Title VII to prohibit harassment based on an employee's decision to transition from his or her biological sex. *See id.* at 17, § II(A)(5)(c). And EEOC makes clear that sexual harassment can be based on employer communications that an employee considers to constitute "offensive comments," "derogatory terms," or "slurs." *Id.* at 15 n.30, 16 n.35, 17, ns.38-39.

Although EEOC calls this mere "guidance," it is binding on covered employers, because EEOC "'bases enforcement actions on the policies or interpretations formulated in the document' [and] '. . . it leads private parties to believe' [EEOC] will take action 'unless they comply with the terms of the document.'" *Burrows*, 2024 WL 4315021, at *7 ¶ 35 (citations omitted). Accordingly, it is the policy and official position of the EEOC, based on the Enforcement Guidance and the agency's enforcement actions, that an employer's continuing use of pronouns consistent with an employee's sex, its expression of Catholic values regarding abortion, fertility treatments, and gender transition; and its preservation of private spaces to one sex may now violate Title VII's ban on sex discrimination and harassment.

Whether by EEOC enforcement, class action lawsuit, or employee lawsuit, a successful claim under the PWFA or Title VII could result in compensatory and punitive damages, attorneys fees, and costs. The EEOC has authority to investigate Title VII violations and will ask violators to take

corrective action for the discriminatory behavior. 42 U.S.C. § 2000e-5(a). And the Department of Justice may not only bring a federal lawsuit to enforce Title VII and the PWFA, it can issue right to sue letters and thereby unleash private lawsuits enforcing these laws. 42 U.S.C. § 2000e-5; 29 C.F.R. § 1601.28. Both the PWFA and Title VII create private rights of action.

## PROCEDURAL HISTORY

CBA Plaintiffs filed this suit on July 24, 2024, (Doc. 1), and filed a motion for preliminary injunction on July 30, 2024, (Doc. 8), after failing to reach an agreement as to non-enforcement with the Defendants. The Court held a hearing on the motion for preliminary injunction on September 18, 2024, (Doc. 28), and granted the CBA's motion for preliminary injunction on September 23, 2024. (Doc. 31). The Court's order explained that CBA members face a credible threat of enforcement as EEOC refuses to disavow enforcement and is actively prosecuting employers under EEOC's errant interpretations of its authorizing statutes. *Burrows*, 2024 WL 4315021, at *4-6. The Court also explained that CBA has associational standing to vindicate the rights of its members, because CBA has satisfied the test for associational standing from *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 986 (8th Cir. 2011). *Burrows*, 2024 WL 4315021, at *6. And the Court concluded that all of the preliminary injunction factors, including probability of success on the merits, favored CBA. *Id.* at *7-10. The Court explained that this suit should not have been necessary, "Time and again the First Amendment rights of American citizens has been the subject of litigation Federal court. Organizations must continually sue to keep the federal government from infringing on basic and well-settled rights to freedom of religion." *Id.* at *1 n.2.

Since the Court's order granting the CBA's motion for preliminary injunction, the parties have conferred regarding a joint motion to convert the Court's preliminary injunction to a permanent injunction and final judgment. The parties could not reach an agreement.

Numerous states and religious groups have filed similar legal challenges to the PWFA Rule. *See Texas v. Garland*, 719 F. Supp. 3d 521 (N.D. Tex. 2024) (enjoining administrative or other adjudication of PWFA claims against State of Texas because Congress, having passed the bill through proxy voting, violated the quorum rule in U.S. Const., art. I, § 5); *Tennessee et al v. EEOC*, No. 2:24-CV-00084 (E.D. Ark. April 25, 2024); *Louisiana et al. v. EEOC*, No. 2:24-cv-00629 (W.D. La. May 13, 2024); *U.S. Conf. of Catholic Bishops et al. v. EEOC*, No. 2:24-cv-691 (E.D. La. May 22, 2024). The Western District of Louisiana issued a preliminary injunction finding that "the EEOC has exceeded its statutory authority to implement the PWFA and, in doing so, both unlawfully expropriated the authority of Congress." *Louisiana v. Equal Emp. Opportunity Comm'n*, 705 F. Supp. 3d 643, 649 (W.D. La. 2024).

## STANDARDS OF REVIEW

### 1. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." *Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 948 (8th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

### 2. Permanent Injunction

Rule 65 of the Federal Rules of Civil Procedure authorizes district courts to grant injunctive relief. When considering a motion for permanent injunction, four factors control: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties; (3) whether the movant proves actual success on the merits; and (4) the public interest." *Forest Park II v. Hadley*, 336 F.3d 724, 731 (8th Cir. 2003) (citing *Bank One, Utah v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999)). While no one factor is dispositive, success on the merits is most important. *Brady v. Nat'l Football League*, 640 F.3d 785, 789 (8th Cir. 2011). The balance of harms and public interest factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The burden to demonstrate the necessity of injunctive relief rests with the movant. *General Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009).

### 3. Declaratory Judgment

Under the Declaratory Judgment Act, a district court may "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought" so long as there is "a case of actual controversy within its jurisdiction." 28 U.S.C. § 2201. "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

**ARGUMENT**

**1. The Court should convert its motion for preliminary injunction into a permanent injunction.**

Federal Rule of Civil Procedure 65(a)(2) permits consolidation of the preliminary injunction proceedings with merits proceedings:

> Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing. Even when consolidation is not ordered, evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial.

Furthermore, the Federal Rule of Civil Procedure 57 permits the Court to order a "speedy hearing of a declaratory-judgment action." Pursuant to these rules, the Court should consolidate the preliminary-injunction proceedings with its determination on the merits, declare CBA members rights, and enjoin Defendants from enforcing the challenged portions of the PWFA Rule and the Enforcement Guidance.[3] There are at least two reasons to do so.

**1.1. No further factual development is necessary, and the Court can simply convert its injunction from preliminary to permanent under FRCP 65(a)(2).**

*First*, no further factual development is necessary, the parties' legal positions have not changed, and there has been no intervening change in the law since the Court entered its preliminary injunction in favor of the CBA. Defendants do not challenge the sincerity of CBA members'

---

[3]   Plaintiffs respectfully request the Court rule before a new presidential administration is sworn into office. CBA's experience with such presidential transitions is that Defendants request a stay of the case to determine the effect of a new administration, if any. This happened in the *Religious Sisters of Mercy* litigation, where Defendants requested numerous stays. Yet not withstanding the requested stays, Defendants made no substantive change the outcome of those delays was no substantive change in policy, all the while CBA and its members were forced to wait seven years—from 2016 (the date of filing) to 2023 (the date of final judgment)—to resolve a dispute that did not meaningfully change at all in that time.

religious beliefs. To the contrary, the parties' dispute concerns legal questions—namely, whether this case is justiciable and the proper scope of declaratory and injunctive relief. CBA Plaintiffs have briefed those issues in detail in support of their motion for preliminary injunction, (Docs. 8, 11, 27), which CBA Plaintiffs incorporate by reference here. The Court can simply convert its preliminary injunction into a permanent injunction under Rule 65, and enter Plaintiff's requested declaratory relief.

### 1.2. The preliminary injunction order was correct on the merits.

*Second*, the Court's order is correct both on the question of justiciability and on the merits.

#### 1.2.1. CBA Members have suffered Article III injury.

As the Court has concluded, CBA Plaintiffs have standing to challenge the PWFA Rule and the Enforcement Guidance. This is so because Plaintiffs and their members face a credible threat of enforcement. Specifically, HHS's and EEOC's contention that they have not yet to date evaluated whether CBA members are entitled to a religious exemption from the PWFA Final Rule and the Enforcement Guidance and that that determination must occur on a "case-by-case" basis "constitutes 'a concession that [they] may' seek enforcement." *Burrows*, 2024 WL 4315021, at *4 (quoting *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 376 (5th Cir. 2022)). Indeed, the EEOC regularly prosecutes covered employers for "misgendering" employees and for "gender identity" discrimination. *See* Enforcement Guidance at 17 n.42 (collecting enforcement actions) (Doc. 22-1).[4]

---

[4] *E.g.*, *Roxanna B. v. Yellen*, EEOC No. 2020004142, 2024 WL 277871, at *12 (Jan. 10, 2024) (liability imposed for "misgendering and deadnaming"); *Jameson v. U.S. Postal Serv.*, EEOC Appeal No. 0120130992, 2013 WL 2368729, at *2 (May 21, 2013) (misuse of pronoun may constitute sex-based harassment); *Lusardi v. Department of the Army*, EEOC Appeal No. 0120133395, 2015

Article III injury in the pre-enforcement context is present if CBA shows: "an intention to engage in a course of conduct arguably affected with a constitutional interest," "[arguably] proscribed by a statute," and there "exists a credible threat of prosecution thereunder." *Religious Sisters of Mercy*, 55 F.4th at 603. Defendants do not dispute that CBA Plaintiffs' intended conduct is affected with a constitutional interest or that the PWFA Final Rule and the Enforcement Guidance require CBA members to accommodate and speak in favor of employee abortions, immoral infertility treatments, or gender ideology on their face. Defs. Mem. Opp. Pls. Mot. Prelim. Inj. at 1 (Doc. 22) (The PWFA Final Rule "encompasses abortion and certain infertility treatments."); *id.* at 6 ("The Guidance also provides examples of 'harassing conduct' . . . including 'repeated and intentional . . . misgendering' and 'the denial of access to a bathroom or other sex-segregated facility consistent with the individual's gender identity.'"). That is sufficient for pre-enforcement standing. Courts "assume a credible threat of prosecution" in a "pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict" First Amendment rights. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020) (collecting cases). "[W]here the enforcement of a regulatory statute would cause plaintiff to sustain a direct injury, the action may properly be maintained, whether or not the public officer has 'threatened' suit; the presence of the statute is threat enough." *United Food & Com. Workers Int'l Union, AFL-CIO, CLC v. IBP, Inc.*, 857 F.2d 422, 428 (8th Cir. 1988). But were that not enough, Defendants' refusal in their briefing and again at the oral argument on preliminary injunction to disavow enforcement of the PWFA Rule and the Enforcement is itself a credible threat as explained above.

---

WL 1607756 at *10-13 (Apr. 1, 2015) (liability imposed for supervisor's use of incorrect pronouns and refusal to allow use of restroom consistent with gender identity).

Further, CBA's members have suffered regulatory harm. An "additional regulatory burden" "undeniably [creates] a . . . 'case or controversy.'" *Ass'n of Am. Railroads v. Dep't of Transp.*, 38 F.3d 582, 586 (D.C. Cir. 1994); *see also Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019) (same). CBA's members are objects of the PWFA Rule and the Enforcement Guidance. They have not adopted the requisite accommodating policies, and would incur compliance and training burdens if forced to do so. 89 Fed. Reg. 29,096, 29,175-77 (detailing compliance cost); *see also Louisiana*, 705 F. Supp. 3d at 656 (EEOC forcing religious employer to "choose between two untenable alternatives . . . constitutes injury"). In addition, "[t]he burden of investigation and possible litigation" of a CBA member's religious defenses to a Title VII enforcement action is "added regulatory burden and compliance costs" and therefore Article III injury. *Burrows*, 2024 WL 4315021, at *4; *see also Christian Emps. All. v. EEOC*, 2022 WL 1573689, at *5 (D.N.D. May 16, 2022) (requiring religious organizations "to prove they are religious or evaluating whether their religious preferences can withstand a case-by-case analysis is a sufficient injury."); *Louisiana*, 705 F. Supp. 3d at 663.

### 1.2.2. The CBA has associational standing.

An association may sue on behalf of its members if: "(1) the individual members would have standing to sue in their own right; (2) the organization's purpose relates to the interests being vindicated; and (3) the claims asserted do not require the participation of individual members." *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 986 (8th Cir. 2011). As this Court has previously ruled, each element of this test is present. First, "the CBA has identified the Archdiocese of Saint Paul and Minneapolis and the Diocese of Baker as non-plaintiff members withstanding to sue. Doc. No. 11 at 16." *Burrows*, 2024 WL 4315021 at *6; *see also* Cary Decl. ¶¶ 4-24; Hebda Decl., ¶¶ 4-22. Second, the CBA is organized "[t]o support Catholic employers . . . that, as part of their religious witness and exercise, provide health or other benefits to their respective employees in a

manner that is consistent with Catholic values"; and "[t]o work and advocate for religious freedom of Catholic and other employers seeking to conduct their ministries and businesses according to their religious values." Compl. ¶ 30; Compl. Ex. A, CBA Articles, art. IV. Finally, as to the third element, the relief requested is declaratory judgment and an injunction, and as such do not require the participation of individual members. *Religious Sisters of Mercy v. Becerra,* 513 F.Supp.3d 1113, 1137 (D.N.D. 2021) (citing *Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 533 (8th Cir. 2005)).

### 1.2.3.   Redressability and traceability are present.

"For pre-enforcement constitutional challenge, causation only 'requires the named defendants to possess authority to enforce the complained-of provision.'" *Burrows*, 2024 WL 4315021, at \*6 ¶ 24 (quoting *Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017)). "The issue is also redressable because the Court's decision would 'relieve a discrete injury' of potential enforcement." *Id.* (quoting *Massachusetts v. EPA*, 549 U.S. 497, 525 (2007)). "If the rules were vacated as substantively unlawful, it is indeed likely that the members' injuries would be redressed." *Burrows*, 2024 WL 4315021, at \*6 ¶ 24 (quoting *Iowa League of Cities v. EPA*, 711 F.3d 844, 870 (8th Cir. 2013)).

### 1.2.4.   The PWFA Rule and the Harassment Guidance violate RFRA (Count V).

As the Court has already concluded, the PWFA Rule and the Enforcement Guidance violate RFRA. *Burrows*, 2024 WL 4315021, at \*9 § 43. That conclusion was correct.

Congress enacted RFRA "to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). RFRA forbids government from "substantially burden[ing] a person's exercise of religion" unless the burden (1) "is in furtherance of a compelling governmental interest" and (2) "is the least restrictive means of furthering that compelling interest." 42 U.S.C. § 2000bb-1(b). "A person whose religious practices are burdened in violation

17

of RFRA 'may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief.'" *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 424 (2006) (quoting 42 U.S.C. § 2000bb-1(c)). If a substantial burden exists, then the government assumes the obligation to establish the "exceptionally demanding" strict scrutiny standard. *Hobby Lobby*, 573 U.S. at 728. RFRA requires courts to interpret the "broad protection of religious exercise" to the "maximum extent" possible. *Id.* at 696 n.5.

***Substantial Burden.*** The EEOC's interpretations of the PWFA and Title VII resulting in the PWFA Rule and the Harassment Guidance impose a substantial burden on the CBA members' religious exercise. *See, e.g.*, Compl. ¶¶ 14, 43, 129-30, 157, 159. A substantial burden is one that imposes "substantial adverse practical consequences" on an employer for following its religious beliefs or that "cause[s] the objecting party to violate its religious beliefs" to comply with the law. *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 591 U.S. 657, 692 (2020) (Alito, J., concurring) (citation omitted). The CBA members' religious beliefs prevent them from cooperating with the portions of the laws and interpretations challenged here. Compl. ¶¶ 14, 43, 129-30, 157, 159. As a result, being required to provide accommodations under the PWFA or the PWFA Rule for abortion and immoral fertility treatment, or being forced under Title VII or the Harassment Guidance to use false pronouns upon an employee's request, to refrain from expressing Catholic teaching regarding sexual issues, and to give employees of one sex access to private spaces reserved for those of the other sex would be contrary to sincerely held religious beliefs. *Burrows*, 2024 WL 4315021 at *8 ¶ 36; *see also Christian Emps. All. v. United States Equal Opportunity Comm'n*, 719 F. Supp. 3d 912, 925-26 (D.N.D. 2024) (finding substantial burden when Plaintiff "must either comply with the EEOC and HHS mandates by violating their sincerely held religious

beliefs or else face harsh consequences like paying fines and facing civil liability."). Under the PWFA and Title VII as interpreted by the EEOC under the PWFA Rule and the Harassment Guidance, CBA members face the choice of complying with laws that are manifestly contrary to their Catholic values or facing civil liability, injunctive relief, and entangling litigation by either the EEOC or private parties. *See* 42 U.S.C. § 2000gg-2(a); 42 U.S.C. § 2000e-5.

**Compelling Interest.** The EEOC does not have a compelling interest in burdening CBA members' religious beliefs. *Burrows*, 2024 WL 4315021, at *8. To meet this burden, the government must do more than identify "broadly formulated interests justifying the general applicability of government mandates." *O Centro*, 546 U.S. at 431; *see also Sharpe Holdings, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 801 F.3d 927, 937 (8th Cir. 2015).  Thus, an assertion by the EEOC of its broad "interest in combating discrimination in the workforce" will not suffice.  *Religious Sisters of Mercy v. Azar*, 513 F.Supp. 3d 1113, 1148 (D. N.D. 2021). For instance, Title VII and the PWFA exempt employers with less than 15 employees, leaving about 80 percent of private employers and millions of employees uncovered. 89 Fed. Reg. 29,096, 29,151; Richard Carlson, *The Small Firm Exemption and the Single Employer Doctrine in Employment Discrimination Law*, 80 St. John's L. Rev. 1197, 1198-99 n.14 (2006). Similarly, EEOC broadly exempts any employer facing an "undue hardship" from complying with the Final Rule. 89 Fed. Reg. 29,096, 29,205. The government cannot excuse small employers and those with cost objections while also claiming "that its non-discrimination policies can brook no departures" for the CBA's members. *Fulton v. City of Philadelphia*, 593 U.S. 522, 542 (2021). The point only grows clearer in light of numerous other exceptions to EEOC's enforcement position. *See* 42 U.S.C. §§ 2000e; 2000e-1; 2000e-2 (allowing exemptions based on, inter alia, occupational qualifications, private-membership status, and employment of

aliens). The EEOC cannot and has not articulated how granting specific exemptions for the CBA members will harm the asserted interests in preventing discrimination.

***Least Restrictive Means.*** To satisfy the least-restrictive-means test, the government must "come forward with evidence" to show that its policies "are the only feasible means . . . to achieve its compelling interest." *Sharpe Holdings*, 801 F.3d at 943. "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt v. Hobbs*, 574 U.S. 352, 365 (2015). In the RFRA context, "a regulation may constitute the least restrictive means of furthering the government's compelling interests if 'no alternative forms of regulation' would accomplish those interests without infringing on a claimant's religious-exercise rights." *Sharpe Holdings*, 801 F.3d at 943 (quoting *Sherbert v. Verner*, 374 U.S. 398, 407 (1963)). The EEOC fails to meet this high burden. This is so because Title VII provides an alternative: a religious exemption for religious employers. *See* 42 U.S.C. § 2000e-1(a). And EEOC's case-by-case approach to determining religious exemptions is "not the least restrictive means, especially in the absence of evidence supporting this position." *Christian Emps. All. v. United States Equal Opportunity Comm'n*, 719 F. Supp. 3d 912, 926 (D.N.D. 2024). Indeed, a case-by-case religious exemption application process for the 8,400-member Catholic Benefits Association would itself be extraordinarily burdensome.

Because EEOC has violated RFRA, Plaintiffs are entitled to their attorneys' fees and costs. 42 U.S.C. § 1988(b). Plaintiffs respectfully request the Court award Plaintiffs their fees and costs.

### 1.3. The PWFA Rule and the Enforcement Guidance violate the Free Exercise Clause (Count VI).

The Court need not address Plaintiffs' remaining claims. Plaintiffs' RFRA claim is sufficient to resolve the dispute between the parties. Yet if the Court disagrees that CBA is entitled to relief, the First Amendment and the APA provide additional basis to enter judgment in CBA's favor.

EEOC has violated "bedrock" Free Exercise rights in two ways. First, a policy that burdens religion while reserving discretion for the government "to decide which reasons for not complying with the policy are worthy of solicitude" must satisfy strict scrutiny. *Fulton*, 593 U.S. at 537. EEOC admits that it reserves discretion to make "case-by-case" decisions on whether accommodating a particular employee or particular situation is an "undue hardship" that can be denied. 89 Fed. Reg. 29,096, 29,205. EEOC performs this "individualized assessment" for religious objectors as well. *Id.* at 29,153. But this is precisely the "case-by-case analysis" that "is antithetical to a generally applicable policy." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 688 (9th Cir. 2023) (en banc); *see also U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 838 (N.D. Tex. 2022) (policy's allowance of "individualized assessment of the reasons" for non-compliance means "favoritism is built into the mandate" and is not generally applicable). This case-by-case approach permits EEOC to decide both whether the economic burden on an employer is sufficiently compelling to exempt that employer, *and* whether an employer's religious belief is sufficiently important to warrant an exemption on a discretionary basis. Allowing "exemptions based on the circumstances underlying each application" triggers strict scrutiny. *Fulton*, 593 U.S. at 534.

Second, if a law "treat[s] any comparable secular activity more favorably than religious exercise," it again must pass strict scrutiny. *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). But here, EEOC exempts any secular employer who can show an "undue hardship" and all employers with less than 15 employees from its mandates, exempting approximately 80 percent of private employers and leaving millions of employees uncovered. 89 Fed. Reg. 29,096, 29,151; Carlson, 80 St. John's L. Rev. 1198-99 n.14. Because EEOC chose to treat such secular interests more favorably than religious objections to abortion for "no apparent reason other than administrative convenience,"

EEOC must satisfy strict scrutiny. *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571, 613 (N.D. Tex. 2022) (EEOC interpretation of Title VII burdening religion subject to strict scrutiny because, *inter alia*, it exempted employers with fewer than 15 employees); *Youth 71Five Ministries v. Williams*, No. 24-4101, 2024 WL 3749842, at *3 (9th Cir. Aug. 8, 2024) (protecting religious hiring policies against anti-discrimination rules). Having triggered strict scrutiny, EEOC fails it for the reasons identified above under RFRA.

### 1.4. The PWFA Rule and the Enforcement Guidance violate CBA members' right to free speech (Count IV).

The PWFA rule and the Enforcement Guidance violate the Free Speech Clause in two ways: (1) compelling CBA members to associate with employees whose conduct and speech undermines their religious expression and (2) restricting CBA members' religious speech and compelling them to accommodate messages of which they disapprove.

EEOC's mandate violates the right of "expressive association." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). "'[I]mplicit in the right to engage in activities protected by the First Amendment' is 'a corresponding right to associate with others in pursuit of'" those activities. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (same). This freedom of association "plainly presupposes a freedom not to associate," and thus prevents an expressive association from being "forc[ed] … to accept members it does not desire." *Id.* at 648. A group's associational rights are burdened when it "engage[s] in some form of expression" and when the forced association would "significantly affect [its] ability to advocate" for its viewpoints. *Id.* at 648, 650. A court must "give deference to [the] association's assertions regarding the nature of its expression" and its "view of what would impair [that] expression." *Id.* at 653. EEOC's requirements burden CBA members' expressive association rights.  First, "[r]eligious groups" like those led by the CBA members are

"the archetype of associations formed for expressive purposes," since their "very existence is dedicated to the collective expression and propagation of shared religious ideals." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 200 (2012) (Alito, J., joined by Kagan, J., concurring). That applies to the CBA and its members. *See* Compl. ¶¶ 14, 30, 33, 43; Compl. Ex. A, CBA Articles, art. IV (Doc. 1-1); Cary Decl. ¶¶ 15-17, 20-21, 24; Hebda Decl., ¶¶ 8, 10-11, 13-16.

Second, EEOC's mandate violates CBA members' free speech rights by censoring their religious speech within their ministries and by compelling them to permit messages that violate their beliefs. Both compelled speech and compelled silence are "presumptively unconstitutional." *NIFLA v. Becerra*, 585 U.S. 755, 766 (2018). This is true for religious speech, since "the Free Speech Clause provides overlapping protection for expressive religious activities" that, along with the Free Exercise Clause, "doubly protects religious speech." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022). The PWFA Rule states that it "broadly" prohibits anything that "might have dissuaded a reasonable worker" from seeking accommodations, including "interfer[ing]" in a request, "issuing a policy or requirement that purports to limit" seeking accommodations, or disciplining an employee for "assist[ing] a coworker in requesting" accommodation. 89 Fed. Reg. 29,096, 29,214-18. The Rule also bars "unwelcome, critical comments." *Id.* at 29,218. And the Enforcement Guidance prohibits "misgendering" an employee.  Enforcement Guidance at 17-18, § II(A)(50(c) (Doc. 22-1). These provisions prohibit CBA members from informing applicants and employees of their current employment policies and beliefs regarding abortion, immoral infertility treatments, and biological sex. They also limit the CBA members' ability to encourage workers to make decisions consistent with Catholic teaching.

**1.5. The PWFA Rule violates the Administrative Procedure Act (Counts I-III).**

Defendants are "agencies" under the APA, 5 U.S.C. § 551(1). The PWFA Rule is a "rule" under the APA. 5 U.S.C. § 551 and "final agency action" subject to judicial review. 5 U.S.C. § 704. The APA prohibits agency actions that are "not in accordance with law," "in excess of statutory… authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). The PWFA Rule is not in accordance with law for several independent reasons.

The PWFA Rule requires employers to accommodate direct abortion and immoral fertility treatments. It is not in accordance with the PWFA statutory text, which does require employers to accommodate abortion or immoral fertility treatments. Accordingly, the PWFA Rule exceeds the EEOC's authority and is contrary to the PWFA statute.

Under the APA, courts are "not obliged to stand aside and rubberstamp" administrative decisions that are "inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Friends of Boundary Waters Wilderness v. Bosworth*, 437 F.3d 815, 821 (8th Cir. 2006) (quoting *Nat'l Lab. Rel. Bd. v. Brown*, 380 U.S. 278, 291, (1965)). An agency administrative decision may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory . . . authority," or "without observance of procedure required by law." *Id.* § 706(2). Indeed, "[i]f congressional intent is clearly discernable, the agency must act in accordance with that intent and the court need not defer to the agency's interpretation of its mandate." *Ark. AFL-CIO v. F.C.C.*, 11 F.3d 1430, 1440 (8th Cir. 1993). Courts "start" this inquiry "with the text." *Sackett v. Env't Prot. Agency*, 598 U.S. 651, 671 (2023); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012) ("[T]he best evidence of Congress's intent is the statutory text.").

24

**Statutory text.** The PWFA text is clear: abortion and immoral fertility treatment are not covered by the new law. The PWFA requires that employers accommodate "known limitations related to [] pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg-1(1). Abortion and fertility treatment are not mentioned anywhere in the text. Moreover, "known limitations" include "physical or mental conditions," none of which can be understood as covering direct abortion, which is a voluntary decision to terminate a pregnancy, not a "condition" that is related to pregnancy. Likewise with immoral fertility treatment, those actions are, by definition, attempts to bring about a pregnancy, not a limitation or condition of pregnancy that al-ready has come into existence. For this reason, when it comes to Title VII, a "condition" related to pregnancy has been found to include things that are "initiated by pregnancy" not attempts to bring about pregnancy that does not already exist. *See generally E.E.O.C. v. Houston Funding II, Ltd.*, 717 F.3d 425, 429 (5th Cir. 2013).

**Legislative history.** The PWFA's legislative history, as summarized by the Ethics and Public Policy Center, affirms the lack of any application to abortion or immoral fertility treatment.

> One of the PWFA's cosponsors, Senator Bill Cassidy (R-LA), explained that the PWFA was meant to help ensure "a safe environment for pregnant women and their unborn children in the workplace," calling the Act "pro-mother" and "pro-baby."[5]

> When abortion concerns in the PWFA were raised on the Senate floor by Senator Thom Tillis (RNC) on behalf of himself and Senators James Lankford (R-OK) and Steve Daines (R-MT), Cassidy responded, "I reject the characterization that [the PWFA] would do anything to promote abortion."[6] Lead Democrat co-sponsor Senator Bob Casey agreed, explaining that the EEOC "could not … issue any regulation that requires abortion leave, nor does the act permit the EEOC to require employers to provide abortions in violation of State law."[7]

---

[5] 168 Cong. Rec. S7,049, 7,050 (daily ed. Dec. 8, 2022), https://www.congress.gov/congressional-record/volume-168/issue-191/senate-section/article/S7049-2.

[6] 168 Cong. Rec. at S7,050.

[7] 168 Cong. Rec. S7,049-52.

[T]he bill sponsors' statements were never contradicted by any Democrat member of Congress. . . . During the passage of the Act, Senator Steve Daines (R-MT) stated:

> [T]he purpose of the [PWFA] is to help pregnant mothers in the workplace receive accommodations so that they can maintain a healthy pregnancy and childbirth. Therefore, I want to make clear for the record that the terms "pregnancy" and "related medical conditions," for which accommodations to their known limitations are required under the legislation, do not include abortion.

> On December 8, the sponsor of this legislation, Senator Bob Casey stated on the Senate floor as follows: "I want to say for the record, however, that under the act, under the Pregnant Workers Fairness Act, the Equal Opportunity Employment Commission, the EEOC, could not—could not—issue any regulation that requires abortion leave, nor does the act permit the EEOC to require employers to provide abortions in violation of State law."[8]

After the EEOC issued its proposed rule, Cassidy called out the EEOC for "go[ing] rogue" and "completely disregard[ing] legislative intent and attempt[ing] to rewrite the law by regulation."[9]

Ethics and Public Policy Center, Comment Letter on Regulations to Implement the Pregnant Workers Fairness Act Proposed Rule (October 10, 2023), https://eppc.org/wp-content/uploads/2023/10/EPPC-Scholar-Comment-EEOC-Regulations-to-Implement-the-Pregnant-Workers-Fairness-Act.pdf.

***Major Questions Doctrine***. The major questions doctrine provides additional reason to reject the EEOC's efforts to change the meaning of the PWFA by creating a mandate to accommodate abortion and immoral fertility treatment. Abortion is a paradigmatic example of a major question

---

[8] 168 Cong. Rec. S10,081 (daily ed. Dec. 22, 2022), https://www.congress.gov/congressional-record/volume-168/issue-200/senate-section/article/S10081-2.

[9] *Ranking Member Cassidy Blasts Biden Administration for Illegally Injecting Abortion Politics into Enforcement of Bipartisan PWFA Law*, U.S. Comm. Health, Educ., and Labor, and Pensions, Aug. 8, 2023, https://www.help.senate.gov/ranking/newsroom/press/ranking-member-cassidy-blasts-biden-administration-for-illegally-injecting-abortion-politics-into-enforcement-of-bipartisan-pwfa-law.

of national importance. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 229, 269 (2022). Congress does not inadvertently legislate on the topic of abortion.  The major questions doctrine prevents agencies from "highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 597 U.S. 697, 723-24 (2022) (rejecting "delegation claimed to be lurking" in ambiguous statutory text). In *West Virginia*, the Supreme Court reasoned that "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" *Id.* at 723. If agencies are to regulate in areas of national concern, Congress must clearly express an intent to delegate such authority to the agency. *See NFIB v. OSHA*, 595 U.S. 109, 124 (2022) (Gorsuch, J., concurring) ("If administrative agencies seek to regulate the daily lives and liberties of millions of Americans . . . they must at least be able to trace that power to a clear grant of authority from Congress."); *Biden v. Nebraska,* 143 S. Ct. 2355, 2380 (2023) (Barrett, J., concurring) (similar). Absent a "clear delegation," the agency is not free to regulate on the subject of major questions. *See Biden*, 143 S. Ct. at 2374 (rejecting agency attempt to permit student loan forgiveness).

Consistent with the PWFA's clear text and uniform legislative history, the EEOC cannot claim to have authority to create new substantive regulations governing the major questions of abortion accommodation and immoral infertility accommodation without providing a "clear congressional authorization." *West Virginia*, 597 U.S. at 722-23. There is no such clear congressional authorization here. Even the EEOC admits that the PWFA lacks "an explicit mention of abortion." 89 Fed. Reg. 29,096, 29,111. Just the opposite; the PWFA provides a specific carve-out for health insurance coverage whereby the PWFA cannot "require an employer-sponsored health plan to pay for or cover any particular item, procedure, or treatment," which would include any attempt to mandate

27

insurance coverage for abortion or immoral infertility treatment, among others. 42 U.S.C. §
2000gg-5(a)(2). Congress did not give the EEOC the authority to add an abortion or immoral in-
fertility requirement to the PWFA.

***Eviscerating the Statutory Religious Exemption.*** The PWFA Rule also violates the APA by
narrowing the religious employer exemption to make it pointless. According to the EEOC, the ref-
erence to the religious exemption in Title VII, grafted into the PWFA, 42 U.S.C. § 2000gg-5(b),
must be narrowed to cover only claims of religious-status discrimination. 89 Fed. Reg. 29,096,
29,146-47 n.239. This is mistaken. Title VII's religious exemption extends beyond mere religious
status discrimination and protects religious belief and conduct of the exempt employers. *See* 42
U.S.C. §§ 2000e-1(j), 2000e-1(a) (protecting religious employers with regard to an employee's "re-
ligious observance and practice"); *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 229
(3d Cir. 2007) (collecting cases). Here, the PWFA does not prohibit religious status or class dis-
crimination, making the EEOC's narrow interpretation of the exemption a nullity. *See Mountain
States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249 (1985) (describing "elementary
canon of construction that a statute should be interpreted so as not to render one part inopera-
tive.") (quotation and citation omitted).

The better interpretation would apply the exemption to allow "faith-based organizations to
employ only those people 'whose beliefs and conduct are consistent with the employer's religious
precepts.'" Stephanie Philips, *A Text-Based Interpretation of Title VII's Religious-Employer Exemp-
tion,* 20 Tex. Rev. L. & Pol. 295, 302, 317, 338, 340 (2016). The Title VII religious exemption pro-
tects religious entities from the scope of the "subchapter," all of Title VII, not merely the narrow
category of religious class discrimination. See *Starkey v. Roman Catholic Archdiocese of Indianapolis*,

41 F.4th 931, 946 (7th Cir. 2022) (Easterbrook, J., concurring) (broadly construing religious exemption in Title VII); *Bear Creek*, 571 F. Supp. 3d at 590 (N.D. Tex. 2021) ("Read plainly [] Title VII does not apply to religious employers when they employ individuals based on religious observance, practice, or belief."). Contrary to the PWFA Rule, then, Title VII's religious exemption is not so flimsy as to exempt religious employers *only* "from Title VII's prohibition against discrimination on the basis of religion." 89 Fed. Reg. 29,096, 29,146. Rather, it protects religious employers from *any* Title VII claim if they made an employment decision based on an individual's particular religious belief, observance, or practice.

*Canon of Constitutional Avoidance.* Finally, the canon of constitutional avoidance counsels against the EEOC's interpretation of the PWFA.  Under constitutional avoidance "a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018); *Union Pac. Ry. Co. v. U.S. Dep't of Homeland Sec.*, 738 F.3d 885, 900 (8th Cir. 2013) (describing "hallowed rules of constitutional avoidance" and choosing to "avoid these 'difficult and sensitive questions'" by interpretation).

There are a plethora of constitutional issues arising from the PWFA Rule. Consider just four examples. (1) Strict scrutiny is required under the Free Exercise Clause because the PWFA Rule is not neutral and generally applicable due to its statutory religious exemption and its exclusion of employers with fewer than fifteen employees. *Church of Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 546 (1993). (2) Under the Free Exercise Clause, strict scrutiny applies when the law categorically exempts some for secular reasons but denies categorical exemption for religious reasons, as PWFA does here for organizations employee less than 15 people. *Fraternal Order of Police*

*Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999). (3) The EEOC has taken the position thirty-three times in the PWFA Rule that it may only determine the applicability the mandates to particular employers on a "case-by-case" basis. If this were so, strict scrutiny is required when "individualized [] assessment" is necessary to determine the applicability of a law burdening religious exercise. *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 883-84 (1990). (4) First Amendment analysis is required when a law forces an employer to employ a person to represent it "who behaves in a manner directly violative of the company's convictions . . . and inhibits the practice of [the employer's] beliefs." *Braidwood,* 70 F.4th at 938.

**1.6. Plaintiffs will suffer irreparable harm without permanent injunctive relief.**

As the Court has previously concluded, CBA members will suffer irreparable harm absent injunctive relief. *Burrows*, 2024 WL 4315021, at *9 ¶ 44. This is because "the loss of freedoms guaranteed by . . . RFRA . . . constitute per se irreparable harm." *Franciscan All.*, 47 F.4th at 380 (citing *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 294 (5th Cir. 2012)); *see also Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 608–09 (8th Cir. 2022) (footnotes omitted). Because the CBA will succeed on the merits of its RFRA claim, irreparable harm is established in this case.

**1.7. The balance of the equities and the public interest favor permanent injunctive relief.**

As the Court has previously concluded, the balance of the equities and the public interest favor injunctive relief. *Burrows*, 2024 WL 4315021, at *9 ¶¶ 45-48. Since CBA members are likely to succeed, EEOC must "present powerful evidence of harm to [their] interests" to prevent CBA members from meeting the balancing requirement. *Opulent Life Church*, 697 F.3d at 297. Here, the harms faced by CBA members are severe, and the harms to government are minimal. The EEOC admits that both the PWFA and Title VII exempt employers with fewer than fifteen employees. "[W]here the regulation [is underinclusive and] fails to address significant influences that impact

the purported interest, it usually flushes out the fact that the interest does not rise to the level of being 'compelling' . . . enough to justify abridging core constitutional rights." *281 Care Comm. v. Arneson*, 766 F.3d 774, 785 (8th Cir. 2014) (second alteration in original) (citations omitted). The public interest "factor overlaps considerably with the previous one, and most of the same analysis applies." *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015). "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). It is not in the public interest to force CBA members, contrary to their Catholic faith, to accommodate their employees' abortions and immoral infertility treatments, to use false pronouns, to abstain from expressing Catholic teaching regarding sexual issues, and to give employees of one sex access to private spaces reserved to those of the other sex.

On the other side of the ledger, the government identifies no particularized, let alone compelling, equities that favor of forcing Catholic employers to accommodate direct abortion or treat gender transition in ways contrary to sincere religious beliefs. At most, the government points to an interest in supporting women in seeking an abortion or employees in not being subject to pronoun use with which they disagree. Neither stands up to scrutiny. When it comes to respecting the freedom of religious employers to organize their affairs consistent with religious beliefs courts have regularly declined to allow the government to point to claimed impact on employees. That same theory of third party harm was repeatedly raised in the plethora of contraceptive mandate cases and rejected by courts up to the U.S. Supreme Court. *Hobby Lobby*, 573 U.S. at 729 n.37 (2014) ("Nothing in the text of RFRA or its basic purposes supports giving the Government an entirely free hand to impose burdens on religious exercise so long as those burdens confer a benefit on other individuals . . .. By framing any Government regulation as benefiting a third party, the Government

could turn all regulations into entitlements to which nobody could object on religious grounds, rendering RFRA meaningless."). Even if the government has a generalized interest in the harms of employees that consideration must be understood in the context of this litigation: does the government have an interest in *forcing these religious employers* to provide accommodation to hostile employees. The public interest and equities from the general application of the government's chosen position cannot be applied to Catholic employers without a far more particularized showing that the government has even attempted here.

**2. Plaintiffs' requested relief is proper.**

Plaintiffs respectfully request that the Court (1) declare Plaintiffs and CBA members' rights vis-à-vis the PWFA Rule and the Enforcement Guidance, (2) enjoin Defendants from enforcing the PWFA Rule and Enforcement Guidance, and (3) award Plaintiffs their reasonable costs and attorneys' fees.

Plaintiffs' request for declaratory relief is proper because there is an actual controversy between the parties, and the parties' interests are adverse. On the one hand, CBA Plaintiffs and their members wish to operate their organizations consistent with their Catholic faith and their constitutional rights. On the other hand, Defendants wish to force CBA Plaintiffs and their members to violate their faith and accommodate employee conduct that is actively hostile to Catholic belief. This kind of dispute falls squarely within the purpose of the Declaratory Judgment Act "to settle 'actual controversies' before they ripen into violations of law or breach of some contractual duty." *Braidwood*, 70 F.4th at 926.

In conferral, Defendants have taken issue with the aspect of Plaintiffs' requested declaratory relief that would declare neither the PWFA nor Title VII require "CBA Plaintiffs [or their] members to accommodate [their] employees' direct abortion, or immoral fertility treatments;

[facilitation of the same;] speak or communicate in favor of direct abortion, immoral fertility treatments, or gender transition when such is contrary to the Catholic faith; refrain from speaking or communicating against the same when such is contrary to the Catholic faith; use pronouns inconsistent with a person's biological sex; or allow persons to use private spaces reserved for the opposite sex." Compl. at 51-52 ¶¶ A-B. But this declaration is necessary because both the PWFA Rule and the Enforcement Guidance create speech codes that prohibit Catholic employers from speaking consistently with Catholic values regarding the sanctity of life and prohibit them from taking disciplinary action against employees who speak inconsistently with those values. Enforcement Guidance at 14-18 § II(A)(5) (Doc. 22-1); 89 Fed. Reg. 29,096, 29,188; 29 C.F.R. §§ 1636.1(6) and 1636.5(f). A declaration from this Court will provide much needed clarity to Plaintiffs and their members that they can operate their organizations consistent with their faith.

Plaintiffs' second request for injunctive relief is necessary to protect Plaintiffs and their members from unlawful enforcement actions as explained previously in this memorandum. Absent an injunction of the PWFA Rule and Enforcement Guidance, Plaintiffs live under a credible threat that continuing to operate according to Catholic values risks ruinous penalties.

In conferral and during oral argument on the preliminary injunction motion, Defendants objected to the Court's enjoining Defendants from issuing notice-of-right-to sue letters ("NRTS"). 29 C.F.R. § 1601.28. But the Court's preliminary injunction was proper and should be made permanent. The NRTS often includes a determination by EEOC that "the Commission has found reasonable cause" for the employee's charge, which under these circumstances would entail a rejection of the employer's rights to religious freedom. 29 C.F.R. § 1601.28 (b)(1) ("Where the Commission has found reasonable cause to believe that title VII . . . or the PWFA has been violated, and

33

where the Commission has decided not to bring a civil action against the respondent, it will issue a notice of right to sue on the charge."). "A letter to an employee from an agency detailing a right to sue is still a determination of the agency that the organization is not subject to a religious exemption, which would bar any suit." *Burrows*, 2024 WL 4315021, at *10.

Declaratory relief is regularly issued in litigation involving government violation of Constitutional rights. *See, e.g.*, *Religious Sisters of Mercy v. Cochran*, 2021 WL 1574628, at *1 (D.N.D. Feb. 19, 2021) (entering declaratory and injunctive relief in favor of the CBA); *Braidwood*, 70 F.4th at 926 (affirming entry of declaratory relief in similar case). This case is no different. Two additional courts have enjoined EEOC from issuing NRTS in relation to the PWFA. *Texas*, 719 F. Supp. 3d at 558-59; *Louisiana*, 705 F. Supp. 3d at 664. As the Court explained in *Garland*, an injunction of the NRTS is proper here because Final Rule is "unconstitutional" and therefore the "enforcement powers that the" PWFA Rule "purports to give the defendants are themselves unconstitutional." *Garland*, 719 F. Supp. 3d at 558. Defendants' enforcement powers include the NRTS. *Id.*

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant them declaratory relief and a permanent injunction along with injunctive relief as set forth in the motion filed simultaneously herewith. Plaintiffs also request that the Court award reasonable attorneys' fees and costs.

DATED: November 12, 2024.

Respectfully submitted,

*/s/ L. Martin Nussbaum*
L. Martin Nussbaum
Andrew Nussbaum
First & Fourteenth PLLC
2 N. Cascade Ave., Suite 1430
Colorado Springs, CO 80903

34

(719) 428-2386
martin@first-fourteenth.com
andrew@first-fourteenth.com

and

Michael Francisco*
First & Fourteenth PLLC
800 Connecticut Ave NW, Suite 300
Washington, DC 20006
(202) 754-0522
michael@first-fourteenth.com
*(application for admission forthcoming)

*Attorneys for Plaintiffs*